**2014-1372**

---

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

**KFX MEDICAL CORPORATION,**

Plaintiff-Appellee,

**v.**

**ARTHREX, INC.,**

Defendant-Appellant.

---

Appeal from the United States District Court for the Southern District of California
in case no. 3:11-cv-01698, Judge Dana M. Sabraw.

---

**NON-CONFIDENTIAL BRIEF FOR DEFENDANT-APPELLANT
ARTHREX, INC.**

---

Robert W. Dickerson
DICKSTEIN SHAPIRO LLP
2049 Century Park East, Suite 700
Los Angeles, CA 90067-3109
Telephone: (310) 772-8317

Charles W. Saber
Salvatore P. Tamburo
Megan S. Woodworth
S. Gregory Herrman
DICKSTEIN SHAPIRO LLP
1825 Eye Street NW
Washington, DC 20006-5403
Telephone: (202) 420-2200

Attorneys for Defendant-Appellant

Dated: June 23, 2014

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## KFX MEDICAL CORPORATION, v. ARTHREX, INC.

### No. 2014-1372

### <u>CERTIFICATE OF INTEREST</u>

Counsel for Defendant-Appellant, Arthrex, Inc. certifies the following:

1.      The full name of every party represented by me is:

      Arthrex, Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

      N/A

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

      None

4.      The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or are expected to appear in this court are:

      DICKSTEIN SHAPIRO LLP:  Robert W. Dickerson, Charles W. Saber, Salvatore P. Tamburo, Megan S. Woodworth, S. Gregory Herrman

Dated:  April 7, 2014        By:  /s/ Robert W. Dickerson

Robert W. Dickerson
DICKSTEIN SHAPIRO LLP
2049 Century Park East, Suite 700
Los Angeles, CA 90067-3109
Tel.: (310) 772-8317
Fax: (310) 772-8301
DickersonR@dicksteinshapiro.com

Counsel for Defendant-Appellant

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ....................................................................1

STATEMENT OF JURISDICTION...................................................................2

STATEMENT OF ISSUES ON APPEAL ..............................................................3

STATEMENT OF THE CASE SETTING OUT THE FACTS RELEVANT TO THE ISSUES ....................................................................................4

    I.      INTRODUCTION...............................................................................4

    II.    KFX'S PATENTS ..........................................................................7

        A.    The First (Medial) Anchor ....................................................9

        B.    The Second (Lateral) Anchor...................................................12

    III.   THE PRIOR ART RELEVANT TO THIS APPEAL........................15

        A.    The Millett Work ..................................................................15

        B.    The Greenfield Patent .............................................................16

    IV.   ARTHREX'S DEVELOPMENT OF ITS BRIDGING METHOD....18

        A.    Arthrex Instructs Surgeons To Insert the First Anchor into Bone Without Being Underneath the Soft Tissue....................19

        B.    There is *No* Tensioning of the Suture *After* the Lateral Anchor is Inserted into the Bone .............................................20

    V.    PROCEEDINGS IN THIS LAWSUIT .............................................24

        A.    *Markman* Proceedings .............................................................25

        B.    Summary Judgment Proceedings...........................................26

        C.    Trial and Post-Trial Proceedings .............................................27

SUMMARY OF ARGUMENT .......................................................................29

ARGUMENT ...............................................................................................31

I.   STANDARD OF REVIEW ................................................................31

II.  THE DISTRICT COURT ERRED IN DENYING JUDGMENT
     OF NON-INFRINGEMENT TO ARTHREX BECAUSE
     ARTHREX'S ANCHORS ARE *NOT* POSITIONED
     UNDERNEATH THE TISSUE WHEN INSERTED INTO BONE ..32

III. ARTHREX IS ENTITLED TO JUDGMENT OF NON-
     INFRINGEMENT UNDER THE CORRECT CONSTRUCTION
     OF "INSERTING [AN] ANCHOR INTO BONE" ...........................38

     A.   "Inserting [an] Anchor Into Bone" Means the Anchor Must
          Be Put or Placed Securely in the Bone .....................................38

     B.   Under this Correct Construction, Arthrex's Accused
          Methods Do Not Infringe as a Matter of Law ..........................41

IV.  THE DISTRICT COURT ERRED IN DENYING ARTHREX
     JUDGMENT AS A MATTER OF LAW THAT KFX'S
     PATENTS ARE OBVIOUS IN VIEW OF MILLETT AND
     GREENFIELD ....................................................................................46

     A.   Legal Standard For Obviousness ..............................................46

     B.   The Evidence Overwhelmingly Supports a Finding of
          Obviousness as a Matter of Law in View of the
          Combination of the Millett Work and Greenfield ....................48

V.   ARTHREX IS ENTITLED TO JUDGMENT OF NO INDUCED
     INFRINGEMENT ..............................................................................59

     A.   Legal Standard for Inducement ................................................59

     B.   KFx Failed to Provide Sufficient Evidence that Arthrex
          Knew of the Infringement .........................................................60

     C.   Knowledge of Infringement Cannot be Shown Where
          Arthrex Presented Objectively Reasonable Defenses ...............65

CONCLUSION .......................................................................................67

# CONFIDENTIAL MATERIAL OMITTED

Confidential material subject to protective order has been deleted from the nonconfidential version of this brief. The deleted portions on pages 12 and 36 describe information designated confidential by KFx, including competitor information.

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allergen, Inc. v. Duke Univ.,*
No. 2013-1249, slip op. (Fed. Cir. June 10, 2014) ............................................57

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assoc., Inc.,*
682 F.3d 1003 (Fed. Cir. 2012) ............................................................66

*Bos. Scientific Scimed, Inc. v. Cordis Corp.,*
554 F.3d 982 (Fed. Cir. 2009) .......................................................47, 50

*Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc.,*
725 F.3d 1341 (Fed. Cir. 2013) ............................................................37

*Commil USA, LLC v. Cisco Sys., Inc.,*
720 F.3d 1361 (Fed. Cir. 2013) ......................................................61, 65

*Cybor Corp. v. FAS Techs., Inc.,*
138 F.3d 1448 (Fed. Cir. 1998) ......................................................31, 32

*Daiichi Sankyo Co., Ltd. v. Apotex, Inc.,*
501 F.3d 1254 (Fed. Cir. 2007) ............................................................50

*Dow Chemical Co. v. Halliburton Oil Well Cementing Co.,*
324 U.S. 320 (1945) ............................................................................56

*Global-Tech Appliances, Inc. v. SEB, SA,*
563 U.S. __, 131 S.Ct. 2060 (2011) ...............................................*passim*

*Graham v. John Deere,*
383 U.S. 1 (1966) ................................................................32, 46, 50

*Hoechst Celanese Corp. v. BP Chemicals Ltd.,*
78 F.3d 1575 (Fed. Cir. 1996) ............................................................35

*In re Applied Materials, Inc.,*
692 F.3d 1289 (Fed Cir. 2012) ............................................................58

*In re Seagate Tech., LLC,*
   497 F.3d 1360 (Fed. Cir. 2007) (en banc) ...................................62, 66

*Jungersen v. Ostby & Barton Co.,*
   335 U.S. 560 (1949)..........................................................................56

*Knorr-Bremse System Fuer Nutzahrzeuge v. Dana Corp.,*
   383 F.3d 1337 (Fed. Cir. 2004) ..................................................62, 63

*KSR Int'l Co. v. Teleflex Inc.,*
   550 U.S. 398 (2007)...................................................................passim

*Laryngeal Mask Co., Ltd. V. Ambu A/S,*
   618 F.3d 1367 (Fed. Cir. 2010) .......................................................37

*Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.,*
   485 F.3d 1157 (Fed. Cir. 2007) .......................................................56

*Mikkelsen Graphic Eng'g Inc. v. Zund Am., Inc.,*
   2011 U.S. Dist. LEXIS 141548 (E.D. Wis. Dec. 8, 2011) ................62

*Motorola, Inc. v. Interdigital Tech. Corp.,*
   121 F.3d 1461 (Fed. Cir. 1997) .......................................................56

*Muniauction, Inc. v. Thomson Corp.,*
   532 F.3d 1318 (Fed. Cir. 2008) ..................................................47, 49

*O.I. Corp. v. Tekmar Co.,*
   115 F.3d 1576 (Fed. Cir. 1997) .......................................................36

*O2 Micro International v. Beyond Innovation Technology Co.,*
   521 F.3d 1351 (Fed. Cir. 2008) .......................................................33

*Pause Tech., LLC v. TiVo, Inc.,*
   419 F.3d 1326 (Fed. Cir. 2005) .......................................................38

*Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005) .................................................passim

*Randall Mfg. v. Rea,*
   733 F.3d 1355 (Fed. Cir. 2013) .......................................................54

*Renishaw PLC v. Marposs Societa'*
  158 F.3d 1243 (Fed. Cir. 1998) ...................................................32, 41

*Richardson Vicks, Inc. v. Upjohn Co.,*
  122 F.3d 1476 (Fed. Cir. 1997) .........................................................47

*Rothman v. Target Corp.,*
  556 F.3d 1310 (Fed. Cir. 2009) .........................................................56

*Ruiz v. A.B. Chance Co.,*
  357 F.3d 1270 (Fed. Cir. 2004) ...................................................47, 55

*Safeco Insurance Co. v. Burr,*
  551 U.S. 47 (2007)..............................................................................66

*Sciele Pharma, Inc. v. Lupin, Ltd.,*
  684 F.3d 1253 (Fed. Cir. 2012) .........................................................49

*SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.,*
  225 F.3d 1349 (Fed. Cir. 2000) .........................................................32

*Soverain Software LLC v. Newegg Inc.,*
  705 F.3d 1333 (Fed. Cir. 2013) ...................................................49, 50

*Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.,*
  620 F.3d 1305 (Fed. Cir. 2010) .........................................................66

*SynQor, Inc. v. Artesyn Tech., Inc.,*
  709 F.3d 1365 (Fed. Cir. 2013) .........................................................50

*Tandom Corp. v. U.S. Intern. Trade Com'n,*
  831 F.2d 1017 (Fed. Cir. 1987) .........................................................35

*Technology Patents LLC v. T-Mobile (UK) Ltd.,*
  700 F.3d 482 (Fed. Cir. 2012) ...........................................................37

*Telemac Cellular Corp. v. Topp Telecom, Inc.,*
  247 F.3d 1316 (Fed. Cir. 2001) .........................................................45

*Toro Co. v. White Consol. Indus., Inc.,*
  199 F.3d 1295 (Fed. Cir. 1999) ...................................................35, 36

*Vita-Mix Corp. v. Basic Holding, Inc.,*
581 F.3d 1317 (Fed. Cir. 2009) ..........................................................61

*Voice Technologies Group, Inc. v. VMC Systems, Inc.,*
164 F.3d 605 (Fed. Cir. 1999) ............................................................35

*Warner-Lambert Co. v. Apotex Corp.,*
316 F.3d 1348 (Fed. Cir. 2003) ..........................................................61

*Wyers v. Master Lock Co.,*
616 F.3d 1231 (Fed. Cir. 2010) ..........................................................46

## STATUTES

35 U.S.C. § 103(a) .................................................................................46

35 U.S.C. § 271(b) ...........................................................................57, 61

28 U.S.C. § 1295 .....................................................................................2

28 U.S.C. § 1331 .....................................................................................2

28 U.S.C. § 1338(a) .................................................................................2

## STATEMENT OF RELATED CASES

Appellant states that there has been no other appeal in or from this same civil action that was previously before this or any other appellate court.  Appellant is also unaware of any case pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

# STATEMENT OF JURISDICTION

This action arises under the Patent Laws of the United States, Title 35, United States Code.  The district court had subject matter jurisdiction over this patent infringement action under 28 U.S.C. §§ 1331 and 1338(a).  On October 17, 2013, the United States District Court for the Southern District of California entered a final judgment against Defendant-Appellant Arthrex, Inc. and in favor of Plaintiff-Appellee KFx Medical Corp and subsequently denied Arthrex's JMOL/new trial motions.  A12-14; A1-6.   Arthrex timely filed a notice of appeal on March 19, 2014.  A18127-130.  This Court has jurisdiction under 28 U.S.C. § 1295.

## STATEMENT OF ISSUES ON APPEAL

The issues on appeal are:

i) whether the district court erred in construing KFx's patents in a way that resulted in its failure to grant judgment of non-infringement to Arthrex, where the plain meaning of KFx's patent claims require that the medial anchor be inserted into bone while positioned underneath the soft tissue, and Arthrex does not promote such a step;

ii) whether Arthrex is entitled to judgment under the correct construction of "inserting [an] anchor into bone," where the district court failed to construe the actual claim term requested by the parties, and as a result, incorrectly construed the term by failing to consider the proper intrinsic evidence;

iii) whether the district court erred in denying Arthrex's JMOL that KFx's patents are obvious over the Millett/Greenfield combination, where Millett discloses every limitation of the claims except that the suture is fixedly secured to the second (lateral) anchor without tying a knot, and where Greenfield discloses a knotless two-piece anchor that is functionally identical to KFx's lateral anchor; and

iv) whether the district court erred in denying JMOL that Arthrex does not induce infringement where KFx produced no legally relevant evidence showing that Arthrex had knowledge of the alleged infringement.

**STATEMENT OF THE CASE SETTING OUT THE FACTS RELEVANT
TO THE ISSUES**

## I.    INTRODUCTION

This is a case about performing surgery to re-attach tissue (such as a tendon)
that has been torn away from bone.  KFx Medical Corp. ("KFx") asserted three
patents, U.S. Patent No. 7,585,311 ("the '311 patent") (A77-114), and two patents
from this family, U.S. Patent Nos. 8,100,942 ("the '942 patent") (A115-149), and
8,109,969 ("the '969 patent") (A150-184) (collectively, "the KFx patents") against
Arthrex, Inc. ("Arthrex"), alleging that Arthrex indirectly infringed the KFx
patents through its promotion of two surgical procedures called "SutureBridge"
and "SpeedBridge."  A185-239; A323-336.

The KFx patents describe and claim a method where two or more suture
anchors are connected together ("bridged") by suture.  In commercial use (and in
many of the claims), four anchors (two under the tissue to be repaired ("medial"
anchors) and two next to the tissue ("lateral" anchors) are connected by sutures in a
criss-cross pattern.  Fig. 3C of KFx's patent (annotated), shown below, depicts this
arrangement that is commonly referred to as a "suture bridge" technique.



FIG. 3C

KFx's patents describe and claim specific methods of performing a suture bridging technique; methods that KFx's inventor admitted are "very different" than Arthrex's promoted techniques.  A8235 at 134.  The district court, however, made a series of pretrial rulings that effectively eliminated these important distinctions.  As a result of those rulings, KFx was able to claim that Arthrex's procedures, *ones that KFx consciously and specifically decided **not** to pursue*, are covered by its patents.  That cannot be correct, and those pretrial rulings (related to inserting the first anchor underneath the tissue and the meaning of inserting an anchor into bone) form the basis of Arthrex's non-infringement appeal.

Moreover, KFx's patents are invalid as obvious by the combination of prior work performed by Dr. Peter Millett ("Millett" or "the Millett Work") and U.S. Patent No. 5,584,835 ("Greenfield").  A3098-3116.  The Millett Work, which also discloses four anchors connected by criss-crossed sutures, is essentially identical to KFx's methods except that the sutures are not secured to the "lateral" anchors without tying a knot.  Greenfield, however, discloses that missing feature; a

5

knotless two-piece lateral anchor that is functionally identical to the lateral anchor described and claimed in KFx's patents.

Notwithstanding these teachings, the district court upheld the jury's "ultimate conclusion" of non-obviousness because it believed the jury's verdict was "supported by substantial evidence." A3. That was error, as both the Supreme Court and this Court have stated over and over again, obviousness is a legal analysis that must be independently performed by the court. The proper analysis under the "expansive and flexible" standards set forth is *KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398 (2007), overwhelmingly shows that the Millett/Greenfield combination renders the KFx patent claims invalid.

Finally, judgment of no induced infringement should be entered for Arthrex because KFx offered no legally relevant evidence (let alone substantial evidence) that Arthrex knew (or was willfully blind) that the acts by the surgeons (the alleged direct infringers) constituted infringement of KFx's patents. *Global-Tech Appliances, Inc. v. SEB, SA,* 563 U.S. __, 131 S.Ct. 2060, 2068 (2011). For example, the principle evidence KFx offered, Arthrex's surgical guides instructing surgeons how to perform the accused techniques (relevant to showing that Arthrex encouraged an act), is ***irrelevant*** to the ***different*** question of whether Arthrex ***knew*** that surgeons would be infringing by following the guide's steps.

## II.    KFX'S PATENTS

KFx filed its first patent application on September 17, 2004 (which eventually became the '311 patent), covering work on a suture bridging method developed by KFx earlier that year.  A2935-37.  A first anchor, called a "medial" anchor, is underneath the tissue when inserted into bone, as required by every claim of the KFx patents.  The first anchor has a suture attached to it which is passed over the top of the tissue.  A second "lateral" anchor is then inserted into the bone adjacent to the tissue.  *After* insertion of the second "lateral" anchor, the suture from the "medial" anchor is "tensioned" to compress the tissue to bone.  Finally, the suture is then "fixedly secured" to the "lateral" anchor without tying knots.  This basic construct (with two anchors) is shown as Figure 16F (annotated) of the KFx patents.  The claims of the KFx patents also include this construct using three or four anchors.



FIG. 16F

In light of other bridging art before the PTO, KFx was forced to twice amend the claims, in which KFx added limitations and a specific order of steps were required. A11234-242; A11259-267; A11278-287; A11292-300. Thus, as the claims were eventually issued, all claims had at least the following steps *in this precise order*:

a. A first (medial) suture anchor is inserted into the bone while positioned underneath the torn tissue;

b. The suture from the medial anchor is passed over the tissue;

c. The second (lateral) suture anchor is inserted into the bone;

d. The suture from the medial anchor is tensioned to compress the tissue back to the bone; and

e. The suture is fixedly secured to the lateral anchor without tying knots.

For example, claim 1 of the '311 patent, below, shows these various steps:

> **1**. A method of attaching soft tissue to bone, comprising:
> inserting a first anchor into bone, wherein the first anchor is positioned underneath the soft tissue such that no part of the anchor extends beyond an edge of the soft tissue;
> passing a first length of suture from said first anchor over the soft tissue;
> inserting a second anchor into bone, wherein the second anchor is positioned beyond the edge of the soft tissue such that it is not underneath the soft tissue;
> after inserting the second anchor, tensioning the first length of suture to compress an area of tissue to bone between the edge of the soft tissue and the first anchor; and
> fixedly securing the first length of suture to the second anchor without tying any knots.

A110.

A.     The First (Medial) Anchor

The first (medial) anchor is described as a "tissue and bone piercing anchor."

A108 at 9:59.  It has "a first configuration having a small diameter for easy

piercing through soft tissue and bone and a second deployed configuration where

wing-like protrusions are deployed to prevent the bone anchor from being easily

removed from the bone."  A108 at 9:65-10:4.  This is achieved by the design of the

anchor, which is shaped like a nail having a small diameter so as not to cause

damage to the tissue while passing through.  A105 at 4:39-41; A108 at 10:10-12;

A2933-34.

Because of this design and method, the first anchor is always underneath the

tissue when inserted into bone.  This description is repeated at least 12 times

throughout the specification.  A77 at Abstract; 2:19-21; 2:38-41; 4:11-13; 4:39-41;

4:55-57; 10:60-61; 10:23-24; 12:54-57; 13:38-39; 13:41-42; 13:59-61.  Figure 16B

(annotated) of the KFx Patents (below) also shows the medial anchor being

inserted underneath the tissue by going through the soft tissue.



**Anchor passing through tissue**

**Anchor inserted into bone while positioned underneath the tissue**

**FIG. 16B**

The inventors' lab notebook included in the provisional application also explains to "insert low profile anchor through rotator cuff and below surface of bone." A2936-37; Fig. 2 of lab notebook, below.



There is no description within the KFx patents of inserting the medial anchor any way other than going through the soft tissue and then into the bone so that it is underneath the tissue when inserted into bone.

Not only is this the only method described, but the KFx patents also describe the perceived advantages associated with the method -- stating that a step is eliminated because the suture does not need to be passed from the first medial anchor up through the soft tissue. A105 at 4:9-11 ("[T]he surgeon does not need to pass the suture through the soft tissue 12 from beneath the soft tissue 12").

This disclosure in the specification and the claims is no accident. It is exactly what the KFx inventors intended when they described and claimed their invention. Inventor Green testified that the inventors made this decision on purpose and ***consciously chose not to*** insert the medial anchor directly into bone so it would not be underneath the tissue when inserted because *"we thought it was a good idea to do, go through the tendon.* We also looked at whether you could go under the tendon [but] that seemed like it would be – have an additional set of challenges." He concluded: "We thought it would be ***easier to go through*** if it was simpler." A2922-23; A2929-30 (emphasis added).

Inventor Dr. Tauro agreed. When asked why he wanted the medial anchor to go through the soft tissue (called a "trans-tendon" approach), Dr. Tauro, just as stated in the patents, testified "it gives you the advantage of not -- potentially not having to pass sutures independently." A2933-34.

KFx's commercial product (which was on the market for a short time) used this "trans-tendon" approach where the medial anchor is inserted into bone underneath the tissue by going through the tissue. A2953. KFx claimed the same advantages described in the specification, touting the benefits of this insertion method compared to the insertion method used by Arthrex (where the tissue is moved aside before insertion directly into bone). A2939 (distinguishing KFx's trans-tendon insertion from methods, like Arthrex's, which insert the medial

anchor into bone first and then pass suture up through the tissue -- "Minimizes

damage to the tendon caused by multiple instrument/suture passes."); A2951-52

(KFx CEO, Tate Scott, explaining to a surgeon that ██████████████████████

██████████████████████████ ); A2960 ██████████████████████

████████████████████████████████

████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

████████████████████

B.     The Second (Lateral) Anchor

This second anchor is called a "suture capturing anchor" in KFx's patents

and is inserted "lateral," *i.e.,* beyond the edge of the tissue.  It is described, without

exception, as a two-part anchor with a "base" and a "cap" where the suture is

captured between the two pieces when the cap is snapped into the base.  Figures

6A and 8 (annotated and reproduced below) depict the anchor base 100 and the

anchor top 200 for the second (suture capturing) anchor.



KFx invented a specific method of inserting the second anchor into bone to capture and secure the suture between the two anchor portions without tying any knots.  The specification repeatedly describes -- *no fewer than eight times* -- that the base of the second anchor is inserted into bone *so that it is secure within the bone.*  A104 at 1:58-63; 1:64-66; 2:52-54; 2:58-62; A106 at 5:45-49; 5:52-55; 5:55-59; A107 at 8:59-62.  The specification explains that regardless of how the anchor is inserted, the goal is always "to secure the anchor base 100 to bone."  A106 at 5:55-60.

After the base of the second (lateral) anchor has been secured in the bone, the suture from the first "medial" anchor is tensioned to compress the tissue onto the bone.  If the inserted anchors are not securely in the bone, KFx's bridge would not work.  For example, when the suture is tensioned (as shown in Figure 16 E, annotated, below), significant pressure is placed on the medial anchor (800).  If that anchor were not securely in the bone, it would come flying out of the hole and

the surgery would be a failure. A1769 at ¶ 8. As shown below, that failure is avoided *because* the medial anchor is secured in the bone with the wings deployed before the suture is tensioned.



## FIG. 16E

After the suture is tensioned, the anchor top is moved toward the anchor base on the lateral (second) anchor to clamp ("fixedly secure") the suture between the top and the base. A106 at 5:24-33, 33-37; A107 at 8:63-66. This process is shown below in annotated Figs. 9C, 9D and 6B.



FIG. 9C    FIG. 9D    FIG. 6B

## III.   THE PRIOR ART RELEVANT TO THIS APPEAL

### A.   The Millett Work

In late 2002 and early 2003, almost two years before KFx filed its patent

application and more than a year before KFx first worked on a bridging concept,

Dr. Peter Millett, working together with Arthrex, developed his own suture bridge

repair technique where a series of anchors where bridged together.  A8331; A8233-

34.  It is undisputed that the Millett Work is prior art to the KFx Patents.  A3085-

86; A3070-71.[1]

The Millett Work includes a tissue repair bridging method almost identical

to the bridging method that is later described in KFx's Patents.  It discloses four

anchors -- two medial anchors and two lateral anchors.  The four anchors are

linked together by suture to form a criss-cross pattern like that described in KFx's

---

[1]     The Millett Work is described in Dr. Millett's Article, entitled "Mattress
Double Anchor Footprint Repair:  A Novel, Arthroscopic Rotator Cuff Repair
Technique," published October 2004.  A3141-45.

Patents. *See* Fig. 3C, *supra,* at 5. A3144; A3118-22; A3072-73. Dr. Millett's

four-anchor bridge (A3144, annotated) and the same bridge from KFx's patents,

are shown below (annotated).

**KFx's Invention**



FIG. 3C

**Dr. Millett's Work (Prior Art)**



The only meaningful difference is that Millett describes the use of knotted,

instead of the knotless, "lateral" anchors used by KFx. It is undisputed, however,

that Millett discloses tensioning after insertion of the lateral anchor; as KFx's

expert, Dr. Ticker, acknowledged. A3043-44.

B.     The Greenfield Patent

Greenfield issued on December 17, 1996, and is prior art to KFx's Patents.

A3037; A3054. Greenfield describes a two-piece anchor functionally identical to

the second (lateral) anchor described in the KFx patents. Just like KFx's lateral

anchor, Greenfield discloses a knotless anchor having a base that screws into bone

16

beyond an edge of the soft tissue and a cap that is engaged together with the base to secure a strand of suture between the two anchor portions.  A3112 at 6:66-8:10.

And just like the KFx anchor, *only after* the base of the Greenfield anchor is inserted into bone (A3113 at 7:13-16), the suture (attached at the other end to the tissue) is tensioned (A3113 at 7:30-32).  The cap is then pressed into the base to secure the suture between the two anchor portions.  A3113 at 7:65-8:2; A3114 at 9:40-44.  *See* Figs. 1, 5 (annotated), below.



**Anchor Cap**

**Anchor Base**

**Anchor Cap Inserted Into Anchor Base to Capture Suture In Between**

Fig. 1               Fig. 5

Finally, just like the KFx patents (A104 at 1:39-43), Greenfield explains that because the suture is tensioned ***after insertion of the base*** (called the bone anchor in Greenfield), the surgeon can adjust the position of the soft tissue.  A3114 at 9:32-39 ("Once engaged, the surgeon can pull on the suture material while it is threaded through the suture anchor and apply a proper tension to the suture to

adjust the position of the soft tissue"); *see also* A3113 at 7:28-32 (suture tensioned after insertion of base to determine whether suture placement is "optimal").

## IV.    ARTHREX'S DEVELOPMENT OF ITS BRIDGING METHOD

Arthrex first worked with Dr. Millett to develop his bridging technique in late 2002-early 2003.  A8350-51.  This work was shared with Dr. Neal ElAttrache, one of Arthrex's consulting physicians, who immediately understood that Dr. Millett's work could be improved if a knotless anchor was used as the lateral anchor.  A8331 at 409-12; A8351.  As a result, in early 2003, Arthrex, based on Dr. ElAttrache's idea, began working on its own bridging construct.  It used its existing knotless Bio-Tenodesis anchor as the lateral anchor, and built and successfully tested a suture bridge model later in 2003.  A8331 at 411-12; A8351-53.  Arthrex postponed this development work until 2005.  A8365 at 537-38.[2]

By that time, Arthrex had developed its new "PushLock" knotless anchors.  When tests revealed that the suture bridging worked better with the new PushLock anchor, Arthrex substituted the PushLock anchor for the Bio-Tenodesis device.  A8365 at 538-39; A9280-85.  Accordingly, in early 2006, Arthrex began

---

[2]    While KFx did not contest this timing, it did contest whether this early Arthrex work anticipated the KFx patents and the jury agreed with KFx.  A8517.  That issue is not pressed here.  KFx also pointed to evidence that the Bio-Tenodesis anchor, used as a stand-alone anchor (*i.e., **not** as the lateral anchor in a bridge), was unsuccessful.  It did not, however, contest the test results showing the Bio-Tenodesis anchor worked successfully as the lateral anchor in a bridge.  A8372-at 566-A8373 at 572; A14573-74; A14683-84.

promotion of its "SutureBridge" surgical method, where four anchors (two medial and two lateral) were connected together with suture to form a bridge. Subsequently, after Arthrex developed a second knotless anchor called "SwiveLock," it promoted that anchor in a second bridging technique called "SpeedBridge." A14712-716. For purposes of this appeal, the differences between SutureBridge and SpeedBridge (or between PushLock and SwiveLock) are not relevant.

KFx accuses Arthrex's SutureBridge and SpeedBridge surgical techniques of indirect infringement of the KFx Patents. While Arthrex's techniques are suture bridging methods, they are substantially different from the methods described and claimed in the KFx Patents. The differences relevant to this appeal are discussed below.

A.    Arthrex Instructs Surgeons To Insert the First Anchor into Bone
      Without Being Underneath the Soft Tissue

As shown in Arthrex's surgical technique guides, Arthrex instructs surgeons to insert the first (medial) anchor into bone *without the anchor being underneath the soft tissue.* A9282 (Fig. 3, below). Thus, the medial anchor is ***not*** positioned underneath the tissue when it is inserted into bone. Then the attached suture must be passed up through the tissue using a separate instrument -- the step that KFx's patents teach to avoid. A105 at 4:9-11; A9282 (Fig. 4, annotated, below); *see also,* A14715 (SpeedBridge brochure).

19



**Suture Passed Up Through Tissue (Step Eliminated By KFx's Patents)**

**Tissue**

**Anchor is Not Underneath Tissue**

**Bone**

**B.** There is *No* Tensioning of the Suture *After* the Lateral Anchor is Inserted into the Bone

While PushLock and SwiveLock (Arthrex's lateral anchors) are knotless anchors, they are very different from the lateral anchor disclosed and claimed in the KFx patents (an anchor base that is securely in the bone when inserted and a cap that snaps into the base to capture the suture). In Arthrex's procedures, the suture from the medial anchor is threaded through the eyelet of the lateral anchor. A8304; A9283 (Fig. 6, below).[3]

---

[3]     At trial, it was contested whether the eyelet should be considered part of the anchor. Arthrex does not press that issue here as it does not matter for the issues on appeal.



Suture Threaded Through Eyelet of Lateral Anchor

Retrieve one FiberWire strand from each Bio-Corkscrew FT through the lateral (or anterolateral) portal. Thread both FiberWire strands through the BioComposite PushLock eyelet on the distal end of the driver.

The eyelet is then placed at the bottom of the bone hole. The eyelet can move freely in and out of the hole (because it is physically smaller than the bone hole); and Arthrex specifically instructs surgeons they can physically remove the eyelet from the hole if the surgeon desires. A8335 at 426; A8336 at 431-32; A9283, Fig. 8 with yellow hi-lite, below.



Eyelet Placed at Bottom of Bone Hole

Anchor Body Not Yet Inserted

Completely advance the driver into the pilot hole beyond the first laser line, until the anchor body contacts bone. Evaluate tissue tension. If it is determined that the tension is not adequate, the driver can be backed out and tension readjusted. Alternatively, additional tension may be applied, while leaving the driver in place, by pulling on each suture strand independently.

Use a mallet to tap the anchor body into the pilot hole until the second laser line is flush with the humerus.

Only when the anchor body is hammered or screwed into the hole is it "inserted into bone" under the correct construction. This is because it is securely in the bone hole because it has a diameter larger than the bone hole. A8348 at 479-80; A9284 (Fig. 9, below).



Similarly, it is undisputed that the suture is "fixedly secured" **simultaneously with the anchor body being inserted into the bone hole** as the suture is wedged between the anchor and the bone wall.  A9283-84; A14716; A8335 at 427; A8348 at 479-80.

This fundamental difference from the base and cap anchor described in the KFx patents, once again, is no accident.  KFx's inventors explained that they consciously decided *not* to use a system, like Arthrex's, where the suture is wedged between the bone and the anchor.   For example, inventor Green testified:

Q:      Did you ever consider a lateral anchor that secured the suture by compressing it between the bone and the anchor as opposed to between two pieces of the anchor?

A:      The answer is yes, *but it was discounted almost immediately*. *Bone is not a reliable geometric shape* after you've driven a screw into it. *You couldn't reliably count on it* supplying a clamping force to

23

something because it can – it can crack. It can change. . . . *We considered it briefly. It wasn't pursued.*

A18186-87 at 216:15-217:14 (emphasis added). *See also* A18248 at 94-95; A8236 at 135:18-22; A8272 at 181.

Since the suture can no longer move once the anchor body is inserted, it is **impossible** to tension the suture **after** anchor insertion. *Supra* at 23. Likewise, because the suture is secured **simultaneously** with insertion of the anchor body, it is **impossible** to "fixedly secure" the suture to the lateral anchor **after** anchor insertion.

## V.    PROCEEDINGS IN THIS LAWSUIT

KFx filed this lawsuit on August 1, 2011. Prior to that time, it never indicated to Arthrex that it believed Arthrex was infringing or that Arthrex needed a license. A8366 at 541; A8400-01. Shortly before the '311 patent issued in 2009, however, KFx did contact Arthrex and inquired whether Arthrex wanted to purchase the patent so that it could assert it against an Arthrex competitor (with which it had ongoing litigation). Arthrex had no interest in any such arrangement. A8399-400.

In light of this notification, Arthrex reviewed the claims of the '311 patent and concluded that it did not infringe, and that the '311 patent was invalid. Once KFx sued (the first time a claim of infringement was made), Arthrex engaged outside counsel to provide an independent analysis. A8399-401. Counsel rendered

24

a series of opinions confirming that Arthrex did not infringe and that the patents were invalid.  A8401-04; A13905-14024; A14025-14153; A14154-14283; A14284-14523; A14524-527.

A.    *Markman* Proceedings

At *Markman*, the principal issue was the meaning of "inserting [an] anchor into bone."  Arthrex argued that a review of the intrinsic evidence lead to the conclusion that "inserting [an] anchor into bone" meant "putting or placing [an] anchor into bone so that it is securely fixed in the bone."  A1522-25; A1790-97. Among other things, Arthrex explained that *every* disclosure in the patents described that the anchor was securely in the hole, as required by suture anchors, and that KFx's invention would not work unless the anchors were securely in the bone.  *Id*.

The district court's half-page ruling focused on the single word "inserting" (not "inserting [an] anchor into bone") and stated it has a plain and ordinary meaning (obtained from extrinsic dictionaries submitted by KFx) of "putting or placing into."  While the district court stated that it reviewed the intrinsic evidence, it made no reference to it, except to state, without explanation, that Arthrex's intrinsic evidence was merely "'example[s] of how to practice the invention in a particular case.'"  A17.

B.     Summary Judgment Proceedings

Arthrex moved for summary judgment of no direct infringement and invalidity.  One of the grounds for non-infringement was that Arthrex does not instruct surgeons to insert the first (medial) anchor into bone "underneath the tissue" as required by the asserted claims.  Among other things, Arthrex set forth the plain language of the claim requiring that the first anchor be positioned underneath the tissue when inserted into bone, the description and benefits of KFx's approach set forth in the specification where the medial anchor is inserted underneath the tissue by the trans-tendon approach discussed above, and the testimony from KFx's inventors that they specifically *rejected* Arthrex's promoted method where the medial anchor is inserted directly into bone without being underneath the tissue.  A2668-673; A2683-84; A2702-07.  In rejecting Arthrex's argument, the district court mischaracterized Arthrex's construction, never considered the language of the claim itself, and swept away all of Arthrex's evidence as mere examples from the specification.  A27.

One of Arthrex's invalidity arguments was that the Millett/Greenfield combination rendered the asserted claims invalid for obviousness.  Arthrex demonstrated that Millett disclosed the entirely of the claims except that the suture was not fixedly secured to the lateral anchors without tying knots.  The invention was obvious when combined with Greenfield, a two-piece "base and cap" anchor

that is functionally identical to the knotless "base and cap" anchor disclosed in the KFx patents. Although it was conceded that this description of the prior art was accurate, the district court nonetheless denied the motion because, in its view, Arthrex had not supplied evidence establishing a motivation to combine. A25-26. The district court made this ruling even though Greenfield itself explains that its knotless anchor allows the surgeon to optimize the repair by tensioning the suture after insertion, the benefits identified in KFx's patents. *Supra* at 16-18.

C.     Trial and Post-Trial Proceedings

The case proceeded to a two-phase trial in August (liability) and October (damages) 2013. In the first phase, the jury found that Arthrex willfully induced infringement of KFx's patents. A8518. In the second phase, the jury awarded $29,000,000 to KFx, less than half of the damages it sought. A8890.

The district court subsequently denied Arthrex's JMOL and new trial motions, except that it overturned the jury's finding of willful infringement. In doing so, the district court specifically noted that Arthrex's claim construction and invalidity positions were reasonable defenses. A6-7.

The court also denied KFx's request for an ongoing royalty. After the jury's verdict, Arthrex had modified its promoted techniques to eliminate any reference to tensioning the suture after any part of the lateral anchor (including the eyelet) was put into the bone hole, eliminating any possible future infringement. Thus, the

district court agreed that KFx was not entitled to any continued royalty.  A18111-14.

Arthrex filed this timely appeal.  KFx did not cross-appeal.

# SUMMARY OF ARGUMENT

The plain meaning of KFx's claims is that when the first (medial) anchor is inserted into bone, it is positioned underneath the soft tissue. That does not happen in Arthrex's accused procedures as the medial anchor is not underneath the tissue when inserted. The only procedure identified in KFx's patents is the anchor going through the tissue so that it is underneath the tissue when inserted into bone. The patents explain that procedure is beneficial because it eliminates the additional step of having to bring the suture back through the tissue, a step that must occur in Arthrex's procedures. This is no accident as KFx's inventors intentionally chose not to develop the Arthrex procedure KFx now accuses of infringement.

The district court misconstrued "inserting [an] anchor into bone" by focusing only on the word "inserting." When the entire phrase is considered in light of the specification, the correct construction is putting or placing an anchor into bone so that it is secure. Every disclosed anchor is securely in the bone and KFx's invention would not work if the anchors weren't secure. Under the correct construction, it is undisputed that Arthrex's procedures do not meet multiple claim limitations.

The Millett/Greenfield combination renders KFx's patents obvious. Millett discloses the same suture bridging method as KFx's patents except that it does not disclose "fixedly securing" the suture to the lateral anchor without tying knots

29

(Millett uses knots for this step).  It was immediately understood to use a knotless anchor to improve upon Millett, and Greenfield is a two-piece "base and cap" knotless anchor that is functionally identical to KFx's knotless "base and cap" anchor.  Greenfield discloses the benefits of tensioning the suture after insertion of the anchor base, just as disclosed in KFx's patents.

Arthrex is entitled to JMOL of no indirect infringement because KFx offered no legally relevant evidence to establish that Arthrex knew (or was willfully blind) that the accused procedures infringed KFx's patents.  Arthrex also did not induce because it had objectively reasonable defenses.

## ARGUMENT

## I.   STANDARD OF REVIEW

This Court confirmed the *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448

(Fed. Cir. 1998) "standard of *de novo* review of claim construction, whereby the

scope of the patent grant is reviewed as a matter of law." *Lighting Ballast Control*

*LLC v. Philips Electronics North America Corp.,* 744 F.3d 1272, 1276-77 (Fed.

Cir. 2014) *(en banc)*. During claim construction, "the claims are of primary

importance, in the effort to ascertain precisely what it is that is patented." *Phillips*

*v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). "[T]he words of a claim are

generally given their ordinary and customary meaning," *id.*, and "[i]n some cases,

the ordinary meaning of claim language as understood by a person of skill in the

art may be readily apparent even to lay judges, and claim construction in such

cases involves little more than the application of the widely accepted meaning of

commonly understood words." *Id.* at 1314.

"[T]he claims are directed to the invention that is described in the

specification; they do not have meaning removed from the context from which

they arose." *Phillips*, 415 F.3d at 1316. *Phillips* also teaches that "the

interpretation to be given a term can only be determined and confirmed with a full

understanding of what the inventors actually invented and intended to envelop with

the claim. The construction that stays true to the claim language and most

naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

Obviousness is a question of law based on the underlying factual findings: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the art; and (4) objective indicia of nonobviousness. *KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398, 406 (2007). *Graham v. John Deere*, 383 U.S. 1, 17–18 (1966).

This Court reviews a denial of a motion for JMOL *de novo* by reapplying the JMOL standard. *Cybor Corp.,* 138 F.3d at 1454. Thus, this Court can reverse a denial of a motion for JMOL if the jury's factual findings are not supported by substantial evidence or if the legal conclusions implied from the jury's verdict cannot in law be supported by those findings. *Id.; see also SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.,* 225 F.3d 1349, 1354 (Fed. Cir. 2000).

## II. THE DISTRICT COURT ERRED IN DENYING JUDGMENT OF NON-INFRINGEMENT TO ARTHREX BECAUSE ARTHREX'S ANCHORS ARE *NOT* POSITIONED UNDERNEATH THE TISSUE WHEN INSERTED INTO BONE

Claim 1 of the '311 patent requires "inserting a first anchor into bone, wherein the first anchor is positioned underneath the soft tissue. . . ." *See, e.g.,*

*supra* at 9-12; A110.   As this language states, when inserting the first anchor into bone, it is positioned underneath the soft tissue.[4]

Based on this plain language, Arthrex moved for summary judgment because in its SutureBridge and SpeedBridge techniques, Arthrex promotes that when the first (medial) anchors are inserted, they are ***not*** "positioned underneath the soft tissue." Rather, Arthrex's anchors are inserted directly into bone. *Supra* at 19-20.

The district court rejected Arthrex's position.  It believed that Arthrex's motion raised a claim construction issue, but it misstated Arthrex's position, asserting that Arthrex proposed a construction that the first anchor must be inserted through the tissue.  A27.  The court then rejected Arthrex's "proposed construction of the claims," ignoring much of Arthrex's evidence cited in support of its plain meaning construction, and dismissing the rest as mere "examples of the invention" that do not limit the claims.  A27.[5]

---

[4]      Every other asserted claim contains the same or similar language.

[5]      The district court also notes that it agreed with KFx that Arthrex was raising an untimely claim construction issue.  A27.  The contention misses the point. Arthrex was simply applying the plain meaning of the phrase to the undisputed facts.  But viewing Arthrex's argument (as well as KFx's counter-construction, A3682) as claim construction, even the district court noted that "the issue needs to be resolved."  A27.  That is correct because it became incumbent upon the district court to construe the term where a dispute regarding the scope of a claim emerges. *O2 Micro International v. Beyond Innovation Technology Co.,* 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it.").

The district court's analysis was wrong.  The district court never explained why Arthrex's plain meaning was incorrect *in light of the claim language itself.*  It could not do so because, as explained above, the claim language requires that upon inserting the anchor, it is positioned underneath the tissue.  The district court's failure even to mention Arthrex's plain language argument speaks volumes for why it is wrong.

The district court was also wrong in characterizing Arthrex's evidence about the disclosure in the specification as mere examples of the invention.  ***It is KFX's invention.***  Every time KFx had an opportunity to describe how its medial anchor is inserted, *without fail,* it described the medial anchor as being inserted through the tissue and into bone so that it is positioned underneath the tissue upon insertion.  *Supra* at 9-12.  This sole method of describing how the medial anchor is inserted is described in the specification *at least 12 different times*, as well as in the inventors' lab notebook from the provisional application.  *Supra* at 9-10.

The specification explains why such a method is described and claimed.  It does so because use of the KFx method eliminates the step of the surgeon having to bring the suture back through the tissue so that it is on top of the tissue (where it needs to be so that the suture can then be passed over the top of the soft tissue to the second (lateral) anchor).  There is no need for this extra step (which requires a

separate instrument) because, by first going through the tissue during insertion of the medial anchor, the suture is already on top of the tissue. *Supra* at 10-12.

Both KFx inventors acknowledged they intended that the medial anchor be underneath the tissue by inserting it through the tissue. They also explained why they rejected inserting the medial anchor the way Arthrex does it (adjacent to the tissue). Inventor Green testified he considered the Arthrex method and rejected it because it creates more work for the surgeon. A2922-23; A2829-30. Inventor Tauro concurred that KFx's chosen method was superior for this same reason. A2933-34.

As this Court explained, such inventor testimony helps to "explain the invention and what was intended to be conveyed by the specification and covered by the claims." *See Voice Technologies Group, Inc. v. VMC Systems, Inc.,* 164 F.3d 605, 615 (Fed. Cir. 1999). And such inventor testimony is particularly relevant when, as here, it serves to confirm the other evidence. *Hoechst Celanese Corp. v. BP Chemicals Ltd.,* 78 F.3d 1575, 1580 (Fed. Cir. 1996).[6]

---

[6]     In a footnote and without analysis, the district court stated it agreed with KFx that "importing this limitation into the claims" is inappropriate under the doctrine of claim differentiation. A27. The district court is apparently referring to dependent claim 3, which recites that "the first anchor is inserted through the soft tissue." A110. But as Arthrex explained -- and the district court failed to address -- this Court has stated that claim differentiation cannot be used to expand the scope of a claim beyond what was invented, including when, as here, a dependent claim supposedly adds a claim limitation to an independent claim. *Tandom Corp. v. U.S. Intern. Trade Com'n,* 831 F.2d 1017, 1024 (Fed. Cir. 1987); *Toro Co. v. White*

This distinction between KFx's method and Arthrex's method is no small

matter. When KFx marketed its suture bridging product, it touted the differences

between its procedure and Arthrex's procedure, telling the market that its product

is better because it inserts through the soft tissue and Arthrex does not. *Supra* at

11-12. KFx's CEO explained the advantages of KFx's method over the

competition, specifically including Arthrex, stating that ████████████████████

███████████████████████████████████ *Supra* at 12.[7]

It is difficult to conceive of a set of facts in which the evidence more clearly

reveals what exactly the inventors intended to be their invention -- and what they

consciously did ***not*** invent -- than it does in this case. *Phillips*, 415 F.3d at 1316

("[T]he interpretation to be given a term can only be determined and confirmed

with a full understanding of what the inventors actually invented and intended to

envelop with the claim."). Here, *all of the evidence* supports Arthrex's plain

meaning that the anchor is positioned under the soft tissue when it is inserted into

bone. This is not a mere example of KFx's invention; it ***is*** KFx's invention.

As explained above, Arthrex does not promote inserting its anchors when

they are positioned underneath the tissue in the SutureBridge and SpeedBridge

---

*Consol. Indus., Inc.,* 199 F.3d 1295, 1302 (Fed. Cir. 1999); *O.I. Corp. v. Tekmar Co.,* 115 F.3d 1576, 1582 (Fed. Cir. 1997).

[7] The Arthrex approach, of course, has its own advantages. For example, while a suture is passed through tissue, a surgeon avoids having an anchor, with a diameter larger than suture, piercing the tissue. A9282; A14715.

procedures. *See* Fig. 3, *supra*, at 20. Moreover, Arthrex teaches that surgeons

***must*** perform an extra step of bringing the suture back through the tissue (*See* Fig.

4, *supra* at 20), the same extra step KFx's patents teach ***to avoid*** by using its

method. *Technology Patents LLC v. T-Mobile (UK) Ltd.*, 700 F.3d 482, 493-94

(Fed. Cir. 2012) (asserted claims could not cover "the very . . . system that the

patent criticized").[8] Accordingly, judgment of non-infringement should be

granted. *See, e.g., Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc.,* 725

F.3d 1341, 1349 (Fed. Cir. 2013) (reversing denial of summary judgment after

correcting district court's claim construction).[9]

---

[8]     The district court's reliance on *Laryngeal Mask Co., Ltd. V. Ambu A/S,* 618
F.3d 1367 (Fed. Cir. 2010), A27, is misplaced. The facts of that case are entirely
different. There, unlike here, virtually all of the evidence supported a finding that
the claim term "backplate" should ***not*** be construed to include a "tube joint." *Id.* at
1371-72. Neither the claim language nor the specification supported it. *Id.* at
1371-72. Here, the claim language, the specification, and ***all*** of the evidence
supports Arthrex's proposed plain meaning.

[9]     In summary judgment, KFx mentioned in passing that Arthrex's "PASTA"
method inserts the medial anchor when it is positioned underneath tissue. But KFx
never accused it of infringement in its complaint or its contentions. A5504-15;
A18324-29; A18419-25. Nor did KFx seek discovery on the medial anchor
(SutureTak) promoted with the PASTA method and PASTA kits or include that
anchor in its damages. A8784 at 976; A12377-81; A12382-86; A12387-91;
A12392-96; A12397-401; A12402-06.

## III.   ARTHREX IS ENTITLED TO JUDGMENT OF NON-INFRINGEMENT UNDER THE CORRECT CONSTRUCTION OF "INSERTING [AN] ANCHOR INTO BONE"

### A.   "Inserting [an] Anchor Into Bone" Means the Anchor Must Be Put or Placed Securely in the Bone

During *Markman*, the parties asked the district court to construe the term "inserting [an] anchor into bone."  Arthrex proposed the term means "putting or placing the anchor in the bone so that it is securely fixed in the bone."  A1522-25. According to KFx, the term means "putting or placing [an] anchor into bone." A1112.

The district court, however, only construed the word "inserting," ***incorrectly*** stating that "the dispute here centers on the meaning of 'inserting.'"  A17.  By focusing only on the word "inserting," in a vacuum -- instead of the entire phrase as the parties requested -- the district court ignored the remainder of the claim context.

As this Court has repeatedly held, claim construction begins with the words of the claim -- they are of "primary importance."  *Phillips,* 415 F.3d at 1312.  This Court instructs that "proper claim construction . . . ***demands interpretation of the entire claim in context, not a single element in isolation***." *Pause Tech., LLC v. TiVo, Inc.,* 419 F.3d 1326, 1331 (Fed. Cir. 2005) (emphasis added).  The district court's error in approach lead to the wrong result.

38

Unlike the district court's construction, Arthrex's proposed construction takes into account the **entirety** of the claim. It takes into account **what** is being inserted -- an anchor -- **where** the anchor is being inserted -- into bone, and **why** it is being inserted -- to be able to withstand suture tension. All anchors need to be securely fastened so they can do their job. A suture anchor is no different. A1769 at ¶ 7. When that is considered, and the specification is consulted as it must be, the correct construction is that the anchor must be put or placed in the bone hole so that it is secure.

That KFx's anchors must be securely in the bone is made clear in the specification which repeatedly describes -- **no fewer than 12 times** -- that the anchors are inserted into the bone so that they are secured in the bone. *Supra* at 9-10. For example, the medial (first) anchor is **always** described as being secured in the bone hole and **always** described as having protrusions (sometimes deployable) that engage with the bone to secure the anchor to the bone. A108 at 9:66-10:4; 10:9-11, 28-30; A109 at 12:61-63.[10]   Similarly, the lateral (second) anchor is

---

[10]   KFx argued below that the deployable feature of the medial (first) anchor supports its construction because the anchor is described as being inserted first and then there is a second step of deploying the anchor (*e.g.,* wings) to secure it in the bone. A1115. But KFx never denies that the anchor is **always** secured in the bone before any other claim step is performed, including the step of tensioning the suture attached to the medial anchor. *Supra* at 8. Thus, considering the entire context of the claim, "inserting [an] anchor into bone" means that the anchor is secured in the bone, regardless of whether that securing takes one step or two

*always* described as being secured in the bone as facilitated by physical features, including screw threads, that engage with the bone hole. A104 at 1:58-63, 64-66; 2:52-54, 58-62; A106 at 5:45-49, 52-59; A107 at 8:59-62. Although the specification is not limited to a specific type of physical feature for securing the anchors to bone, the specification teaches that, regardless of the features used, what matters is that those features *"secure the anchor base to the bone."* A106 at 5:55-59.

*Not once does the specification describe the anchor being inserted in bone and then used in the patented method without being securely in the bone hole.* Yet this was KFx's proposed construction, and the one adopted by the district court because it focused only on the word "inserting."

The district court dismissed all of this evidence about securing KFx's anchor as mere "examples" that are not meant to limit the claim. A17. But these are much more than mere "examples." *This is KFx's invention.*

Every so-called "example" has to be securely in the hole because KFx's invention would not work if the anchor was not secure. Every asserted claim requires that the suture from the medial (first) anchor be tensioned after insertion of the lateral (second) anchor. If that medial anchor were *not* securely in the bone -- as would be permitted under the construction adopted below -- the force from

steps. What is important is that the anchor is secured in the bone. Then, and only then, do the rest of the steps occur.

tensioning the suture would cause the anchor to come flying out of the hole, making the surgery a failure.  A1769 at ¶ 8.  *The reason that such failure is averted is because the anchor is securely in the bone hole.  See* Fig. 16E, *supra* at 14.

As this Court explained, "the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim.  *The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."  Phillips,* 415 F.3d at 1316 (quoting *Renishaw*, 158 F.3d at 1250) (emphasis added).  That is Arthrex's proposed construction that the anchor is securely fixed when it is put or placed in the bone.[11]

> B.    Under this Correct Construction, Arthrex's Accused Methods Do Not Infringe as a Matter of Law

As explained above, all of the claims require that the suture be tensioned *after* insertion of the lateral anchor.  Similarly, the claims require that the suture be "fixedly secured" to the lateral anchor after inserting the lateral anchor and after tensioning the suture.  Should the Court adopt Arthrex's proposed construction, neither of these claim limitations is met.

---

[11]    Arthrex's construction is consistent with the dictionary definition of "anchor," *i.e.,* "to secure firmly."  A1707-09; A18629-31.  *See, e.g., Phillips,* 415 F.3d at 1319 (extrinsic evidence may also be useful to the court in construing the claims, so long as it is considered in the context of the intrinsic evidence).

There is no dispute about how Arthrex's accused lateral anchors are used in SutureBridge and SpeedBridge. The suture from the medial anchor is threaded through the eyelet of the lateral anchor. A8304; A9283 (Fig. 6, below).



Suture Threaded Through Eyelet of Lateral Anchor

Retrieve one FiberWire strand from each Bio-Corkscrew FT through the lateral (or anterolateral) portal. Thread both FiberWire strands through the BioComposite PushLock eyelet on the distal end of the driver.

The eyelet is then placed at the bottom of the bone hole. The eyelet can move freely in and out of the hole (because it is physically smaller than the bone hole); and Arthrex specifically instructs surgeons they can physically remove the eyelet from the hole if the surgeon desires. *See* A9282, Fig. 8 with yellow hi-lite, below. Thus, the eyelet is not yet "inserted into bone" (even if it is part of the anchor) under the correct construction because it is not secured in the bone hole. A8335 at 426; A8336 at 431-32.



Eyelet Placed at Bottom of Bone Hole

Anchor Body Not Yet Inserted

Completely advance the driver into the pilot hole beyond the first laser line, until the anchor body contacts bone. Evaluate tissue tension. If it is determined that the tension is not adequate, the driver can be backed out and tension readjusted. Alternatively, additional tension may be applied, while leaving the driver in place, by pulling on each suture strand independently.

Use a mallet to tap the anchor body into the pilot hole until the second laser line is flush with the humerus.

Under the correct construction, the "anchor is inserted into the bone" only when the anchor body is hammered or screwed into the hole. This is because it has a diameter larger than the bone hole. A8349 at 481; A9284 (Fig. 9, below). Thus, under Arthrex's proposed construction, it is undisputed that the suture is "fixedly secured" ***simultaneously with the second anchor being inserted into the bone hole*** as the suture is wedged between the anchor and the bone wall. A8318 at 359; A9283-84; A14716; A8335 at 427; A8348 at 479-80.[12]

---

[12] Prior to insertion of the anchor body, the suture is not fixedly secured because it can still move. KFx knows this, as its only basis for liability (under the district court's construction of "inserting") was the surgeon's ability to further



This distinction is critical as KFx made clear that it ***intentionally chose not to include Arthrex's "wedging" method in its patents*** (which fixedly secures suture simultaneously with inserting the anchor). For example, KFx's inventor Green testified:

Q:      Did you ever consider a lateral anchor that secured the suture by compressing it between the bone and the anchor as opposed to between two pieces of the anchor?

A:      The answer is yes, ***but it was discounted almost immediately.*** Bone is not a reliable geometric shape after you've driven a screw into it. ***You***

---

tension (*i.e.,* continue to move) the suture after the eyelet was in the hole, but before the anchor body was inserted. *See* Fig. 8, above.

***couldn't reliably count on it*** supplying a clamping force to something

because it can – it can crack.  It can change. . . . ***We considered it briefly.  It***

***wasn't pursued.***

A18186-87 at 216-17 (emphasis added); A8272.

KFx's other inventor, Dr. Tauro, was equally definitive that wedging is ***not***

part of the invention:

Q:     Did you even consider any lateral anchor where the suture is wedged

between the anchor and the bone?

A:     ***No.***

Q:     Why?

A:     In the rotator cuff application, it's been my opinion that that's -- ***the***

***bone is too soft up there to rely on it as part of the fixation of the suture.***

A18248 at 94-95; A8236 at 135:18-22.

Because it is impossible to tension the suture *after* the second anchor is

inserted into bone (A8318 at 359), and it is impossible to "fixedly secure" suture to

the second anchor after it is inserted into bone (*id.*) -- as inserting the anchor

should properly be construed -- Arthrex is entitled to judgment of non-

infringement as a matter of law.  *Telemac Cellular Corp. v. Topp Telecom, Inc.*,

247 F.3d 1316, 1323 (Fed. Cir. 2001).

IV. **THE DISTRICT COURT ERRED IN DENYING ARTHREX JUDGMENT AS A MATTER OF LAW THAT KFX'S PATENTS ARE OBVIOUS IN VIEW OF MILLETT AND GREENFIELD**

A. Legal Standard For Obviousness

A patent is invalid as obvious "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a).

Obviousness is a question of law based on underlying factual findings: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the art; and (4) objective indicia of nonobviousness. *KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398, 406 (2007). *Graham v. John Deere*, 383 U.S. 1, 17–18 (1966).

Prior to *KSR*, courts were strictly held to the TSM ("teaching, suggestion or motivation") test. *KSR*, 550, U.S. at 400-403. In conducting an obvious analysis, courts could look **only** at prior art references directed to solving the **same** problem the patentee was trying to solve. *Id*.

"*KSR*, however, instructs courts to take *a more 'expansive and flexible approach'* in determining whether a patented invention was obvious at the time it was made." *Wyers v. Master Lock Co.,* 616 F.3d 1231, 1238 (Fed. Cir. 2010). (citing *KSR*, 550 U.S. at 415) (emphasis added). "In particular, the Court

46

emphasized the role of 'common sense': '[r]igid preventative rules that deny factfinders recourse to common sense . . . are neither necessary under our case law nor consistent with it.'" *Id*. (citing *KSR*, 550 U.S. at 421). "A central principle in this inquiry is that 'a court must ask whether the improvement is more than the predictable use of prior art elements according to their established functions.'" *Muniauction, Inc. v. Thomson Corp.,* 532 F.3d 1318, 1325 (Fed. Cir. 2008).

This is especially true in the predictable, mechanical arts, such as this art, as Dr. Ticker acknowledges (A3057 at ¶ 212). *Ruiz v. A.B. Chance Co.,* 357 F.3d 1270, 1276 (Fed. Cir. 2004) (stating generally easier to find obviousness in "simpler mechanical technologies").

"When reviewing the denial of a JMOL motion, '[t]his court reviews a jury's conclusions on obviousness, a question of law, without deference.'" *Muniauction,* 532 F.3d at 1324-27 (finding patent invalid as a matter of law, in view of the evidence, notwithstanding a jury finding patent not invalid).

"When we consider that, *even in light of a jury's findings of fact, the references demonstrate an invention to have been obvious, we may reverse its obviousness determination*." *Bos. Scientific Scimed, Inc. v. Cordis Corp.,* 554 F.3d 982, 990 (Fed. Cir. 2009) (citing *Richardson Vicks, Inc. v. Upjohn Co.,* 122 F.3d 1476, 1479 (Fed. Cir. 1997))) (emphasis added).

B.    The Evidence Overwhelmingly Supports a Finding of Obviousness as a Matter of Law in View of the Combination of the Millett Work and Greenfield

As described above, Millett discloses a four-anchor suture bridge with two medial anchors (underneath the tissue) and two lateral anchors (adjacent to the tissue) where the suture from the medial anchors is bridged over the tissue (to compress the tissue to bone) and attached to the lateral anchors. *Supra* at 15-16. The only meaningful difference between the Millett Work and KFx's claims is that the suture is not "fixedly secured" to the lateral anchors without tying knots. Millett performs this step by tying knots. *Supra* at 16.

Greenfield supplies this missing limitation. It discloses a two-piece anchor that is functionally identical to the lateral anchor disclosed in KFx's patents. Just like KFx's patents, Greenfield discloses a two-piece anchor with a base that is first inserted into bone, the suture (attached to adjacent tissue) is then tensioned, then the anchor cap is inserted into the base to secure the suture between the anchor cap and base. *Supra* at 16-18. KFx's expert, Dr. Ticker, agrees Greenfield discloses all of these features. A3074-77.

When Arthrex moved for summary judgment, KFx conceded that Millett/Greenfield disclosed all limitations of the claims. A3675-78; A5633 at 4:18-25. At JMOL, likewise, there was no real dispute about the level of skill in

the art, about the teachings of Millett and Greenfield, or about whether the combination of Millett and Greenfield disclosed every limitation of the claims.[13]

Despite this evidence, when the district court considered "the jury's ultimate conclusion that the patents were not obvious," it merely stated that the jury's "decision is supported by substantial evidence." A18118. It did not conduct its own analysis and review the question of obvious *de novo.*

The district court's approach was clear error. This Court has rejected that approach, holding that "[t]his court reviews a jury's conclusion on obviousness, a question of law, without deference." *Muniauction,* 532 F.3d at 1324-27. Both the Supreme Court and this Court could not be clearer that the question of obviousness is a matter of law reserved to the Court. *See, e.g., KSR,* 550 U.S. at 427; *Soverain Software LLC v. Newegg Inc.,* 705 F.3d 1333, 1336 (Fed. Cir. 2013) *reh'g granted,* 515 F. App'x 883 (Fed. Cir. 2013) *and amended on reh'g,* 728 F.3d 1332 (Fed.

---

[13] Notwithstanding its concession at summary judgment, KFx argued at trial that Millett/Greenfield does not disclose two insignificant structural limitations (from the '969 patent) -- the location of the aperture on the second anchor and how the second anchor is attached to the inserter. These limitations do not relate to the basic bridging concepts and order of steps described above, *supra* at 7-9. The Supreme Court and this Court have explained that courts do not need to find "precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR*, 550 U.S. at 418; *Sciele Pharma, Inc. v. Lupin, Ltd.*, 684 F.3d 1253, 1259 (Fed. Cir. 2012). Dr. Greenleaf testified, **without contradiction,** that even if the prior art did not disclose these minor structural features, it would have been common sense to a person of ordinary skill in the art to include these normal features in an anchor. A8390 at 637-39.

Cir. 2013); *Bos. Scientific,* 554 F.3d at 990; *Daiichi Sankyo Co., Ltd. v. Apotex, Inc.,* 501 F.3d 1254, 1256 (Fed. Cir. 2007). In each of these cases, the court (typically this Court) conducted its own detailed analysis of the facts to determine, as a matter of law, whether the claims would have been obvious to one of ordinary skill in the art at the time of the invention.

And in doing this required analysis, this Court uses the proper "expansive and flexible" approach enunciated by the Supreme Court in *KSR* and followed by this Court in each of its subsequent cases. This Court routinely considers all the facts and often concludes that the claims are obvious as a matter of law even in the face of some evidence that points in the opposite direction. *See, e.g., KSR,* 550 U.S. at 422-26; *Soverain Software,* 705 F.3d at 1337-41; *Bos. Scientific,* 554 F.3d at 990-92; *Daiichi,* 501 F.3d at 1257-59.

The district court did none of this by reference to the "substantial evidence" test. The district court's approach is nothing short of a complete abdication of its responsibility to decide the obviousness question as a matter of law.[14]

---

[14] The district court tried to justify its approach by relying upon *SynQor, Inc. v. Artesyn Tech., Inc.,* 709 F.3d 1365, 1377 (Fed. Cir. 2013), *cert denied,* __ U.S. __, 134 S.Ct. 648 (2013), where this Court stated in dicta that whether there was a motivation to combine was an underlying factual issue. Even if that assertion were established law (a dubious assertion since "motivation to combine" is not identified as an underlying factual issue for the jury in *Graham, KSR* or any other Federal Circuit case), the ultimate analysis in *SynQor* is no different than every other case. In *SynQor,* as in those other cases, this Court explained that it "reviews the ultimate conclusion of obviousness without deference" (*id*. at 1373), it conducted a

Under the proper approach, the evidence overwhelmingly supports a finding of obviousness as a matter of law.  The prior art Millett Work, which disclosed almost the identical bridging concept before KFx, "really enthused the entire orthopedic community to look for ways of fixing rotator cuffs down to the anatomic footprint better than we had been doing."  A8390 at 639-640.  It was immediately recognized that Dr. Millett's work could be improved by using a knotless anchor.  For example, Dr. Greenleaf explained that surgeons soon realized after seeing Millett, which required several knots to be tied, that "going to a knotless technique would be ideal."  A8390 at 640.  Dr. Tauro did not dispute this. He agreed that knotless anchors were well known at the time (A8235 at 131)[15] and that it was understood that knotless anchors solved the known difficulty with tying knots arthroscopically.  A8230 at 114-A8231 at 116 ("Now you have got to take that knot and push it down the cannula again.  It can be daunting if you don't do it all the time. And so, you know, knot tying was a big challenge").[16]

---

detailed analysis of all the facts and found that the claims were not obvious as a matter of law.  *Id*. at 1373-75.

[15]     Inventor Green also agreed knotless anchors were well-known at the time of the Millett Work, and prior to KFx's invention.  A8270 at 175.

[16]     Upon learning about the Millett Work, Dr. ElAttrache and Arthrex had the idea to improve upon it by using knotless lateral anchors, and by August 2003, Arthrex had successfully tested a 4-anchor suture bridge with knotless lateral anchors.  A8352 at 493-95; A8331 at 410-11; A8390 at 639-40-A8391 at 642-43.

All that could possibly be left is a knotless anchor where the suture is tensioned after anchor insertion. KFx's patents explain that this approach is an advantage because when the suture is tensioned after the anchor is inserted, the suture tension can be optimized since the surgeon knows exactly where the lateral anchor is located. A104 at 1:39-43; A108 at 9:43-58. KFx's inventors also testified to this benefit of the invention. A8233 at 124-25; A8241 at 156.

Greenfield itself provides the best evidence that it should be combined with Millett. Not only is Greenfield a two-piece "base and cap" knotless anchor used in *the same field as Millett -- i.e.,* arthroscopic, orthopedic surgery (A3113 at 7:24-25), just like the lateral anchor disclosed in KFx's patents -- but it also teaches the benefits of first inserting the anchor base and then tensioning the suture. It explains that after the base is inserted but before the cap is put into place (just like in the KFx patent), the surgeon "can pull on the suture material while it is threaded through the suture anchor and apply a proper tension to the suture to adjust the position of the soft tissue and the tension of the suture thereon." A3114 at 9:35-42; *see also* A3113 at 7:13-32 (tensioning suture after anchor insertion allows the surgeon to achieve an optimal repair).

In addition to these express teachings in Greenfield, Arthrex showed at trial that permitting suture tensioning after anchor insertion solved a problem in the industry, that Greenfield was the type of anchor that solved that problem, and that

it taught one of ordinary skill in the art to use Greenfield as the solution.  A8390 at 639-640.

By contrast, KFx offered nothing of substance to counter this evidence.  Its expert, Dr. Ticker, was forced to acknowledge his previous testimony that he *did not* "have an opinion whether it would have been appropriate to combine the Millett work with a Greenfield knotless two-piece anchor."  A8427 at 776.  Despite this candid admission, when asked on direct examination whether there was a reason to combine Millett and Greenfield, Dr. Ticker testified simply that "I don't think there was a reason.  It wasn't obvious to do that."  A8424 at 765.

The only reason Dr. Ticker ultimately provided for this conclusory testimony was that "there was nothing in Millett that would direct you to go, say, to Greenfield as opposed to any of the other patents that were out there.  Again, some that wouldn't allow tension after insertion, that was the important part." *Id*. at 765-66.

This explanation side-steps the most relevant facts -- it ignores Greenfield.  As explained above, *and as Dr. Ticker did not dispute,* Greenfield does explain why its two-piece "base and cap" knotless anchor provides the precise benefits identified by Dr. Ticker; it teaches to tension the suture after the anchor base is inserted into bone to adjust the position of the soft tissue and to optimize the repair.

*Supra* at 17-18. Thus, even in the pre-*KSR* world, the strict TSM (teaching, suggestion, or motivation) test would have been met.

Moreover, Dr. Ticker's type of reasoning has been soundly rejected by *KSR* and this Court. *KSR* rejected the approach that one of the references must provide the teaching, suggestion or motivation that the two references be combined. Rather, as this Court explained, the Supreme Court, in *KSR*, "criticized a rigid approach to determining obviousness based on the disclosures of individual prior-art references, *with little recourse to knowledge, creativity, and common sense that an ordinarily skilled artisan would have brought to bear when considering combinations or modifications.*" *Randall Mfg. v. Rea,* 733 F.3d 1355, 1362 (Fed. Cir. 2013) (citing *KSR,* 550 U.S. at 415-22) (emphasis added).

Dr. Ticker's approach (even if it *did* apply to Greenfield) is the rigid approach rejected by the Supreme Court and this Court. In stark contrast to Arthrex's evidence, Dr. Ticker never considered how a person of ordinary skill would react knowing about the problems that existed with tying knots, or would react to the benefits taught in Greenfield of tensioning the suture after the anchor base is inserted into bone. Dr. Ticker never considered how all of this might influence a person of ordinary skill in the art to combine Millett and Greenfield.

He simply points to Millett and says it does not direct a person of ordinary skill to Greenfield.[17]

In sum, the prior art Millett Work discloses the basic bridging concepts from KFx's Patents to provide a better footprint for repairing torn tissue. Those working in the field recognized that Millett could be improved by a knotless lateral anchor. That missing limitation is supplied by the functionally-identical Greenfield base-and-cap knotless anchor. In addition to providing the known benefits of a knotless anchor in the same field as Millett, Greenfield also explains the benefits of permitting suture tensioning after insertion of the anchor base. Under the "expansive and flexible" approach to obviousness enunciated in *KSR* and followed by this Court, this a strong case of obviousness as a matter of law. This finding is all the more appropriate because the technology is in the predictable, mechanical arts (as Dr. Ticker acknowledges, A3057 at ¶ 212) where it is generally easier to find obviousness. *Ruiz*, 357 F.3d at 1276.[18]

KFx's secondary considerations evidence does not change this result. The Supreme Court placed secondary considerations in their proper context long ago,

---

[17]  Dr. Ticker also provided testimony that, according to KFx, establishes secondary considerations of non-obviousness. As shown *infra* at 55-59, any such evidence cannot and does not overturn Arthrex's strong showing of obviousness.

[18]  Even if the district court's substantial evidence approach were the law, KFx's patents are still obvious. As explained above, KFx has no legally appropriate evidence to avoid a finding of obviousness. But even if it has something to say, such evidence can hardly be described as substantial.

stating "[secondary] considerations are relevant only in a close case where all other proof leaves the question of invention in doubt." *Dow Chemical Co. v. Halliburton Oil Well Cementing Co.,* 324 U.S. 320, 330 (1945); *see also Jungersen v. Ostby & Barton Co.*, 335 U.S. 560, 567 (1949) ("Where . . . invention is plainly lacking, commercial success cannot fill the void").

While evidence of secondary considerations, if present, should be considered, this Court has maintained this same view toward "secondary considerations." *Rothman v. Target Corp.,* 556 F.3d 1310, 1322 (Fed. Cir. 2009) (a strong prima facie showing of obviousness stands *even where there is "considerable evidence" of secondary considerations*) (emphasis added); *Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.,* 485 F.3d 1157, 1162 (Fed. Cir. 2007) (obviousness found *notwithstanding "substantial evidence of secondary considerations"* given the strength of the prima facie obviousness showing) (emphasis added); *Motorola, Inc. v. Interdigital Tech. Corp.*, 121 F.3d 1461, 1472 (Fed. Cir. 1997) (obviousness confirmed *even in light of "strong objective evidence" of secondary considerations*) (emphasis added).

The district court did not claim KFx's evidence of secondary considerations was "considerable," "substantial" or "strong;" it merely summarizes KFx's evidence.  A4.  But even if KFx's evidence was "considerable," as the Supreme

Court and this Court have repeatedly held, secondary consideration are insufficient to save a patent that is otherwise invalid as obvious.

In any event, KFx's secondary considerations evidence is scant.  The district court relied on its belief that "Arthrex, tried and failed, to arrive at the patented method."  A4.  But as explained above, Arthrex did not try and fail.  To the contrary, Arthrex and Dr. ElAttrache developed a bridge with a knotless anchor which was successfully tested.  *Supra* at 18.[19]  Arthrex did not come out with its SutureBridge method earlier as it was working on other priorities, including the development of an improved knotless anchor.  *Supra* at 18-19.  These facts are similar to *Boston Scientific*, 554 F.3d at 991, where the Federal Circuit recognized the defendant's "delay" had nothing to do with an inability to conceive of the claimed drug-eluding stent; but rather it was due to practical difficulties in finding a suitable drug.

The district court also relies on "long-felt need for the patented method."  A4.  But as explained above, there was no such long-felt need.  Millett had previously developed the basic bridging concept and *almost immediately* after Dr.

---

[19]    To the extent the court relied upon lack of success that Arthrex had making a commercially viable stand-alone knotless anchor (*i.e.,* one ***not*** used in a bridged construct), this would fall outside the scope of the claims.  It is legal error to rely upon such evidence as secondary considerations.  *See Allergen, Inc. v. Duke Univ.,* No. 2013-1249, slip op. at 23 (Fed. Cir. June 10, 2014).

Millett's method was introduced, Dr. ElAttrache and Arthrex realized a knotless lateral anchor would improve it. *Supra* at 18.

Lastly, the district court relies on Arthrex's "commercial success." But KFx did not establish the required nexus between that success and the claimed invention, that is, the specific order of steps required by all claims. *See In re Applied Materials, Inc.,* 692 F.3d 1289, 1299-1300 (Fed Cir. 2012) (commercial success requires a "nexus . . . between the sales and the merits of the claimed invention," that is, "proof that the sales were a direct result of the unique characteristics of the claimed invention – as opposed to other economic and commercial factors unrelated to the quality of the patented subject matter").

Without question, SutureBridge has been successful. But the evidence does not fairly show that the success is attributable to the patented invention. The evidence at trial was that Arthrex's success was due to its unique culture of innovation, its speed in bringing new products to the market to meet surgeon's needs, its extensive surgeon training, its reputation for high quality products and its low failure rates. A8345 at 467-A8347 at 473. It is for these same reasons that Arthrex is a strong number-one in its market for all of its products.

Moreover, the patent covers only a specific order of steps, including tensioning the suture *after* inserting the lateral anchor. Arthrex's SutureBridge brochure, however, allows the surgeon to choose one of three methods of

tensioning.  The first two, tensioning the suture *before* any part of the anchor goes in the hole, or removing the eyelet from the hole to re-tension the suture (if the original tension was not adequate), admittedly did not infringe the patent.  A8315 at 347-48.  Only the third option, where the suture is tensioned while the eyelet remains in the hole, was found to infringe.  KFx did not even try to quantify the number of surgeons who use this third option.

It is significant that upon the jury's verdict, Arthrex revised its materials to eliminate this third tensioning option so that today, Arthrex does not teach tensioning the suture after any part of the anchor is placed into the hole.

## V.     ARTHREX IS ENTITLED TO JUDGMENT OF NO INDUCED INFRINGEMENT

### A.     Legal Standard for Inducement

In *Global-Tech Appliances, Inc. v. SEB, SA,* 563 U.S. ___, 131 S.Ct. 2060, 2068 (2011), the Supreme Court clarified that "induced infringement under [35 U.S.C. § 271(b)] requires knowledge that the induced acts constitute patent infringement" (in addition to knowledge of the patent).  Proof of "willful blindness" is sufficient to establish such knowledge because "persons who know enough to blind themselves to direct proof of critical facts in effect have actual knowledge of those facts."  *Id*. at 2068-69.  The Court emphasized that willful blindness is an exacting standard, surpassing recklessness and negligence.  *Id*. at 2070-71.  To be willfully blind, "(1) the defendant must subjectively believe that

there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Id*. at 2070. "[T]hese requirements," the Court explained, "give willful blindness an appropriately limited scope." *Id*.

> B.      KFx Failed to Provide Sufficient Evidence that Arthrex Knew of the Infringement

KFx failed to establish that Arthrex should be liable for induced infringement because it did not set forth substantial evidence that Arthrex had knowledge of – or was willfully blind to – the infringement. The "evidence" relied upon by KFx, discussed below, is legally ***irrelevant*** to this knowledge issue. The evidence relevant to the issue shows the opposite -- that Arthrex did not subjectively believe that its SutureBridge or SpeedBridge procedures infringe any valid claim of KFx's Patents.

In denying JMOL, the district court noted that KFx "relied primarily" upon evidence such as technique guides, establishing the unremarkable fact that Arthrex encouraged surgeons to perform the SutureBridge and SpeedBridge procedures. A4-5. KFX focused on this evidence in its arguments to the jury as well as in responding to Arthrex's JMOL. *E.g.,* A8431 at 794:17-796:22; A8452 at 879:16-19. Such evidence, however, is legally insufficient to constitute inducement. For some time, this Court has held that the specific intent requirement for inducement

requires more than "mere knowledge of possible infringement by others." *Warner-Lambert Co. v. Apotex Corp.,* 316 F.3d 1348, 1364, (Fed. Cir. 2003).

For example, in *Vita-Mix Corp. v. Basic Holding, Inc.,* 581 F.3d 1317, 1329 (Fed. Cir. 2009), as here, the plaintiff tried to rely upon the defendant's instructions to customers – which allegedly taught an infringing use – as evidence of a culpable intent to infringe. *Id*. at 1328. But this Court affirmed the district court's grant of summary judgment of no liability, ***because there was no evidence that suggested the defendant believed the instructions taught an infringing use.*** The Court recognized that encouraging the acts is different from having the requisite knowledge; although the instructions encourage the acts, they do not demonstrate a specific intent to encourage infringement because the defendant "could have reasonably believed" it was teaching a non-infringing method. *Id*. at 1328.

More recently, this Court raised the requisite knowledge standard, explaining "[a] finding of inducement requires both knowledge of the existence of the patent ***and*** *'knowledge that the induced acts constitute patent infringement.'*" *Commil USA, LLC v. Cisco Sys., Inc.,* 720 F.3d 1361, 1367 (Fed. Cir. 2013) (citing *Global-Tech,* 131 S. Ct. at 2068) (emphasis added). As one district court since explained in rejecting an argument similar to KFx's: "encouraging another to commit acts under circumstances in which one knows that there is a risk that those acts constitute patent infringement does not lead to liability under § 271(b).

Knowledge of a risk that the acts *might* constitute infringement is not enough; the inducer *must know* that the acts constitute infringement." *Mikkelsen Graphic Eng'g Inc. v. Zund Am., Inc.,* 2011 U.S. Dist. LEXIS 141548 (E.D. Wis. Dec. 8, 2011) (emphasis added).

The other rationale that the district court provides for denying JMOL is that the jury was free to reject Arthrex's evidence of its good faith belief in non-infringement. A5. KFx argued, and the district court seemingly agreed, that the jury could infer the requisite intent because Arthrex did not obtain a formal, written opinion from "a patent lawyer" in 2009 and because it is not clear whether its independent counsel reviewed the regulatory submission on the accused products that KFx relied upon in its infringement case at trial. *Id*.; A17394.

This too is legally insufficient. Arthrex did not have an obligation to obtain an opinion of counsel when it learned of the KFx '311 patent. *In re Seagate Tech., LLC,* 497 F.3d 1360, 1371 (Fed. Cir. 2007) (en banc). This KFx evidence, nothing more than "poking holes" in those opinions, cannot be legally relevant to satisfy KFx's burden.

Likewise, liability premised on an inference from a lack of opinion of counsel is the same adverse inference that this Court soundly rejected a decade ago. *Knorr-Bremse System Fuer Nutzahrzeuge v. Dana Corp.,* 383 F.3d 1337 (Fed. Cir. 2004). In *Knorr-Bremse,* this Court held that "no adverse inference that

an opinion of counsel was or would have been unfavorable flows from an alleged infringer's failure to obtain or produce an exculpatory opinion of counsel." *Id.* at 1341.

Yet here, KFx argued that the jury could infer that because Arthrex did not obtain an independent opinion in 2009 that such an opinion would have been negative, and likewise, that because Arthrex's independent counsel did not have the FDA submission that KFx relied upon at trial, that his opinion would have also been adverse to Arthrex if he had all of the information. A8435 at 808:12-22; A17394.[20] That rationale defies *Knorr-Bremse's* prohibition that "it is inappropriate to draw a[n] adverse inference from failure to consult counsel." 383 F.3d at 1345.

The evidence relevant to Arthrex's knowledge of infringement, most of which the district court's JMOL Order ignores, confirms that Arthrex *did not know* it was inducing infringement. This evidence begins with KFx's witnesses. Mr. Scott, the CEO of KFx, testified that *KFx understands Arthrex does not believe*

---

[20] Despite KFx's attorney argument, there was no showing that Arthrex intentionally "withheld" the FDA documents from its opinion counsel, Mr. Gaskey, or that it would have been relevant to his opinion. The FDA documents were relevant to whether the eyelet was part of the anchor (an issue before the jury and not raised in this appeal). But none of Mr. Gaskey's opinions focused on whether the eyelet component was part of the "anchor." A13905-918; A14025-042; A14154-172; A14524-526. Rather, Mr. Gaskey's non-infringement opinions were premised on the "inserting" issue (which the district court has stated was reasonable, A6-7) and on prosecution history estoppel.

*that it infringes.* A8288 at 246:6-23. Inventor Dr. Tauro testified that "*Arthrex's SutureBridge is very different than KFx's technique,*" and that "both the medial and lateral implants in SutureBridge *are completely different* than in KFx's technique." A8235 at 133:21-134:18 (emphasis added).

The remaining evidence is consistent. When KFx's first patent was about to issue in 2009, KFx told Arthrex about its patent but ***did not allege*** that Arthrex was infringing or that Arthrex would need a license. A8399-400 at 675:20-676:7; 676:20-677:7; 677:14-19. Even without a claim of infringement, Arthrex's general counsel, Mr. Schmieding, reviewed the KFx patent claims and prosecution history confirming that the Arthrex procedures were "absolutely different" from KFx patented methods, recognizing many of the same differences acknowledged by the KFx inventors. A8390 at 677:20-681:7; *supra* at 11.

When KFx finally did make an allegation of infringement (by filing the present suit), Mr. Schmieding requested an independent infringement review by outside counsel, Mr. Gaskey, instructing Mr. Gaskey to review whatever information he needed to determine whether KFx had a claim. *Id.* at 683:3-684:23. Mr. Gaskey subsequently confirmed Mr. Schmieding's earlier belief that Arthrex was not infringing. A13905-918; A14025-042; A14154-172; A14524-526; A8401-03 at 684:24-685:1; 687:4-688:5; 690:13-691:25.

Arthrex also believed that the KFx patents were invalid based on Arthrex's earlier bridging work with Drs. Millett and ElAttrache. A8400-01 at 680:14-681:7. Mr. Gaskey independently confirmed this belief as well. A14284-A14304; A8402-403 at 688:14-690:5. This good faith belief in invalidity likewise conflicts with a finding of inducement. *Commil*, 720 F.3d at 1368.[21]

KFx has no legally relevant evidence, let alone substantial evidence, to support the jury's finding of induced infringement. Accordingly, Arthrex is entitled to judgment of no induced infringement.

### C. Knowledge of Infringement Cannot be Shown Where Arthrex Presented Objectively Reasonable Defenses

Where, as here, the court determines as a matter of law that Arthrex had objectively reasonable defenses, A6-7,[22] there can be no specific intent for inducement. In a similar context, this Court has ruled that "willful" behavior

---

[21]   KFx also failed to produce evidence constituting willful blindness to the infringement. As the Supreme Court explained, willful blindness requires evidence showing "active efforts by an inducer to avoid knowing about the infringing nature of the activities." *Global-Tech,* 131 S.Ct. at 2071. Unlike Arthrex, which went out of its way to confirm its activity was lawful when it was accused of infringement, a willfully blind defendant "takes deliberate actions *to avoid* confirming a high probability of wrongdoing." *Id.* at 2070 (emphasis added). The district court acknowledged that "KFx attacked [Arthrex's] investigation on cross-examination, but it did not present any evidence that Arthrex failed to investigate the patent at all." A8.

[22]   In ruling no willfulness, the district court found that Arthrex's claim construction positions (which would have resulted in a judgment of non-infringement as discussed above) and invalidity defenses were reasonable. *Id.* KFx did not appeal the district court's grant of JMOL of no willful infringement.

requires a finding of objective recklessness.  *In re Seagate*, 497 F.3d at 1371.  A

threshold inquiry into recklessness "entails an objective assessment of potential

defenses based on the risk presented by the patent."  *Bard Peripheral Vascular,*

*Inc. v. W.L. Gore & Assoc., Inc.*, 682 F.3d 1003, 1006 (Fed. Cir. 2012).  If an

"accused infringer relies on a reasonable defense to a charge of infringement," the

risk of infringement is not high enough to satisfy the objective prong of the

recklessness inquiry.  *Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.,*

620 F.3d 1305, 1319 (Fed. Cir. 2010).  If there is no objective recklessness where a

defendant has reasonable defenses, it follows that to give inducement an

"appropriately limited scope" that "surpasses recklessness and negligence,"

*Global-Tech,* 131 S. Ct. at 2070, reasonable defenses must also preclude a finding

of specific intent.

Further support can be found in Supreme Court precedent.  In *Safeco*

*Insurance Co. v. Burr,* 551 U.S. 47 (2007), the Supreme Court held that conduct

consistent with an "objectively reasonable" -- even if mistaken -- construction of

legal requirements cannot be "reckless."  After finding that the defendant's

understanding of the legal requirements "was not objectively unreasonable," the

Court found that the defendant's conduct "falls well short of raising the

'unjustifiably high risk' of violating the statute necessary for reckless liability" as a

matter of law.  *Id*. at 67-70.  More broadly, the Court explained that where

circumstances "allow for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a ***knowing or reckless*** violator." *Id.* (emphasis added).  For this additional reason, Arthrex cannot be liable for indirect infringement as a matter of law.

## CONCLUSION

For the foregoing reasons, this Court should find that the accused methods did not infringe KFx's patents, that Arthrex did not induce infringement of KFx's patents and that KFx's patents are invalid as obvious.

Dated:  June 23, 2014              By:  /s/ Robert W. Dickerson

                                        Robert W. Dickerson
                                        DICKSTEIN SHAPIRO LLP
                                        2049 Century Park East, Suite 700
                                        Los Angeles, CA 90067-3109
                                        Tel.: (310) 772-8317
                                        DickersonR@dicksteinshapiro.com

                                        Counsel for Defendant-Appellee

# ADDENDUM

## ADDENDUM TABLE OF CONTENTS

A – Order (1) granting in part and denying in part Arthrex's Renewed
Motion for Judgment as a Matter of Law pursuant to Rule 50(b) and
(2) denying KFx's Motion for Enhanced Damages and Attorneys' Fees
for Willful Infringement
Dkt. No. 349, Filed February 18, 2014 ...........................................................A1 – A9

B – Order denying Arthrex's Motion for a New Trial
Dkt. No. 350, Filed February 18, 2014 ........................................................A10 – A11

C – Judgment
Dkt. No. 288, Filed October 17, 2013 ...........................................................A12 – A14

D – Order Construing Patent Claims
Dkt. No. 64, Filed October 10, 2012 ...........................................................A15 – A20

E – Order denying Arthrex's Motion for Summary Judgment
Dkt. No. 132, Filed July 10, 2013 ................................................................A21 – A28

F – U.S. Patent No. 7,585,311 ...................................................................A77 – A114

G – U.S. Patent No. 8,100,942 .................................................................A115 – A149

H – U.S. Patent No. 8,109,969 ...............................................................A150 – A184

# ADDENDUM    A

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KFX MEDICAL CORPORATION, a Delaware corporation, | CASE NO. 11cv1698 DMS (BLM) |
| Plaintiff, | **ORDER (1) GRANTING IN PART AND DENYING IN PART ARTHREX'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50(b) AND (2) DENYING KFX'S MOTION FOR ENHANCED DAMAGES AND ATTORNEYS' FEES FOR WILLFUL INFRINGEMENT** |
| vs. | |
| ARTHREX INCORPORATED, a Delaware corporation, | |
| Defendant. | **[Docket Nos. 293, 309]** |
| AND RELATED COUNTERCLAIM. | |

This case comes before the Court on Arthrex's renewed motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b). KFx filed an opposition to the motion, and Arthrex filed a reply. The motion came on for hearing on January 31, 2014. Joseph Jennings appeared and argued for KFx, and Robert Dickerson and Megan Woodworth appeared and argued for Arthrex. After thoroughly considering the parties' briefs and oral argument, the Court grants in part and denies in part Arthrex's motion.

///

///

# I.

## DISCUSSION

Arthrex moves for judgment as a matter of law on the issues of obviousness, direct infringement, induced infringement, damages and willful infringement.[1]  "A Rule 50(b) motion for judgment as a matter of law is not a freestanding motion.  Rather, it is a renewed Rule 50(a) motion."  *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009).  Federal Rule of Civil Procedure 50(a)(1) provides:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
>
> (A) resolve the issue against the party; and
>
> (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1).  In the Ninth Circuit, "'[j]udgment as a matter of law is appropriate when the evidence presented at trial permits only one reasonable conclusion.'"  *Torres v. City of Los Angeles*, 548 F.3d 1197, 1205 (9th Cir. 2008) (quoting *Santos v. Gates*, 287 F.3d 846, 851 (9th Cir. 2002)).  "In other words, '[a] motion for a judgment as a matter of law is properly granted only if no reasonable juror could find in the non-moving party's favor.'"  *Id.* (quoting *El-Hakem v. BJY Inc.*, 415 F.3d 1068, 1072 (9th Cir. 2005)).  When considering a motion for judgment as a matter of law, the court must view the evidence "'in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party.'"  *Id.* at 1205-06 (quoting *LaLonde v. County of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000)).

**A.    Obviousness**

Arthrex argues it is entitled to judgment as a matter of law that the patents in suit are invalid as obvious in view of the prior art references Millett and Greenfield.  Arthrex asserts motivation to combine these references is a question of law for the Court.  From this premise, Arthrex contends the

---

[1]  In a footnote, Arthrex also argues it is entitled to judgment as a matter of law on the issue of anticipation.  (Mem. of P. & A. in Supp. of Mot. at 19 n.8.)  That argument, however, does not show the jury's verdict is not supported by substantial evidence.  Accordingly, the Court denies Arthrex's motion for judgment as a matter of law on the issue of anticipation.

A000002

11cv1698

evidence in this case warrants a finding that there was a reason or motivation to combine Millett and Greenfield, therefore Arthrex is entitled to judgment as a matter of law that the patents are obvious. KFx disputes the premise of Arthrex's argument, namely that reason or motivation to combine is a question of law for the Court. It also disputes Arthrex's interpretation of the evidence.

After reviewing the relevant case law, the Court agrees with KFx that reason or motivation to combine is a factual question for the jury, not a legal question for the Court. *See SynQor, Inc. v. Artesyn Tech., Inc.*, 709 F.3d 1365, 1377 (Fed. Cir.), *cert. denied*, ___ U.S. ___, 134 S.Ct. 648 (2013) (stating the jury resolved the underlying factual issues of obviousness, including "whether there was a reason to combine the various elements taught by Arduini in the manner claimed"); *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1367 (Fed. Cir. 2012) (citing *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 617 F.3d 1296, 1303 (Fed. Cir. 2010)) (stating "whether there is a reason to combine prior art references is a question of fact.") The verdict reflects the jury found for KFx on this issue. *SynQor*, 709 F.3d at 1377. Therefore, this Court must determine whether that implicit finding is supported by substantial evidence.

There is no dispute KFx presented evidence that there was no reason or motivation to combine the prior art references of Millett and Greenfield. Specifically, KFx offered the testimony of Dr. Ticker on this point. Arthrex argues it presented substantial evidence to the contrary, but whether Arthrex presented evidence to support its case is not the issue on the present motion. The issue here is whether the jury's finding is supported by substantial evidence, and the Court finds it is. *See Univ. of Pitt. v. Varian Medical Systems, Inc.*, 877 F.Supp.2d 294, 299-300 (W.D. Pa. 2012) (finding expert testimony created legally sufficient evidentiary basis for jury's finding of nonobviousness); *LG Electronics U.S.A., Inc. v. Whirlpool Corp.*, 798 F.Supp.2d 541, 560 (D. Del. 2011) (stating jury's finding of nonobviousness not against great weight of evidence in view of conflicting expert opinions).

To the extent Arthrex challenges the jury's ultimate conclusion that the patents were not obvious, the Court finds that decision is also supported by substantial evidence. In addition to the evidence mentioned above, KFx presented evidence of secondary considerations of nonobviousness, which support the jury's finding. *See Power-One, Inc. v. Artesyn Tech., Inc.*, 556 F.Supp.2d 591, 601-

02 (E.D. Tex. 2008) (discussing evidence of secondary considerations as support for the jury's finding of nonobviousness). Specifically, KFx presented evidence that others, including Arthrex, tried and failed to arrive at the patented method. KFx also presented evidence that there was a long-felt need for the patented method, and that Arthrex enjoyed considerable commercial success after adopting the patented method. In view of all of the evidence, Arthrex is not entitled to judgment as a matter of law on the issue of obviousness.

**B.      Direct Infringement**

Arthrex also moves for judgment as a matter of law on direct infringement. Specifically, Arthrex argues there was insubstantial evidence to support a finding that the eyelet portion of the Arthrex device was part of the anchor. However, the Court disagrees. As KFx points out, there was more than sufficient evidence to support this finding. Indeed, Arthrex itself described the eyelet as part of the anchor. This evidence was substantial, and thus Arthrex is not entitled to judgment as a matter of law on the issue of direct infringement.

**C.      Induced Infringement**

Next, Arthrex moves for judgment as a matter of law on the issue of inducement. Specifically, Arthrex argues there was insubstantial evidence to support a finding that Arthrex had the requisite intent.

Induced infringement "'requires knowledge that the induced acts constitute patent infringement." *Commil USA, LLC v. Cisco Systems, Inc.*, 720 F.3d 1361, 1366 (Fed. Cir. 2013), *pet. for cert. filed*, No. 13-896 (Jan. 23, 2014) (quoting *Global-Tech Appliances, Inc. v. SEB S.A.*, ___ U.S. ___, 131 S.Ct. 2060, 2068 (2011)). The knowledge requirement "may be satisfied by showing actual knowledge or willful blindness." *Id.* (citing *Global-Tech*, 131 S.Ct. at 2072). Willful blindness exists when one "takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Global-Tech*, 131 S.Ct. at 2070-71. KFx bore the burden to show, by a preponderance of the evidence, that this requirement was met.

There was no dispute in this case that Arthrex was aware of the KFx patents prior to introducing its SpeedBridge and Suture Bridge procedures. The content of Arthrex's technique

- 4 -

A000004

11cv1698

1   guides, videos and sales bulletins was also not in dispute.  KFx relied primarily on this evidence to

2   support its argument that Arthrex had the requisite intent for inducement.

3       Arthrex argues it did not have the requisite intent, and to support that argument it relies

4   primarily on the testimony of Arthrex's Vice President and General Counsel, John Schmieding.[2]  Mr.

5   Schmieding testified that after being notified of the patent, he determined, based on his review of the

6   patent and the file history, that Arthrex did not infringe and the patent was invalid.  Mr. Schmieding's

7   noninfringement opinion was based on his understanding that the SpeedBridge procedure involved

8   "wedging," which "is a completely different concept, functions differently, and times all of those steps

9   in a different manner."  (Trial Tr. at 680.)  Mr. Schmieding's invalidity opinion was based on his

10  understanding of Millett, Thal and Greenfield.

11      On cross-examination, however, Mr. Schmieding admitted he did not have any documents to

12  support his testimony, and that he is "not a patent lawyer."  (*Id.* at 675.)  KFx also introduced

13  evidence, contrary to Arthrex's noninfringement position at trial, that the eyelet was part of the

14  anchor, and that Mr. Schmieding failed to provide that evidence to opinion counsel.  In view of this

15  evidence, the jury could have found that Mr. Schmieding did not have a good faith belief that Arthrex

16  was not infringing the KFx patents or that the patents were invalid.[3]

17      Viewing the evidence in the light most favorable to KFx, and drawing all reasonable inferences

18  in its favor, the Court cannot say no reasonable juror could have found that Arthrex had the requisite

19  intent for inducement.  Accordingly, Arthrex is not entitled to judgment as a matter of law on this

20  issue.

21  **D.    Damages**

22

23      [2]  Arthrex also asserts the intent element is not met in this case because "Arthrex presented
    defenses that were not objectively unreasonable."  (Mem. of P. & A. in Supp. of Mot. at 21.)

24  Although this argument is relevant to the objective prong of willfulness, Arthrex fails to cite any
    authority that it is likewise relevant to the intent requirement for inducement.  Rather, the intent

25  requirement for inducement is more like the subjective prong of willfulness, which asks whether the
    risk of infringement "was either known or so obvious that it should have been known to the accused

26  infringer."  *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007).  Notably, the jury found
    for KFx on this issue, which is consistent with its finding on induced infringement.

27      [3]  Even if the jury found otherwise, *i.e.*, that Mr. Schmieding's positions of nonfringinement
    and invalidity were taken in good faith, that would not mandate a finding of no inducement.  *See*

28  *Commil*, 720 F.3d at 1368-69 (stating although evidence of an accused infringer's good-faith belief
    of invalidity *may* negate the requisite intent for inducement, it does not preclude such a finding).

A000005

Next, Arthrex argues it is entitled to judgment as a matter of law on the issue of damages. Specifically, Arthrex asserts the theory of KFx's damages expert, George Strong, was contrary to law. KFx responds that this argument goes to the admissibility of Mr. Strong's testimony, not to whether there was sufficient evidence to support the jury's decision. The Court agrees, and thus rejects Arthrex's request for judgment as a matter of law on the issue of damages. *See Versata Software, Inc. v. SAP America, Inc.*, 717 F.3d 1255, 1264 (Fed. Cir. 2013), *cert. denied*, 2014 WL 210681 (Jan. 21, 2014) (rejecting arguments about admissibility of expert opinion because they should have been raised "under the framework of the Federal Rules of Evidence and through a challenge under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).").

**E.    Willful Infringement**

The only remaining issue in Arthrex's motion is willful infringement. Although the jury made a finding on this issue, the Court is the final decisionmaker on the first prong of the willfulness inquiry. *Bard Peripheral Vascular, Inc. v. W.L. Gore & Associates, Inc.*, 682 F.3d 1003, 1007 (Fed. Cir. 2012), *cert. denied*, ___ U.S. ___, 133 S.Ct. 932 (2013). This prong asks whether the infringer "acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *Seagate*, 497 F.3d at 1371. KFx must make this showing by clear and convincing evidence. If KFx satisfies the objective prong, the Court must then determine whether there was legally sufficient evidence to satisfy the second prong of the willfulness inquiry, which asks whether "this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer." *Id.*

Arthrex argues KFx cannot satisfy the first, objective prong because Arthrex had reasonable defenses to KFx's claims. Specifically, Arthrex relies on its claim construction position, its noninfringement position and its invalidity positions. KFx disputes the strength of these positions, asserting the invalidity position was weak, the noninfringement position was baseless and the claim construction position was meritless.

The relative strength or weakness of Arthrex's defenses, however, is not the issue. The issue is whether Arthrex's defenses were reasonable, *i.e.*, "whether a 'reasonable litigant could realistically expect' those defenses to succeed." *Bard*, 682 F.3d at 1008 (citations omitted). On the issue of claim

construction, the Court disagreed with Arthrex's arguments, but those arguments were not unreasonable. Indeed, most defendants accused of infringement argue for the narrowest possible interpretation of the claims in an effort to avoid infringement. Likewise, the jury rejected Arthrex's invalidity defenses, but that does not make those defenses unreasonable. *See Voda v. Medtronic Inc.*, 899 F.Supp.2d 1188, 1198 (W.D. Okla. 2012), *aff'd*, 2013 WL 6050872 (Fed. Cir. Nov. 18, 2013) ("the fact that defendants were ultimately unsuccessful does not render these defenses a sham or unreasonable.")

One aspect of Arthrex's case was unreasonable, namely its noninfringement position that its anchors were one-piece anchors. As KFx points out, Arthrex took the opposite position in documents it submitted to the FDA. (*See* Decl. of Joseph Jennings in Supp. of Opp'ns to Arthrex's Post-Trial Motions, Ex. 531 at 6) (describing SwiveLock Anchor as "a two-component, knotless suture anchor comprised of an eyelet and a hollow anchor body.") This kind of about-face has led at least one court to conclude that a noninfringement defense was unreasonable. *See Fractus, S.A. v. Samsung Electronics Co., Ltd.*, 876 F.Supp.2d 802, 829 (E.D. Tex. 2012) (finding noninfringement defense unreasonable where defendant "attempted to argue that its antennas were not 'planar' because they include notches and holes, despite referring to its own antennas as '*planar* inverted-f antennas (PIFA).") Thus, this aspect of Arthrex's case was unreasonable.

Other aspects of the case could also support a finding that Arthrex "acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *Seagate*, 497 F.3d at 1371. Specifically, Arthrex's pre-litigation conduct, set out above in the Court's discussion of inducement, could support a finding that Arthrex was objectively reckless.[4]

Nevertheless, considering that evidence together with Arthrex's defenses and positions during litigation, the Court is not convinced that KFx met its burden to prove by clear and convincing

---

[4] *Seagate* states, "in ordinary circumstances, willfulness will depend on an infringer's prelitigation conduct." 497 F.3d at 1374. And at least one court has looked to these facts in deciding whether the objective prong of the willfulness test has been met. *Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*, No. 09-290, 2013 WL 5332108, at *34-36 (W.D. Penn. Sept. 23, 2013). Arthrex does not rely on its prelitigation conduct in support of request for judgment as a matter of law on willful infringement. However, KFx raised Arthrex's prelitigation conduct in its motion for enhanced damages and attorneys' fees, and the parties discuss it in the briefing on that motion.

1   evidence that Arthrex "acted despite an objectively high likelihood that its actions constituted

2   infringement of a valid patent." *Seagate*, 497 F.3d at 1371. Notably, two courts have found willful

3   / / /

4   infringement post-*Seagate/Bard*, *see Fractus*, 876 F.Supp.2d 802; *Carnegie Mellon*, 2013 WL

5   5332108, but in both of those cases the facts were more egregious than the facts of this case.

6       In *Fractus*, the defendant's noninfringement position was similar to Arthrex's position in this

7   case in that it was inconsistent. However, in *Fractus*, the defendant's invalidity position was also

8   unreasonable in that in coming to its invalidity position, the defendant "analyzed the wrong antenna

9   and resorted to altering the prior art to make it resemble the figures in the Patents-in-Suit." 876

10  F.Supp.2d at 829. Arthrex did not engage in similar behavior in coming to its invalidity position in

11  this case. Rather, it analyzed the relevant prior art and came to conclusions about anticipation and

12  obviousness. Thus, unlike the defendant in *Fractus*, which was left with no reasonable defenses,

13  Arthrex at least had a reasonable defense of invalidity.

14      Similarly, in *Carnegie Mellon*, there was evidence the defendant had knowledge of the patents-

15  in-suit at the time of infringement "and that the very people who designed the Accused Technology

16  knew of the patents." 2013 WL 5332108, at *34. Nonetheless, the defendant "made little effort to

17  determine whether it was infringing these patents." *Id.* at *35. None of the engineers who were

18  working on the Accused Technology read the patent claims, conducted an investigation of the patents,

19  told others to investigate the patents or sent the patents to defendant's legal team. *Id.* The court noted

20  this did not conform with the defendant's "own purported IP policy, which ... requires that any such

21  information about patents be forwarded to the legal department for analysis." *Id.* at *36. The court

22  found the defendant was "a sophisticated entity with nearly 3,000 patents. Yet, it took absolutely no

23  steps to investigate these patents before producing 2.3 billion chips, despite the fact that the

24  technology was *named* after Dr. Kavcic, one of the inventors of the CMU Patents." *Id.* (citation

25  omitted). Here, by contrast, Mr. Schmieding testified that once he was informed of KFx's patent, he

26  reviewed it and came to the conclusion that Arthrex did not infringe and the patent was invalid. KFx

27  attacked that investigation on cross-examination, but it did not present any evidence that Arthrex

28  failed to investigate the patent at all, like the defendant in *Carnegie Mellon*.

1   ///

2   ///

3   ///

4       When compared with these cases, KFx has not met its burden on the first prong of willful

5   infringement.[5] Thus, the Court grants Arthrex's motion for judgment as a matter of law on this issue.

6                                                   **II.**

7                                             **CONCLUSION**

8       For the reasons set out above, the Court grants in part and denies in part Arthrex's renewed

9   motion for judgment as a matter of law. Specifically, the Court grants the motion on the issue of

10  willful infringement and denies the motion as to all other issues. In light of the Court's ruling on

11  willful infringement, the Court also denies KFx's motion for enhanced damages and attorneys' fees.

12      **IT IS SO ORDERED**.

13  DATED: February 18, 2014

14  _____

15                          HON. DANA M. SABRAW
                            United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[5]  In light of this finding, the Court declines to address whether there was sufficient evidence
to support the subjective prong of the willfulness test.

# ADDENDUM   B

1
2
3
4
5
6
7
8 **UNITED STATES DISTRICT COURT**

9 **SOUTHERN DISTRICT OF CALIFORNIA**

10

11 KFX MEDICAL CORPORATION, a      CASE NO. 11cv1698 DMS (BLM)
Delaware corporation,

12                            **ORDER DENYING ARTHREX'S**
                    Plaintiff,     **MOTION FOR A NEW TRIAL**

13     vs.

14                               **[Docket No. 313]**
ARTHREX INCORPORATED, a Delaware

15 corporation,

16                    Defendant.
_____

17 AND RELATED COUNTERCLAIM.

18

19       This case comes before the Court on Arthrex's motion for a new trial. KFx filed an opposition

20 to the motion, and Arthrex filed a reply. The motion came on for hearing on January 31, 2014. Joseph

21 Jennings appeared and argued for KFx, and Robert Dickerson and Megan Woodworth appeared and

22 argued for Arthrex.

23       Arthrex's motion is based on Federal Rule of Civil Procedure 59(a)(1)(A). This Rule states:

24 "The court may, on motion, grant a new trial on all or some of the issues-and to any party-as follows:

25 (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at

26 law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A). Here, Arthrex asserts a new trial is warranted

27 because the jury's invalidity and infringement verdicts are against the clear weight of the evidence.

28 After careful consideration of the arguments raised in the parties' briefs, the evidence presented at trial

1    and the record on file in this case, the Court disagrees with Arthrex's arguments, and therefore denies

2    its motion for a new trial.

3          **IT IS SO ORDERED**.

4    DATED:  February 18, 2014

5                                                    _____

6                                                    HON. DANA M. SABRAW
                                                     United States District Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

A000011

# ADDENDUM   C

1
2
3
4
5
6
7
8
9

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10
11
12

KFX MEDICAL CORPORATION, a
Delaware corporation,

       Plaintiff and Counterdefendant,

       v.

ARTHREX, INCORPORATED., a
Delaware corporation,

       Defendant and Counterclaimant.

13
14
15
16
17
18

Case no. 11cv1698 DMS (BLM)

**JUDGMENT**

19
20
21
22
23
24
25
26
27
28

Pursuant to Rule 58 of the Federal Rules of Civil Procedure, the Court enters judgment as described herein. This judgment is entered further to the jury verdicts returned on August 29, 2013, and October 9, 2013, and the Court's summary judgment orders of October 15, 2012, and July 10, 2013.

1. Arthrex has actively induced infringement of Claims 1, 20 and 28 of U.S. Patent No. 7,585,311 ('311 patent) by promotion of the SutureBridge and SpeedBridge surgical procedures.

2. Claims 1, 20 and 28 of the '311 patent are adjudged not invalid and not unenforceable due to inequitable conduct.

3. Arthrex has actively induced infringement of Claims 1 and 18 of U.S. Patent No. 8,100,942 ('942 patent) by promotion of the SutureBridge and SpeedBridge surgical procedures.

4. Claims 1 and 18 of the '942 patent are adjudged not invalid and not unenforceable due to inequitable conduct.

5. Arthrex has actively induced infringement of Claims 1 and 3 of U.S. Patent No. 8,109,969 ('969 patent) by promotion of the SutureBridge and SpeedBridge surgical procedures.

6. Claims 1 and 3 of the '969 patent are adjudged not invalid and not unenforceable due to inequitable conduct.

7. The jury returned a verdict that the infringement was willful.[1]

8. On Arthrex's counterclaim for a declaration of unenforceability of the '311, '942 and '969 patents, judgment is entered in favor of KFx.

9. On Arthrex's counterclaim for a declaration of noninfringement of the '311, '942 and '969 patents, judgment is entered in favor of KFx.

10. On Arthrex's counterclaim for a declaration of invalidity of the

---

[1] Willfulness is subject to the Court's post-trial consideration of the objective prong of the willfulness issue.

-1-

Judgment
Case no. 11cv1698 DMS (BLM)

'311, '942, and '969 patents, judgment is entered in favor of KFx.

11.    Damages in the amount of $29,000,000 are awarded to KFx for infringement occurring through June 30, 2013.  Any pre-judgment interest and damages for infringement occurring after June 30, 2013, are to be determined by the Court pursuant to motion.

12.    Post-trial motions shall be filed in accordance with Rules 50(b), 54(d) and 59 of the Federal Rules of Civil Procedure.


IT IS SO ORDERED.


Dated: October 17, 2013

Hon. Dana M. Sabraw
United State District Court Judge

Judgment
Case no. 11cv1698 DMS (BLM)

# ADDENDUM   D

1

2

3

4

5

6

7

8 # UNITED STATES DISTRICT COURT

9 ## SOUTHERN DISTRICT OF CALIFORNIA

10

11 KFX MEDICAL CORPORATION, a
Delaware corporation,

CASE NO. 11cv1698 DMS (BLM)

12 **ORDER CONSTRUING PATENT
CLAIMS**

Plaintiff,

13 vs.

14 ARTHREX INCORPORATED, a Delaware
corporation,

15 Defendant.

16 _____

17 AND RELATED COUNTERCLAIM.

18          This matter came before the Court for a claim construction hearing on September 10, 2012.

19 Joseph Jennings and Phillip Bennett appeared and argued on behalf of KFx Medical Corporation

20 ("KFx") and Charles Saber and Salvatore Tamburo appeared and argued on behalf of Arthrex, Inc.

21 ("Arthrex").  After a thorough review of the parties' claim construction briefs and all other material

22 submitted in connection with the hearing, the Court issues the following order construing the disputed

23 terms of the patents at issue in this case.

24 ## I.

25 ### BACKGROUND

26          On August 1, 2011, KFx filed the present Complaint against Arthrex alleging claims of

27 induced and contributory infringement of United States Patent Number 7,585,311 ("the '311 Patent").

28 Arthrex filed an Answer and Counterclaim for declaratory judgment of non-infringement, invalidity

A000015

1    and unenforceability on September 23, 2011.  KFx filed its Answer to the Counterclaim on October

2    17, 2011.

3         On April 2, 2012, the parties filed a joint motion for leave to file a First Amended Complaint,

4    which the Court granted.  The First Amended Complaint realleges the claims in the original

5    Complaint, and adds claims for induced and contributory infringement of United States Patent

6    Numbers 8,100,942 ("the '942 Patent") and 8,109,969 ("the '969 Patent").  Arthrex filed an Answer

7    and Counterclaim on April 23, 2012.

8         On May 25, 2012, KFx filed a motion to dismiss Arthrex's counterclaims for inequitable

9    conduct associated with the '942 and '969 Patents.  The Court granted in part and denied in part KFx's

10   motion, and granted Arthrex leave to file an amended counterclaim, which it chose not to do.  Instead,

11   KFx filed its Answer to the Counterclaim on August 29, 2012.  While that motion was pending, KFx

12   filed a motion for summary judgment of no inequitable conduct in connection with the '311 Patent.

13   That motion is currently pending.

14   **II.**

15   **DISCUSSION**

16        Claim construction is an issue of law, *Markman v. Westview Instruments, Inc.*, 517 U.S. 370,

17   372 (1996), and it begins "with the words of the claim." *Nystrom v. TREX Co., Inc.*, 424 F.3d 1136,

18   1142 (Fed. Cir. 2005) (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir.

19   1996)).  Generally, those words are "given their ordinary and customary meaning." *Id.* (citing

20   *Vitronics*, 90 F.3d at 1582).  This "'is the meaning that the term would have to a person of ordinary

21   skill in the art in question at the time of the invention.'" *Id.* (quoting *Phillips v. AWH Corp.*, 415 F.3d

22   1303, 1313 (Fed. Cir. 2005)).  "The person of ordinary skill in the art views the claim term in the light

23   of the entire intrinsic record." *Id.*  Accordingly, the Court must read the claims "'in view of the

24   specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d

25   967, 979 (Fed. Cir. 1995)).  In addition, "'the prosecution history can often inform the meaning of the

26   claim language by demonstrating how the inventor understood the invention and whether the inventor

27   limited the invention in the course of prosecution, making the claim scope narrower than it would

28   otherwise be.'" *Id.* (quoting *Phillips*, 415 F.3d at 1318).

A000016

Here, there are three patents at issue: the '311 Patent, the '942 Patent and the '969 Patent. Each Patent is entitled, "System and Method for Attaching Soft Tissue To Bone." KFx alleges Arthrex infringes claims 1, 5-7, 11-12, 14-21, 23-25 and 28-30 of the '311 Patent, claims 1-7 and 9-19 of the '942 Patent and claims 1-7 and 13-17 of the '969 Patent. Of these claims, there are six terms and phrases that require construction, which the Court discusses below.[1]

**A.    "Inserting a [ ] anchor into bone"**

The phrase "inserting a [ ] anchor into bone" appears in each of the patents at issue. The dispute here centers on the meaning of "inserting." KFx argues "inserting" should be given its plain and ordinary meaning of putting or placing into, while Arthrex argues "inserting" means putting or placing into so that it is securely fixed.

After reviewing the intrinsic evidence, the Court agrees with KFx that "inserting" should be construed according to its plain and ordinary meaning. Although Arthrex cites to several portions of the specification to support its proposed construction, most of that evidence describes specific embodiments of the invention. *See, e.g.*, '311 Patent, col. 1, ll. 58-63; col. 1, l. 64-col. 2, l. 11; col. 2, ll. 52-67; col. 3, ll. 59-63; col. 4, ll. 11-20; col. 4, ll. 47-53; col. 9, l.65 - col. 10, l. 11; col. 13, ll. 38-45. In this case, those embodiments are meant to provide "example[s] of how to practice the invention in a particular case." *Phillips*, 415 F.3d at 1323. They are not meant to "define the outer limits of the claim term[.]" *Id.* Accordingly, the Court agrees with KFx that one of ordinary skill in the art, after reading the claims and consulting the intrinsic evidence, would construe the phrase "inserting a [ ] anchor into bone" according to its plain and ordinary meaning.

**B.    "Suture"**

The term "suture," which appears throughout the patents at issue, is explicitly defined as "any flexible structure that can be stretched between two or more anchors, and includes, without limitation, traditional suture material, single or multiple stranded threads, or a mesh structure." '311 Patent, col. 3, ll. 52-55. KFx argues the Court should construe "suture" as "any flexible structure that can be stretched between two or more anchors," while Arthrex asserts the Court should construe the term as

---

[1] Prior to the Markman hearing, the parties also disputed the meaning of the term "threads." At the hearing, counsel informed the Court that the parties had agreed KFx's construction was correct. In light of that agreement, the Court will not construe the term "threads."

A000017

1    "a flexible structure that can be stretched between two or more anchors and includes traditional suture

2    material, single or multiple stranded threads, or a mesh structure."

3    "When a patentee explicitly defines a claim term in the patent specification, the patentee's

4    definition controls." *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1380 (Fed. Cir.

5    2009). Here, there is no dispute the patentee defined "suture." KFx and Arthrex include portions of

6    that definition in their proposals, but neither offers the full definition supplied by the patentee.

7    Consistent with the rule stated above, this Court finds that one of ordinary skill in the art, after reading

8    the claims and consulting the intrinsic evidence, would construe the term "suture" according to the

9    meaning provided by the patentee, *i.e.*, as "any flexible structure that can be stretched between two

10   or more anchors, and includes, without limitation, traditional suture material, single or multiple

11   stranded threads, or a mesh structure."

12   **C.    "Fixedly securing the first length of suture to the second anchor without tying knots"**

13          The phrase "fixedly securing the first length of suture to the second anchor without tying

14   knots" appears in each of the patents in suit. As with the term "suture," the patentee provided an

15   explicit definition of the term "fixedly secure," which is "that the suture within the securing

16   mechanism cannot be easily moved relative to the bone anchor." '311 Patent, col. 5, ll. 5-7. Both

17   parties incorporate this definition into their proposed construction of the phrase at issue here. The

18   dispute centers on the "without tying knots" language, with KFx arguing that language modifies the

19   step of fixedly securing the suture to the second anchor, and Arthrex arguing that language should not

20   be included in the definition of this phrase.

21          The claim language makes clear that the step of fixedly securing the first length of suture to

22   the second anchor is performed without tying any knots. Arthrex's proposed construction ignores the

23   entirety of the phrase in favor of the definition of "fixedly secure" only. After reading the claims and

24   consulting the intrinsic evidence, the Court agrees with KFx that one of ordinary skill in the art would

25   construe the phrase "fixedly securing the first length of suture to the second anchor without tying any

26   knots" to mean the first length of suture cannot be easily moved relative to the second anchor and that

27   this step is completed without tying any knots.

28   / / /

- 4 -

11cv1698

**D.** **"Moving the proximal member of the second anchor distally towards the distal member of the second anchor, thereby fixedly securing the first length of suture at the second anchor position without tying any knots"**

In addition to the terms and phrases that run throughout all of the patents at issue, there are a few phrases specific to the '942 and '969 Patents. The first and only phrase specific to the '942 Patent appears in claim 1 and provides: "moving the proximal member of the second anchor distally towards the distal member of the second anchor, thereby fixedly securing the first length of suture at the second anchor position without tying any knots." KFx asserts this phrase should be construed according to its plain and ordinary meaning, while Arthrex argues the phrase should be construed as "the second anchor has two parts and the suture is fixedly secured between the two parts of the second anchor."

After reviewing the intrinsic evidence cited by the parties in support of their respective proposed constructions, the Court agrees with KFx that this phrase needs no construction to a person of ordinary skill in the art. Arthrex' proposed construction fails to convey the relative position of the two parts of the second anchor, how those parts come together and that the suture is secured without tying any knots. As KFx suggests, the plain and ordinary meaning of this phrase is clear to a person of ordinary skill in the art. Therefore, the Court construes this phrase accordingly.

**E.** **"Inserting at least a portion of a second anchor into bone at a position beyond an edge of the soft tissue" [together with] "fixedly securing the first length of suture at the second anchor position without tying any knots"**

Turning to the '969 Patent, the first phrase at issue appears in claim 1, and provides: "inserting at least a portion of a second anchor into bone at a position beyond an edge of the soft tissue" [together with] "fixedly securing the first length of suture at the second anchor position without tying any knots." As above, KFx asserts this phrase should be construed according to its plain and ordinary meaning, while Arthrex argues the phrase should be construed as "the second anchor has two parts and the suture is fixedly secured between the two parts of the second anchor."[2]

/ / /

---

[2] Notably, Arthrex's proposed construction of this phrase is the same as its proposed construction for the phrase discussed above, "moving the proximal member of the second anchor distally towards the distal member of the second anchor, thereby fixedly securing the first length of suture at the second anchor position without tying any knots."

A000019

After reviewing the intrinsic evidence cited by the parties in support of their respective proposed constructions, the Court agrees with KFx that this phrase needs no construction to a person of ordinary skill in the art. Again, Arthrex's proposed construction fails to convey all the details of the claim language, namely that portion of the claim that provides "inserting at least a portion of a second anchor into bone at a position beyond an edge of the soft tissue." Accordingly, the Court construes this phrase according to its plain and ordinary meaning.

**F.    "At least one of said anchors"**

The last phrase at issue in this case also appears in claim 1 of the '969 Patent, and provides: "at least one of said anchors." This phrase appears in claim 1 of the '969 Patent, as recited above. KFx argues this phrase should be accorded its plain and ordinary meaning, while Arthrex asserts it should be construed as "the first anchor inserted into bone." After reviewing the intrinsic evidence cited by the parties in support of their respective proposed constructions, the Court agrees with KFx that this phrase should be construed according to its plain and ordinary meaning.

**III.**

**CONCLUSION**

For the reasons stated above, the disputed terms are interpreted as set forth in this Order.

**IT IS SO ORDERED**.

DATED: October 10, 2012

_____
HON. DANA M. SABRAW
United States District Judge

11cv1698

A000020

# ADDENDUM E

1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT**
9          **SOUTHERN DISTRICT OF CALIFORNIA**
10

11   KFX MEDICAL CORP.,                    CASE NO. 11cv1698 DMS (BLM)
12                          Plaintiff,
13              vs.                         **ORDER DENYING**
                                            **DEFENDANT'S MOTION FOR**
14   ARTHREX, INC.,                         **SUMMARY JUDGMENT**
15                          Defendant.      [Docket No. 81]
16   _____
17   AND ALL RELATED COUNTERCLAIMS.
18

19          This case comes before the Court on Arthrex's motion for summary judgment of invalidity and
20   noninfringement.  KFx filed an opposition to the motion, and Arthrex filed a reply.  The motion came
21   on for hearing on June 28, 2013.  Joseph Jennings and Sean Murray appeared on behalf of KFx, and
22   Charles Saber and Salvatore Tamburo appeared on behalf of Arthrex.  For the following reasons, the
23   Court denies the motion.

24                                          **I.**
25                                    **BACKGROUND**
26          KFx alleges Arthrex is infringing three of its patents:  United States Patent Number 7,585,311
27   ("311 Patent"), United States Patent Number 8,100,942 ("942 Patent") and United States Patent Number
28   8,109,969 ("969 Patent").  All three patents share the same name: "System and Method for Attaching

A000021

Soft Tissue to Bone." KFx alleges Arthrex is indirectly infringing these patents by instructing surgeons to perform Arthrex's "SutureBridge" and "SpeedBridge" surgical techniques.

**II.**

**DISCUSSION**

Defendant moves for summary judgment of invalidity and noninfringement. It argues the patents in suit are invalid as obvious, and the accused methods do not infringe the patents in suit.

**A.    Summary Judgment**

"Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1380 (Fed. Cir. 2005) (citing Fed. R. Civ. P. 56(c)). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982).

The moving party has the initial burden of demonstrating that summary judgment is proper. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). To meet this burden, the moving party must identify the pleadings, depositions, affidavits, or other evidence that it "believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies this initial burden, then the burden shifts to the opposing party to show that summary judgment is not appropriate. *Id.* at 324. The opposing party's evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). *See also IPXL*, 430 F.3d at 1380 (quoting *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus.*, 145 F.3d 1303, 1307 (Fed. Cir. 1998)) (stating "'evidence must be viewed in the light most favorable to the party opposing the motion, with doubts resolved in favor of the opponent.'") However, to avoid summary judgment, the opposing party cannot rest solely on conclusory allegations. *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). Instead, it must designate specific facts showing there is a genuine issue for trial. *Id.* More than a "metaphysical doubt" is required to establish a genuine issue of material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

/ / /

///

**B.    Invalidity**

To prevail on a motion for summary judgment alleging patent invalidity, the moving party must overcome the statutory presumption that the patent is valid. *See* 35 U.S.C. § 282; *IPXL*, 430 F.3d at 1381. This is not an easy task. Indeed, the moving party can only overcome the presumption with "clear and convincing evidence" of patent invalidity. *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 424 F.3d 1276, 1281 (Fed. Cir. 2005) (internal citation omitted).

Here, Defendant argues the patents in suit are invalid as obvious. Title 35 United States Code § 103(a) states:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of the this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103(a). In determining obviousness under this section, "'the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved.'" *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966)). Courts must also consider "any relevant secondary considerations[,]" including "commercial success, long-felt but unsolved needs, failure of others, and unexpected results." *Allergan, Inc. v. Sandoz Inc.*, ___ F.3d ___, 2013 WL 1810852, at *4 (Fed. Cir. May 1, 2013) (citations omitted).

In this case, Defendant relies on two prior art combinations to support its obviousness argument. First, Defendant asserts the patents in suit are obvious in light of United States Patent Number 5,891,168 issued to Raymond Thal ("Thal") and United States Patent Number 5,584,835 issued to Jon B. Greenfield ("Greenfield") or United States Patent Number 7,329,272 issued to Stephen S. Burkhart, *et al.* ("Burkhart"). Second, Defendant argues the patents in suit are obvious over a 2004 article by Peter J. Millett, M.D., *et al.*, entitled "Mattress Double Anchor Footprint Repair: A Novel, Arthroscopic Rotator Cuff Repair Technique" ("the Millett article") in combination with Greenfield and/or Burkhart.

1.    Thal/Greenfield and/or Burkhart

Thal was before the Examiner during prosecution of the patents in suit. He described Thal as follows:

> Thal discloses a method of attaching soft tissue to bone comprising: inserting a first anchor 26 into bone 28, wherein the first anchor is positioned underneath the soft tissue 30; passing a first length of suture 42 from said first anchor over the soft tissue; inserting a second anchor 24 into bone, wherein the second anchor is positioned laterally to the soft tissue; and fixedly securing the first length of suture to the second anchor without tying any knots (Fig. 2).

(Decl. of Charles W. Saber in Supp. of Mot. (Saber Decl."), Ex. 14 at 13.) Greenfield discloses a two-piece knotless anchor, and Burkhart describes Defendant's PushLock anchor.

According to Defendant, Thal discloses every limitation of the asserted claims except one, namely, tensioning the suture after inserting the second anchor into bone. Defendant argues this limitation is found in Greenfield and Burkhart, and thus the combination of Thal and Greenfield and/or Burkhart renders the patents obvious.

In support of this argument, Defendant relies on the prosecution history of the '311 Patent. Specifically, Defendant relies on the Examiner's reason for allowance of the claims over Thal and United States Patent Number 5,634,926 issued to Richard P. Jobe ("Jobe"). Defendant asserts the Examiner allowed the claims to issue over those references because neither disclosed, either individually or in combination, "that the suture be tensioned after the second (lateral) anchor is inserted into bone." (Mem. of P. & A. in Supp. of Mot. at 27) (citation omitted).

Plaintiff disputes this interpretation of the prosecution history. It asserts this limitation, *i.e.*, tensioning the suture after inserting the second anchor into bone, was not the only reason for allowance of the claims. Rather, Plaintiff states the claims were also allowed because neither Thal nor Jobe disclosed the compression of "an area of tissue to bone between the edge of the soft tissue and the first anchor." (Saber Decl., Ex. 14 at 30.)

The Court has reviewed that portion of the prosecution history that Defendant relies on to support this argument, and agrees with Plaintiff that Defendant's interpretation of the record is in error. When the Examiner rejected the claims as obvious over Thal in view of Jobe, he made no mention of the "tensioning" limitation Defendant relies on as the basis for its argument of obviousness. Rather, his

A000024

focus appeared to be on the placement of the anchors "beyond an edge of the soft tissue such that it is not underneath the soft tissue ...." (*Id.* at 13.) In response to that rejection, Plaintiff amended the claims:

> to recite that no part of the first anchor extends beyond the edge of the soft tissue. Claim 91 [Claim 1 of the issued patent] has also been amended to recite, after inserting the second anchor, tensioning the first length of suture to compress an area of tissue to bone between the edge of the soft issue [sic] and the first anchor.

(*Id.* at 26-27.) Plaintiff explained that "neither Thal '168 nor Jobe teach to tension suture *after anchor insertion* to compress an area of tissue to bone *between the edge of the soft issue [sic] and an anchor underneath the soft tissue*." (*Id.* at 27.) It was this distinction that formed the basis for allowance of the claims, (*id.* at 30), not just the "tensioning" limitation Defendant relies on.[1]  Because Defendant's argument is based on a premise that is not supported by the record, the Court rejects Defendant's first argument that the patents are invalid for obviousness.

### 2.    Millett/Greenfield and/or Burkhart

Defendant's second argument is the patents in suit are invalid as obvious over the Millett article in view of Greenfield and/or Burkhart.  Defendant argues the Millett article discloses every limitation of the asserted claims except a knotless second anchor, which is disclosed in Greenfield and Burkhart. Plaintiff does not dispute the scope of the prior art, but urges the Court to reject this argument because Defendant failed to provide any evidence of a reason or motivation to combine these references.

Defendant does not appear to dispute that it must produce some evidence to explain why a person of ordinary skill in the art would have had a reason or motivation to combine the prior art references.  Indeed, even post-*KSR*, Defendant needs "to proffer evidence indicating why a person having ordinary skill in the art would combine the references to arrive at the claimed invention." *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1366 (Fed. Cir. 2012) (citing *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1374 (Fed. Cir. 2008)).

Here, Defendant points to the opinion of Plaintiff's expert, Dr. Ticker, to support its argument that there was a reason or motivation to combine these references, but Dr. Ticker's opinion does not

---

[1]  A review of the drawings in Thal makes this distinction clear.  Those drawings reflect attachment of the soft tissue to the bone at the *edge* of the soft tissue, whereas Plaintiff's invention involves the attachment of an *area* of soft tissue to the bone through the use of anchors underneath the soft tissue and outside the soft tissue and suturing across those points.

support Defendant's argument. On the contrary, "Dr. Ticker[ ] testified that he has no opinion whether it is proper to combine the Millett work with Greenfield or Burkhart." (Reply at 6.) The only other evidence Defendant relies on is the patents in suit. Specifically, Defendant argues the patents in suit identify "the known problems in the prior art, namely a knotless anchor that tensions a suture after insertion." (*Id.* at 8.) As Plaintiff points out, however, "[i]t is impermissible to use the claimed invention as an instruction manual or 'template' to piece together the teachings of the prior art so that the claimed invention is rendered obvious." *In re Fritch*, 972 F.2d 1260, 1266 (Fed. Cir. 1992). Absent any evidence of a motivation to combine these references, Defendant is not entitled to summary judgment of invalidity on the basis of obviousness.

## C. Noninfringement

In addition to moving for summary judgment on the ground of invalidity, Defendant moves for summary judgment on the ground of noninfringement. A determination of infringement, or in this case non-infringement, "requires a two-step analysis. 'First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process.'" *Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1381 (Fed. Cir. 2005) (quoting *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993)). *See also Biagro Western Sales, Inc. v. Grow More Inc.*, 423 F.3d 1296, 1301 (Fed. Cir. 2005) (citing *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998)); *Research Plastics, Inc. v. Federal Packaging Corp.*, 421 F.3d 1290, 1295 (Fed. Cir. 2005); *Aquatex Indus., Inc. v. Techniche Solutions*, 419 F.3d 1374, 1379 (Fed. Cir. 2005) (quoting *Ranbaxy Pharms., Inc. v. Apotex, Inc.*, 350 F.3d 1235, 1239-40 (Fed. Cir. 2003)) (same). The first step is a question of law, and the second step is a question of fact. *Nystrom v. Trex Co., Inc.*, 424 F.3d 1136, 1141 (Fed. Cir. 2005). Infringement will not be shown unless the plaintiff demonstrates "'the presence of every element or its substantial equivalent in the accused device.'" *Terlep*, 418 F.3d at 1384-85 (quoting *Wolverine World Wide, Inc. v. Nike, Inc.*, 38 F.3d 1192, 1199 (Fed. Cir. 1994)).

Here, Defendant raises two noninfringement arguments. First, Defendant argues the asserted claims require that the first anchor be inserted through the soft tissue into the bone. Defendant asserts its accused methods do not perform this step, therefore they do not infringe. Second, Defendant asserts

A000026

1  its Suturebridge method does not infringe because Defendant instructs surgeons using this method to

2  tie knots over the first anchor.

3  / / /

4      1.    Insertion of First Anchor

5      Defendant's first noninfringement argument relies on an issue of claim construction.

6  Specifically, Defendant argues the claims require that the first anchor be inserted through the soft tissue

7  into the bone.  Plaintiff asserts this argument is untimely, and more importantly, that it is incorrect.

8      Although the Court agrees with Plaintiff that this claim construction issue is untimely, the issue

9  needs to be resolved before addressing the issue of infringement.  As mentioned above, Defendant

10  argues the claims require that the first anchor be inserted through soft tissue into bone.  In support of

11  this argument, Defendant relies on the specification and extrinsic evidence.  Plaintiff asserts the portions

12  of the specification on which Defendant relies describe embodiments of the invention, and should not

13  be used to limit the scope of the claims.

14      The Court has reviewed those portions of the specification Defendant cites in support of its claim

15  construction argument, and agrees with Plaintiff that those portions of the specification describe

16  embodiments and examples of the invention, and as such, they should not be read to limit the scope of

17  the claims.  In *Laryngeal Mask Co. Ltd. v. Ambu*, 618 F.3d 1367 (Fed. Cir. 2010), the defendant made

18  a similar argument about whether the term "backplate" included the limitation of a tube joint.  This

19  Court found the "backplate" included that limitation, but the Federal Circuit reversed that claim

20  construction.  For the reasons set out in that case, the Court declines to adopt Defendant's proposed

21  construction of the claims in this case.[2]  The claims do not require that the first anchor be inserted

22  through soft tissue into bone.  With this construction of the claims, Defendant's first argument of

23  noninfringement is rejected.

24      2.    Use of Knots in Connection with First Anchor

25      Defendant's second noninfringement argument is directed to the Suturebridge method.

26  Defendant states that method requires the use of knots to attach the suture to the first anchor, unlike the

27

28      [2] Plaintiff raises another argument against importing this limitation into the claims, namely, that it would render claim 3 superfluous.  The Court agrees with this argument, as well, which provides another reason to reject Defendant's claim construction argument.

A000027

1   method claimed in the patents, which requires that the suture be attached to the second anchor without

2   tying any knots.

3   / / /

4        As Plaintiff points out, however, Defendant's argument is misguided.  That the patent claims

5   require attachment of the suture to the second anchor without tying any knots says nothing about the

6   process of attaching the suture to the first anchor.  That Defendant uses knots to attach the suture to the

7   first anchor has no bearing on the step of attaching the suture to the second anchor.  Accordingly, the

8   Court rejects this argument, and denies Defendant's motion for summary judgment on noninfringement.

9                                              **III.**

10                              **CONCLUSION AND ORDER**

11       For these reasons, the Court denies Defendant's motion for summary judgment.

12       **IT IS SO ORDERED**.

13  DATED:  July 10, 2013

14  _____

15  HON. DANA M. SABRAW
    United States District Judge

A000028

11cv1698

CASE PARTICIPANTS ONLY

# ADDENDUM    F

US007585311B2

## (12) United States Patent
### Green et al.

(10) Patent No.: **US 7,585,311 B2**
(45) Date of Patent: **Sep. 8, 2009**

(54) **SYSTEM AND METHOD FOR ATTACHING SOFT TISSUE TO BONE**

(75) Inventors: **Michael L. Green**, Pleasanton, CA (US); **Joseph C. Tauro**, Toms River, NJ (US); **Bart Bojanowski**, Fremont, CA (US)

(73) Assignee: **KFx Medical Corporation**, Carlsbad, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 749 days.

(21) Appl. No.: **11/143,007**

(22) Filed: **Jun. 1, 2005**

(65) **Prior Publication Data**

US 2006/0004364 A1    Jan. 5, 2006

**Related U.S. Application Data**

(60) Provisional application No. 60/576,477, filed on Jun. 2, 2004, provisional application No. 60/610,924, filed on Sep. 17, 2004, provisional application No. 60/634, 174, filed on Dec. 7, 2004.

(51) **Int. Cl.**
*A61B 17/04*    (2006.01)

(52) **U.S. Cl.** ..................................................... **606/232**

(58) **Field of Classification Search** ................ 606/232, 606/72, 75, 78, 219, 224
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,623,192 A    11/1971    Papazian

| | | |
|---|---|---|
| 4,210,148 A | 7/1980 | Stivala |
| 4,532,926 A | 8/1985 | O'Holla |
| 4,796,612 A | 1/1989 | Reese |
| 4,898,156 A | 2/1990 | Gatturna et al. |
| 5,013,316 A | 5/1991 | Goble et al. |
| 5,192,303 A | 3/1993 | Gatturna et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

SU    1600713    10/1990

(Continued)

OTHER PUBLICATIONS

International Preliminary Report on Patentability mailed Jan. 25, 2007 for International Application No. PCT/US2005/019454.

(Continued)

*Primary Examiner*—(Jackie) Tan-Uyen T. Ho
*Assistant Examiner*—Gregory A Anderson
(74) *Attorney, Agent, or Firm*—Knobbe, Martens, Olson & Bear LLP

(57) **ABSTRACT**

Disclosed herein are methods and devices for securing soft tissue to a rigid material such as bone. A bone anchor is described that comprises a base and a top such that suture material may be compressed between surfaces on the base and top to secure the suture to the anchor. Also described is an inserter that can be used to insert the bone anchor into bone and move the anchor top relative to the anchor base to clamp suture material there between. Also described is a soft-tissue and bone piercing anchor and associated inserter. Methods are described that allow use of the bone anchors to provide multiple lengths of suture material to compress a large area of soft tissue against bone.

**30 Claims, 24 Drawing Sheets**



**US 7,585,311 B2**

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,219,359 | A | 6/1993 | McQuilkin et al. |
| 5,224,946 | A * | 7/1993 | Hayhurst et al. ............ 606/232 |
| 5,269,784 | A | 12/1993 | Mast |
| 5,336,240 | A | 8/1994 | Metzler et al. |
| 5,372,604 | A | 12/1994 | Trott |
| 5,417,712 | A | 5/1995 | Whittaker et al. |
| 5,423,858 | A | 6/1995 | Bolanos et al. |
| 5,423,860 | A | 6/1995 | Lizardi et al. |
| 5,472,452 | A | 12/1995 | Trott |
| 5,478,353 | A | 12/1995 | Yoon |
| 5,500,001 | A | 3/1996 | Trott |
| 5,527,341 | A | 6/1996 | Gogolewski et al. |
| 5,527,343 | A | 6/1996 | Bonutti |
| 5,543,012 | A | 8/1996 | Watson et al. |
| 5,545,180 | A | 8/1996 | Le et al. |
| 5,569,306 | A * | 10/1996 | Thal ............................ 606/232 |
| 5,575,801 | A | 11/1996 | Habermeyer et al. |
| 5,578,057 | A | 11/1996 | Wenstrom, Jr. |
| 5,584,835 | A | 12/1996 | Greenfield |
| 5,591,207 | A | 1/1997 | Coleman |
| 5,634,926 | A * | 6/1997 | Jobe ............................ 606/281 |
| 5,683,419 | A | 11/1997 | Thal |
| 5,690,676 | A | 11/1997 | DiPoto et al. |
| 5,697,950 | A | 12/1997 | Fucci et al. |
| 5,720,765 | A | 2/1998 | Thal |
| 5,725,557 | A | 3/1998 | Gatturna et al. |
| 5,769,894 | A | 6/1998 | Ferragamo |
| 5,800,436 | A | 9/1998 | Lerch |
| 5,814,072 | A | 9/1998 | Bonutti |
| 5,891,168 | A * | 4/1999 | Thal ............................ 606/232 |
| RE36,289 | E | 8/1999 | Le et al. |
| 5,948,001 | A | 9/1999 | Larsen |
| 5,948,002 | A | 9/1999 | Bonutti |
| 5,951,590 | A | 9/1999 | Goldfarb |
| 5,964,769 | A | 10/1999 | Wagner et al. |
| 6,010,525 | A | 1/2000 | Bonutti et al. |
| 6,013,077 | A | 1/2000 | Harwin |
| 6,013,083 | A | 1/2000 | Bennett |
| 6,027,523 | A | 2/2000 | Schmieding |
| 6,045,573 | A | 4/2000 | Wenstrom, Jr. et al. |
| 6,056,751 | A | 5/2000 | Fenton, Jr. |
| 6,063,106 | A | 5/2000 | Gibson |
| 6,093,201 | A | 7/2000 | Cooper et al. |
| 6,093,301 | A | 7/2000 | Van Atta |
| 6,099,547 | A | 8/2000 | Gellman et al. |
| 6,110,207 | A | 8/2000 | Eichhorn et al. |
| 6,117,160 | A | 9/2000 | Bonutti |
| 6,117,161 | A | 9/2000 | Li et al. |
| 6,126,677 | A | 10/2000 | Ganaja et al. |
| 6,149,669 | A | 11/2000 | Li |
| 6,200,330 | B1 | 3/2001 | Benderev et al. |
| 6,241,749 | B1 | 6/2001 | Rayhanabad |
| 6,245,082 | B1 | 6/2001 | Gellman et al. |
| 6,280,474 | B1 | 8/2001 | Cassidy et al. |
| 6,293,961 | B2 | 9/2001 | Schwartz et al. |
| 6,296,659 | B1 | 10/2001 | Foerster |
| 6,306,159 | B1 | 10/2001 | Schwartz et al. |
| 6,319,271 | B1 | 11/2001 | Schwartz et al. |
| 6,328,758 | B1 | 12/2001 | Tornier et al. |
| 6,391,030 | B1 | 5/2002 | Wagner et al. |
| 6,423,065 | B2 | 7/2002 | Ferree |
| 6,432,123 | B2 | 8/2002 | Schwartz et al. |
| 6,464,713 | B2 | 10/2002 | Bonutti |
| 6,491,714 | B1 | 12/2002 | Bennett |
| 6,514,274 | B1 | 2/2003 | Boucher et al. |
| 6,518,200 | B2 | 2/2003 | Lin |
| 6,520,980 | B1 | 2/2003 | Foerster |
| 6,524,317 | B1 | 2/2003 | Ritchart et al. |
| 6,527,794 | B1 | 3/2003 | McDevitt et al. |
| 6,533,795 | B1 | 3/2003 | Tran et al. |
| 6,540,770 | B1 | 4/2003 | Tornier et al. |
| 6,547,800 | B2 | 4/2003 | Foerster et al. |
| 6,551,330 | B1 | 4/2003 | Bain et al. |
| 6,554,852 | B1 | 4/2003 | Oberlander |
| 6,569,187 | B1 | 5/2003 | Bonutti et al. |
| 6,575,987 | B2 | 6/2003 | Gellman et al. |
| 6,582,453 | B1 | 6/2003 | Tran et al. |
| 6,585,730 | B1 | 7/2003 | Foerster |
| 6,605,096 | B1 | 8/2003 | Ritchart |
| 6,635,073 | B2 | 10/2003 | Bonutti |
| 6,638,279 | B2 | 10/2003 | Bonutti |
| 6,652,561 | B1 | 11/2003 | Tran |
| 6,660,008 | B1 | 12/2003 | Foerster et al. |
| 6,660,023 | B2 | 12/2003 | McDevitt et al. |
| 6,673,094 | B1 | 1/2004 | McDevitt et al. |
| 6,712,830 | B2 | 3/2004 | Esplin |
| 6,770,076 | B2 | 8/2004 | Foerster |
| 6,780,198 | B1 | 8/2004 | Gregoire et al. |
| 6,855,157 | B2 | 2/2005 | Foerster et al. |
| 6,984,241 | B2 | 1/2006 | Lubbers et al. |
| 6,986,781 | B2 | 1/2006 | Smith |
| 7,041,120 | B2 | 5/2006 | Li et al. |
| 7,056,333 | B2 | 6/2006 | Walshe |
| 7,081,126 | B2 | 7/2006 | McDevitt et al. |
| 7,083,638 | B2 | 8/2006 | Foerster |
| 7,090,690 | B2 | 8/2006 | Foerster et al. |
| 7,144,415 | B2 | 12/2006 | Del Rio et al. |
| 7,153,312 | B1 | 12/2006 | Torrie et al. |
| 7,156,864 | B2 | 1/2007 | Lintner |
| 7,232,455 | B2 | 6/2007 | Pedlick et al. |
| 7,235,100 | B2 | 6/2007 | Martinek |
| 2001/0008971 | A1 | 7/2001 | Schwartz et al. |
| 2001/0018597 | A1 | 8/2001 | Gellman et al. |
| 2001/0051815 | A1 | 12/2001 | Esplin |
| 2001/0051816 | A1 | 12/2001 | Enzerink et al. |
| 2002/0019649 | A1 | 2/2002 | Sikora et al. |
| 2002/0029066 | A1 | 3/2002 | Foerster |
| 2002/0077631 | A1 | 6/2002 | Lubbers et al. |
| 2002/0111653 | A1 | 8/2002 | Foerster |
| 2002/0128684 | A1 | 9/2002 | Foerster |
| 2002/0169478 | A1 | 11/2002 | Schwartz et al. |
| 2002/0188305 | A1 | 12/2002 | Foerster et al. |
| 2003/0018358 | A1 | 1/2003 | Saadat |
| 2003/0088270 | A1 | 5/2003 | Lubbers et al. |
| 2003/0105591 | A1 | 6/2003 | Hagiwara |
| 2003/0149448 | A1 | 8/2003 | Foerster et al. |
| 2003/0167072 | A1 | 9/2003 | Oberlander |
| 2003/0181925 | A1 | 9/2003 | Bain et al. |
| 2003/0191498 | A1 | 10/2003 | Foerster et al. |
| 2003/0195528 | A1 | 10/2003 | Ritchart |
| 2003/0195563 | A1 | 10/2003 | Foerster |
| 2003/0195564 | A1 | 10/2003 | Tran et al. |
| 2003/0204204 | A1 | 10/2003 | Bonutti |
| 2003/0236555 | A1 | 12/2003 | Thornes |
| 2004/0002735 | A1 | 1/2004 | Lizardi et al. |
| 2004/0024420 | A1 | 2/2004 | Lubbers et al. |
| 2004/0044366 | A1 | 3/2004 | Bonutti et al. |
| 2004/0102779 | A1 | 5/2004 | Nesper et al. |
| 2004/0116961 | A1 | 6/2004 | Nesper et al. |
| 2004/0133238 | A1 | 7/2004 | Cerier |
| 2004/0193217 | A1 | 9/2004 | Lubbers et al. |
| 2004/0225325 | A1 | 11/2004 | Bonutti |
| 2004/0243178 | A1 | 12/2004 | Haut et al. |
| 2004/0254609 | A1 | 12/2004 | Esplin |
| 2004/0267317 | A1 | 12/2004 | Higgins et al. |
| 2005/0027307 | A1 | 2/2005 | Schwartz et al. |
| 2005/0055052 | A1 | 3/2005 | Lombardo et al. |
| 2005/0240199 | A1 | 10/2005 | Martinek et al. |
| 2005/0240226 | A1 | 10/2005 | Foerster et al. |
| 2005/0245932 | A1 | 11/2005 | Fanton et al. |
| 2005/0283158 | A1 | 12/2005 | West |
| 2005/0288682 | A1 | 12/2005 | Howe |
| 2006/0106423 | A1 | 5/2006 | Weisel et al. |
| 2006/0116719 | A1 | 6/2006 | Martinek |

| 2006/0178702 | A1 | 8/2006 | Pierce et al. |
| 2006/0235413 | A1 | 10/2006 | Denham et al. |
| 2006/0271060 | A1 | 11/2006 | Gordon |
| 2006/0271105 | A1 | 11/2006 | Foerster et al. |
| 2006/0293710 | A1 | 12/2006 | Foerster et al. |
| 2007/0142861 | A1 | 6/2007 | Burkhart |

### FOREIGN PATENT DOCUMENTS

| WO | WO 01/54586 | A1 | 8/2001 |
| WO | WO 01/67962 | A2 | 9/2001 |
| WO | WO 02/11630 | A | 2/2002 |
| WO | WO 02/21998 | A2 | 3/2002 |
| WO | WO 03/065904 | A1 | 8/2003 |
| WO | WO 2004/062506 | A1 | 7/2004 |
| WO | WO 2005/112786 | A2 | 12/2005 |
| WO | WO 2005/112788 | A2 | 12/2005 |
| WO | WO 2006/060035 | A2 | 6/2006 |
| WO | WO 2006/067548 | A1 | 6/2006 |
| WO | WO 2006/128092 | A2 | 11/2006 |
| WO | WO 2007/084714 | A2 | 7/2007 |

### OTHER PUBLICATIONS

PCT, Invitation to Pay Additional Fees, mailed May 13, 2008, for International Application No. PCT/US2007/083662.

Lo et al., Double-row arthroscopic rotator cuff repair: re-establishing the footprint of the rotator cuff, *Arthroscopy: The Journal of Arthroscopic and Related Surgery*, 19(9):1035-1042 (2003).

Millett et al., Mattress double anchor footprint repair: a novel, arthroscopic rotator cuff repair technique, *Arthroscopy: The Journal of Arthroscopic and Related Surgery*, 20(8):875-879 (2004).

Waltrip, Robert L., "A Biomechanical Comparison of Three Techniques," *The American Journal of Sports Medicine*, vol. 31, No. 4, pp. 493-497.

International Search Report dated Sep. 6, 2006 from PCT/US2005/019454.

Written Opinion of the International Searching Authority dated Sep. 6, 2006 from PCT/US2005/019454.

International Preliminary Report on Patentability dated Jan. 25, 2007 from PCT/US2005/019454.

* cited by examiner



FIG. 1



FIG. 2



**FIG. 3A**



**FIG. 3B**



# FIG. 3C

A000082



# FIG. 4A



# FIG. 4B



FIG. 4D



FIG. 4C



**FIG. 5B**



**FIG. 5A**

Case: 14-1372 CASE PARTICIPANTS ONLY Document: 20 Page: 124 Filed: 06/23/2014



FIG. 6A



FIG. 5C



## FIG. 6B



FIG. 7A

FIG. 7B

A000089

Case: 14-1372 CASE PARTICIPANTS ONLY Document: 22 Page: 127 Filed: 06/23/2014



FIG. 8



# FIG. 9A

Case: 14-1372 Case: 14-1372 Document: 12 Document: 21 Page: 129 Page: 129 Filed: 06/29/2014 Filed: 06/23/2014



**FIG. 9B**

A000092



FIG. 9C



FIG. 9D

Case: 14-1372    Case: 14-1372    Document: 20    Page: 132    Filed: 06/23/2014    Filed: 06/23/2014



# FIG. 9E



**FIG. 10A**



**FIG. 10B**



FIG. 12



FIG. 11



# FIG. 13



FIG. 14

A000099

Case: 14-1372 CASE PARTICIPANTS ONLY Document: 20 Page: 137 Filed: 06/23/2014



FIG. 15

A000100



# FIG. 16A



# FIG. 16B



## FIG. 16C



## FIG. 16D



## FIG. 16E



## FIG. 16F

US 7,585,311 B2

1

# SYSTEM AND METHOD FOR ATTACHING SOFT TISSUE TO BONE

## RELATED APPLICATIONS

This application claims priority to U.S. Provisional Application Nos. 60/576,477, filed on Jun. 2, 2004; 60/610,924, filed on Sep. 17, 2004; and 60/634,174, filed on Dec. 7, 2004; all of which are incorporated herein by reference in their entirety.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to medical devices and procedures. More particularly, the present invention relates to devices and methods for securing soft tissue to a rigid material such as bone.

### 2. Description of the Related Art

There are several medical procedures where a surgeon needs to attach soft tissue such as tendons or other soft connective tissue to bone. One common example is a torn rotator cuff, where the supraspinatus tendon has separated from the humerus causing pain and loss of ability to elevate and externally rotate the arm. To repair a torn rotator cuff, typically a surgical procedure is used to suture the torn tendon to the bone using a variety of methods. Some procedures utilize large incisions and involve complete detachment of the deltoid muscle from the acromion. Small diameter holes are made in the bone for passing suture material through the bone to secure the tendon. Such large incision procedures are traumatic, causing prolonged pain and recovery time. Other procedures make small incisions and use arthroscopic techniques to attach sutures using either small diameter holes or a bone anchor. However, it is difficult to manipulate sutures within the surgical site using arthroscopic techniques. In addition, when knot tying is used to secure the suture to a bone anchor, it is difficult to properly adjust the tension of the suture while tightening the knot. Similarly, when the suture is attached to a bone anchor prior to insertion of the anchor into the bone, it is difficult to judge the appropriate point of attachment so that the suture will be properly tensioned upon insertion of the bone anchor into the bone. Thus, there is a need for methods and devices that allow easy arthroscopic attachment of a suture to a bone anchor after the anchor is inserted into the bone without the use of knot tying.

## SUMMARY OF THE INVENTION

The present invention is particularly suited for use in arthroscopic procedures, including but not limited to rotator cuff surgery. More broadly, it can be used in any procedure in which it is desired to fix a suture to a solid object without tying of knots, including not only arthroscopic procedures, but also open surgery, and can be used for such diverse purposes as bladder neck suspension, tendon and ligament affixation or repair, prosthetic attachment, and rotator cuff repair.

In one embodiment, the invention includes an anchor for securing a suture to bone, including an anchor base adapted to be securely fixed into the bone and a suture securing mechanism coupled to the anchor base and positioned proximally relative to the anchor base, the mechanism adapted to receive and secure a suture moved laterally into the

In another embodiment, the invention includes an anchor for securing a suture to bone, including an anchor base adapted to be securely fixed into the bone, a first surface coupled to the anchor base and positioned proximally relative

2

to the anchor base, and a second surface coupled to the anchor base and positioned proximally relative to the anchor base, wherein the first and second surfaces are adapted to be relatively positioned in at least two configurations, one of the configurations such that a gap is present between the first and second surfaces so that the suture can be positioned between the first and second surfaces by moving the suture laterally into the gap, and the other of the configurations such that the first and second surfaces are in close proximity so that the suture can be securely clamped between the first and second surfaces.

In another embodiment, the invention includes a method of attaching soft tissue to bone, including passing a length of suture over the soft tissue, inserting an anchor into the bone, and securing the length of suture to the anchor after the inserting without passing an end of the length of suture through any aperture in the anchor and without tying any knots.

In another embodiment, the invention includes a method of attaching soft tissue to bone, including inserting a first anchor through the soft tissue, wherein the first anchor comprises a length of suture fixedly secured to the first anchor prior to insertion, inserting the first anchor into the bone, passing the length of suture over the soft tissue, and fixedly securing, after the passing, the length of suture to a second anchor.

In another embodiment, the invention includes a method of attaching soft tissue to bone, the soft tissue comprising a first surface adjacent to the bone's surface and a second surface opposite the first surface, the method including inserting a first portion of a length of suture into the second surface of the soft tissue, passing a second portion of the length of suture over the second surface of the soft tissue, inserting a first anchor with no suture coupled thereto into the bone, and fixedly securing the length of suture to the inserted first anchor, with the proviso that no part of the first portion of the length of suture is passed out of the second surface of the soft tissue.

In another embodiment, the invention includes a method of attaching soft tissue to bone, including inserting a first anchor with a length of suture pre-coupled thereto through the soft tissue, inserting the first anchor into the bone, inserting a second anchor with no suture coupled thereto into bone, passing the length of suture over the soft tissue, and fixedly securing the length of suture to the inserted second anchor.

In another embodiment, the invention includes a method of attaching soft tissue to bone, the method including inserting a first, second, and third anchor into the bone, fixedly securing a first length of suture over the soft tissue to the first and second anchors, and fixedly securing a second length of suture over the soft tissue to the first and third anchors.

In another embodiment, the invention includes an anchor for securing a suture to bone, the anchor including an anchor base adapted to be securely fixed into the bone, the anchor base comprising a first proximal surface and an anchor top, the anchor top comprising a distal member coupled to the anchor base and a first proximal member comprising a first distal surface, wherein the anchor top is adapted to couple to the anchor base in at least two configurations, one of the configurations such that the first distal surface is above the bone's surface when the anchor base is securely fixed into the bone, such that a suture can be freely passed between the first proximal and first distal surfaces above the bone's surface, and the other of the configurations such that the first distal surface is in close proximity to the first proximal surface, such that a suture can be securely clamped between the first proximal and first distal surfaces.

A000104

US 7,585,311 B2

3

4

In another embodiment, the invention includes an anchor for securing a suture to bone, the anchor including a substantially hollow cylinder comprising an open end and comprising a portion of its walls cut in such a manner so as to allow the cylinder to deform under stress and form lateral protrusions, a substantially pointed tip coupled to the cylinder opposite the open end, wherein the pointed tip is adapted to pierce the bone, and a suture receiver coupled to the pointed tip and positioned within the substantially hollow cylinder so that a suture may be attached to the suture receiver and extend through the cylinder and out of the open end.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 depicts attaching soft tissue to bone using a single bone anchor and a stitch.

FIG. 2 depicts attaching soft tissue to bone using a two bone anchors with a suture stretched there between.

FIGS. 3A-3C depict various geometries of bone anchors and suture patterns for attaching soft tissue to bone.

FIGS. 4A-4D depicts the base of a two-part suture anchor that can be inserted into bone.

FIGS. 5A-5C depicts the top of a two-part suture anchor.

FIGS. 6A and 6B depict the suture anchor top of FIGS. 5A-5C inserted into the suture anchor bottom of FIGS. 4A-4D.

FIGS. 7A and 7B depict a suture anchor inserter.

FIG. 8 depicts components on a suture anchor inserter for attaching to bone and manipulating a suture anchor.

FIGS. 9A-9E depicts manipulation of a suture anchor using a suture anchor inserter to insert the suture anchor into bone and attach suture material to the suture anchor tip.

FIGS. 10A and 10B depict a piercing bone anchor in an un-deployed (FIG. 10A) and deployed (FIG. 10B) state.

FIG. 11 depicts a piercing bone anchor.

FIG. 12 depicts an anchor inserter for inserting a piercing bone anchor.

FIG. 13 depicts the interface between a piercing bone anchor and an anchor inserter.

FIG. 14 is a cut-away view of a bone anchor inserter.

FIG. 15 depicts a safety switch mechanism for a bone anchor inserter.

FIGS. 16A-16F depict a method for attaching soft-tissue to bone using a piercing bone anchor and a suture capturing anchor.

DETAILED DESCRIPTION OF THE CERTAIN EMBODIMENTS

In various embodiments, soft tissue may be attached to bone utilizing one or more bone anchors with suture attached thereto. As used herein, "suture" refers to any flexible structure that can be stretched between two or more anchors and includes, without limitation, traditional suture material, single or multiple stranded threads, or a mesh structure. In some embodiments, suture is passed over the top of the soft tissue so that the suture can press the soft tissue against the bone. In one embodiment, a length of suture is attached to a single bone anchor. One non-limiting example, depicted in FIG. 1, includes stitching the suture 10 to the soft tissue 12, such as by an incline mattress stitch, and then securing the suture 10 to the single bone anchor 14 that is inserted into the bone 16. However, in other embodiments, a length of suture is attached to multiple bone anchors. The use of multiple bone anchors increases the footprint over which the suture material presses the soft tissue against bone. One non-limiting example, depicted in FIG. 2, includes two bone anchors. One

anchor 20 is positioned in a medial location underneath the soft tissue 12 and a second anchor 22 is positioned lateral to the soft tissue 12. The suture 10 is attached to both anchors.

In one embodiment, the suture 10 is attached to the lateral bone anchor 22 only after the medial bone anchor 20 is inserted and the suture 10 is passed over the soft tissue 12. In one embodiment, the suture 10 is attached to the medial bone anchor 20 prior to insertion of the medial bone anchor 20. Thus, in this embodiment, the surgeon does not need to pass the suture through the soft tissue 12 from beneath the soft tissue 12. In one embodiment, the procedure involves inserting the medial bone anchor 20 with suture 10 pre-attached through the soft tissue 12. The medial bone anchor 20 may then be moved laterally relative to the bone 16 in order to pull the soft tissue 12 laterally relative to the bone 16. After appropriate positioning of the soft tissue 12, the medial bone anchor 20 may then be inserted into the bone 16. The lateral bone anchor 22 may then be inserted into the bone 16. The suture 12 may then be passed over the soft tissue 12 and attached to the lateral bone anchor 22. In some embodiments, a lateral bone anchor 22 is provided to which suture 12 can be attached without tying any knots or without passing the suture 12 through any aperture in the lateral bone anchor 22.

In some embodiments, multiple anchors and multiple suture lengths may used to provide a wider area of pressure of the soft tissue against bone. For example, as depicted in FIG. 3A, three anchors are used with two lengths of suture 26 and 28. Alternatively, a mesh structure 29 may be stretched between the three anchors. In another example, as depicted in FIG. 3B, four anchors are used with two lengths of suture. In still another example, as depicted in FIG. 3C, four anchors are used with four lengths of suture. In some embodiments, the individual suture lengths may be part of a larger continuous suture. For example, in FIG. 3A, the suture lengths 26 and 28 may be part of a larger length of suture such that the lengths 26 and 28 are joined at medial bone anchor 20. Those of skill in the art will appreciate that there are any number of anchor and suture geometries that can be used.

In some embodiments, the medial bone anchors 20 are designed so that they can be easily pierced through the soft tissue 12 and bone 16. In some embodiments, the lateral bone anchors 22 are designed so that they can easily capture suture material after insertion of the bone anchors 22. Together, these design features provide a suturing system and method that provides an increased footprint of suture pressure against the soft tissue 12 and ease of implementation for a surgeon. For example, in some embodiments, the entire procedure may be done arthroscopically, with the surgeon needing only to insert the medial bone anchor 20 with suture optionally pre-attached through a first port, insert the lateral bone anchor 22 through a second port, pass the suture over the soft tissue 12 by capturing it from within the second port, and securing the suture to the lateral bone anchor 22. Accordingly, described below are certain embodiments of anchors adapted to capture suture material and anchors adapted to easily pierce through soft tissue and bone.

Suture Capturing Anchor

One embodiment is a bone anchor that allows easy capturing and securing of a suture after the bone anchor is inserted into the bone. In one embodiment, the bone anchor includes a suture securing mechanism positioned on the proximal end of the bone anchor (i.e., the end nearest the surface of the bone and the surgeon). In one embodiment, the suture securing mechanism allows a suture to be moved laterally into the mechanism. By "laterally," it is meant that the suture can be moved into the mechanism by moving the suture in a direc-

US 7,585,311 B2

5

tion that is generally perpendicular to the axis of the suture. In other words, the suture can be moved into the mechanism without threading an end of the suture into the mechanism. In one embodiment, the suture can be fixedly secured within the mechanism without tying any knots. By "fixedly secured," it is meant that the suture within the securing mechanism cannot be easily moved relative to the bone anchor.

One embodiment is a bone anchor that allows easy attachment of suture material by clamping the suture material between two surfaces on the bone anchor. The bone anchor may be configured such that the bone anchor is inserted into the bone without the suture material attached. The two surfaces of the suture securing mechanism may be spaced apart so as to form a gap between the surfaces. The suture material may be passed between the two surfaces and tensioned as desired followed by clamping of the two surfaces together, thereby clamping the suture material there between.

In one embodiment, the bone anchor consists of two parts: an anchor base and an anchor top. The anchor base may be designed to be inserted into a hole in the bone with a proximal surface facing up. The anchor top may be coupled to the anchor base via a distal member. A proximal member on the anchor top may have a distal surface facing down toward the proximal surface on the anchor base. The coupling of the anchor top to the anchor base may be such that the anchor top can move relative to the anchor base such that it can be positioned in one configuration where there is space between the proximal surface on the anchor base and the distal surface on the proximal member of the anchor top. In another configuration, the proximal member of the anchor top may be position such that there is very little space, if any, between the proximal surface on the anchor base and the distal surface on the proximal member of the anchor top. Thus, in the first configuration, suture material may be easily passed between the two surfaces and tensioned as desired. In the second configuration, the suture material may be clamped between the two surfaces such that the suture is secured to the bone anchor.

One embodiment of an anchor base **100** is depicted in FIGS. **4**A through **4**D. FIG. **4**A is a perspective view showing the side **101** and bottom **102** of the anchor base **100**. The bottom **102** of the anchor base **100** may advantageously be tapered to facilitate insertion of the anchor base **100** into bone. In some embodiments, a hole is predrilled into the bone to facilitate insertion of the anchor base **100**. In other embodiments, the anchor base **100** is forced directly into the bone, thereby creating the hole. The sides **101** of the anchor base **100** comprise threads **104** so that the anchor base **100** may be inserted into bone using a screwing action. In some embodiments, the anchor base **100** may be tapped to start the threads **104** into the bone followed by screwing the anchor base **100** into the bone. When the hole in the bone is pre-drilled, the hole is advantageously drilled with a diameter smaller than the diameter of threads **104** so that the threads engage the bone through the sides of the hole. It will be appreciated that this means other than threads may be used to secure the anchor base **100** to bone. For example, angled protrusions may be used that provide greater resistance to removal of the anchor base **100** than to insertion. The protrusions may be static or deployable once the anchor is inserted.

The top of anchor base **100** preferably includes a structure **106** for facilitating the driving or screwing of the base **100** into the bone. In the illustrated embodiment, this comprises a hex nut structure **106** that facilitates engagement with a hex nut driver for screwing the anchor base **100** into the bone. It will be appreciated that other structures known in the art for engaging tools used for screwing action may be used instead

6

of hex nut structure **106**, and that this structure can be indented into or extending out from the top of the anchor base **100**, or can alternatively be formed on the sides of the anchor base **100**.

With reference to FIG. **4**B, which is a perspective view of the top and side of anchor base **100**, the top (proximal end) comprises a hole **108** in the center for receiving the anchor top, which is described below. The top of anchor base **100** also contains a suture gripping structure such as a circular groove **110** that may be concentric with hole **108**. Because of groove **110**, the proximal surface of anchor base **100** is not flat and comprises top surfaces **112** and **114**, bottom surface **116**, and side surfaces **118** and **120**. In some embodiments, some or all of these surfaces may be textured such as with a scallop shape or grooves so as to inhibit movement of suture material pressed against the surfaces. Although a grooved surface is illustrated, it will be appreciated that other shapes for the proximal surface of anchor base **100** are also contemplated, including multiple concentric grooves, a series of protruding ridges, a "vee" shaped channel, or any other suitable structure that permits a suture to be securely locked against the top or proximal end of the anchor base **100**.

Hole **108** in anchor base **100** is an opening into a central ("axial") bore into the anchor base **100**. The sides of the central bore preferably include structures for gripping something inserted into the central bore, such as ratchet structures **122**. FIG. **4**C show a central ratchet bushing **126** that fits within the central bore and contains the ratchet structures **122**. In the embodiment of FIG. **4**C, the ratchet structures **122** are constructed by cutting U shaped cuts into bushing **126**. The U shaped cuts then define tabs that make up the ratchet structures **122**. It will be appreciated that other shapes and methods for making ratchet structures may be used. The purpose of ratchet bushing **126** is to receive the anchor top and secure it to the anchor base **100**. It will be appreciated that other methods of securing the anchor top to the anchor base **100** may be used, such as a frictional fit or threading. Furthermore, the anchor top may be coupled to the anchor base **100** using means other than hole **108** and bushing **126**. For example, the anchor top may be coupled via structures at the perimeter rather than the center or by a hinge.

FIG. **4**D depicts a cross section through the center of anchor base **100**. This view illustrates central bore **130** and groove **110**. The proximal surfaces **112**, **114**, **116**, **118**, and **120** are also apparent. Central bore **130** preferably does not extend all the way through the anchor base **100**. Instead, a smaller bore **132** is present at the distal end **102** of the anchor base **100**. Smaller bore **132** is used to receive a wire connected to an anchor inserter. It will be appreciated that other structures than bore **132** may be used for attaching the wire and that other means than a wire may be used to secure the anchor to the anchor inserter.

FIGS. **5**A through **5**C illustrate one embodiment of an anchor top **200**. FIG. **5**A provides a perspective view of the side and top of the anchor top **200** and FIG. **5**B provides a perspective view of the side and bottom of the anchor top **200**. Anchor top **200** has two members, a distal member **202** and a proximal member **204**. The distal member **202** comprises an elongated shaft, the longitudinal direction of which shall be considered to run along the axis of the distal member **202**. A series of grooves or other mating or locking surfaces or structures **206** exist along a portion of the outside surface of the shaft. The distal member **202** is designed to be inserted into the central bore **130** of the anchor base **100**. The ratchet structures **122** in the anchor base **100** engage grooves **206** to couple the anchor top **200** to the anchor base **100**. The ratchet structures **122** are oriented such that the distal member **202**

US 7,585,311 B2

7

can be easily moved in the distal direction in central bore **130** with the ratchet structures **122** snapping into the grooves **206** as the distal member **202** is moved downward. However, when the ratchet structures **122** are snapped into grooves **206**, proximal movement of distal member **202** is inhibited. Thus, the anchor top **200** may be ratcheted down into anchor base **100**. Because the ratchet structures **122** exist along substantially the entire surface of the central bore **130** (see FIG. 4C), the anchor top **200** may be coupled to the anchor base **100** in several positions. In other words, in one embodiment the anchor top **200** need not be ratcheted into the anchor base **100** as far as it will go for it to be secured to the anchor base **100**.

The proximal member **204** of anchor top **200** is generally cylindrical in shape with a diameter larger than distal member **202**. A hole **208** may advantageously be provided in the center of proximal member **204**. With reference to FIG. 5B, the bottom of distal member **202** also contains a hole **210**. Holes **208** and **210** open into a central bore through the anchor top **200**. This central bore allows the wire referred to above to extend through the anchor top **200** to be secured to bore **132** in the anchor bottom **100**, thus allowing the anchor bottom **100** to be attached to an anchor inserter while still allowing anchor top **200** to be ratchet into anchor bottom **100**. FIG. 5B also illustrates that proximal member **204** contains a groove **212** in its distal surface. Thus, the distal surface of proximal member **204** is not flat and comprises distally facing surfaces **214** and **216** and side facing surfaces **218** and **220**. In some embodiments, some or all of these surfaces may be textured such as with a scallop shape or grooves so as to inhibit movement of suture material pressed against the surfaces. In some embodiments, texturing in the distal surfaces of proximal member **204** match texturing in the proximal surfaces of anchor base **100**. It will be appreciated that the illustrated embodiments represent only one possibility; thus, other shapes for the distal surface of proximal member **204** may also be used. FIG. 5C depicts a cross section through the center of anchor top **200**. In this figure, the central bore **226** is depicted as are surfaces **214**, **216**, **218**, and **220** and grooves **206**.

FIGS. 6A and 6B depict cross sections showing how the anchor top **200** may be coupled to anchor base **100** to form the complete anchor **300**. In FIG. 6A, the anchor top **200** is coupled to anchor base **100** with the proximal member **204** separated from the anchor base **100**. The anchor top **200** is secured to anchor base **100** by distal member **202** extending into central bore **130** of the anchor base **100**. The distal member **202** is secured by ratchet structures (not shown) engaging grooves **206** in distal member **202**. Central bore **226** in anchor top **200** and central bore **130** in anchor base **100** allow a wire to extend into the top of the anchor **300** and be secured to bore **132**. Alternatively, the wire may be secured at other locations within central bore **130**. Thus the wire, which can be coupled to an anchor inserter, can hold the entire anchor assembly **300** and still allow anchor top **200** to move relative to anchor base **100** and the wire.

FIG. 6B depicts the anchor assembly **300** with the distal member **202** of anchor top **200** ratcheted all the way into central bore **130** in anchor base **100**. In this configuration, it can be seen that proximal surfaces **112**, **114**, **116**, **118**, and **120** of the anchor base **100** and distal surfaces **214**, **216**, **218**, and **220** of the proximal member **204** of anchor top **200** form passageways **302** and **304**. The size of passageways **302** and **304** are advantageously such that when a suture passes through them, it will be compressed so that it is securely attached to the anchor **300**.

Another embodiment of the present invention is an inserter designed to insert and manipulate an anchor such as described

8

in FIGS. 1-3. One such inserter **400** is depicted in FIGS. 7A and 7B. Inserter **400** comprises a handle **402** and an inner tube **404**. As depicted in FIG. 7A, the handle **402** comprises a cover **403**. FIG. 7B depicts the inserter **400** with cover **403** removed. Not depicted in FIGS. 7A and 7B are an inner tube disposed inside outer tube **404** and a wire disposed within the inner tube. As will be described in more detail below, the inner and outer tubes may be used to manipulate an anchor **300** such as that described in FIGS. 4-6. The wire may be used to couple the inserter **400** to the anchor **300** as described above. Inserter **400** also comprises an outer tube manipulator **406** and a wire manipulator **408**. Outer tube manipulator **406** comprises release button **410**. Outer tube manipulator **406** is securely attached to outer tube **404**. Outer tube manipulator **406** may move longitudinally relative to handle **402** and the inner tube when release button **410** is pressed. Thus, when outer tube manipulator **406** is moved, outer tube **404** also moves.

Wire manipulator **408** comprises wire grabber **410** to which the wire is attached. The wire extends from wire grabber **410**, through handle **402**, and then through the inner tube. In one embodiment, wire manipulator **408** also comprises a release button **412**. When release button **412** is pressed, the wire manipulator **408** may be pressed into the handle **402** to contact and thus provide additional tension on the wire. When in use, the additional tension causes the anchor base **100** to move relative to inserter **400**. When enough tension is provided to the wire by wire manipulator **408**, the wire may break free from the anchor **300** at its attachment point in bore **132** or at some other predetermined location along the wire. It will be appreciated that any suitable breakable attachment means may be used for securing the wire to the anchor **300**. For example, the wire may be frictionally secured into bore **132** or it may welded to the anchor base **100** using a weld that is weaker than the wire itself or a portion of the wire where breaking is desired may be weakened. In one embodiment, the wire is notched so as to create a weaker region in the wire that will break upon application of suitable force.

The tip **414** of outer tube **404** is depicted in more detail along with inner tube **420**, wire **422**, and anchor **300** in FIG. 8. The end of outer tube **404** may comprise a hex nut driver structure **424** for receiving the hex nut structure **106** of anchor base **100**. Of course, any other suitable engagement structure can be provided on the inserter **400** and the anchor base **100** in order to facilitate placement of the anchor base **100**. Wire **422** extends out of inner tube **420** and into the central bore in the anchor top **200** to attach to anchor base **100** as described above. In some advantageous embodiments, the wire length and tension is adjusted such that the proximal member **204** of anchor top **200** butts against the end **426** of inner tube **420**.

FIGS. 9A through 9E depict how inserter **400** and anchor **300** may be used to insert the anchor **300** into bone and attach a suture to it. FIG. 9A depicts the configuration for inserting the anchor **300** into bone. Outer tube **404** and outer tube manipulator **406** (see FIGS. 7A and 7B) are positioned relative to inner tube **420** and handle **402** (see FIGS. 7 and 8) so that the outer tube **404** engages hex nut structure **106** in the anchor base **100**. It is advantageous in this configuration for the anchor top **200** to be in a position relative to the anchor base **100** such as depicted in FIG. 6A. In the configuration of FIG. 9A, a surgeon may then screw the anchor base **100** into bone by twisting handle **402** of inserter **400** (see FIGS. 7A and 7B).

After the anchor base **100** is inserted into the bone, the outer tube **404** may be slid backward relative to the inner tube **420** and handle **402** to expose the anchor top **200** such as in FIG. 9B. One or more lengths of suture **600** may then be placed in the space between the distal surface **602** of the

A000107

US 7,585,311 B2

9 10

proximal member **204** of anchor top **200** and the proximal surface **604** of the anchor base **100** by moving the suture laterally into the space as depicted in FIG. **9**C. The suture **600** may be manually tensioned as desired. In some embodiments, tensioning of the suture **600** is aided by pulling the suture **600** against the distal member **202** of the anchor top **200**.

After appropriate tensioning of suture **600**, wire manipulator **408** may be pressed to tension the wire, causing the handle **402** of the inserter **400** and the inner tube **420** to be pulled down towards the anchor base **100** so that inner tube **420** ratchets the anchor top **200** down into the anchor bottom **100** as depicted in FIG. **9**D. As the anchor top **200** is pushed axially down, suture **600** will be clamped between the distal surface **602** of the proximal member **204** of anchor top **200** and the proximal surface **604** of the anchor base **100** (see also FIG. **9**C). The clamping will force the suture to be compressed within the passageways **302** and **304** depicted in FIG. **6**B and thus be secured to anchor **300**. The fit between the anchor top **200** and the anchor base **100** in the clamping region is such that the suture **600** is firmly gripped, but is not cut, when it is clamped in place. Appropriate edges that may contact the suture are preferably beveled or rounded to avoid damage to the suture. After anchor top **200** is ratcheted sufficiently into anchor base **100**, wire manipulator **408** (see FIGS. **7**A and **7**B) in inserter **400** may be compressed further to further tension wire **422** (see FIG. **8**) such that wire **422** breaks free from its attachment to anchor base **100**, thus leaving the anchor **300** free from inserter **400** with suture **600** securely attached as depicted in FIG. **9**E.

Although a particular inserter device for inserting and manipulating anchor **300** has been described, it should be understood that other inserter designs may be used for manipulating the parts of anchor **300** described above to insert the anchor into bone and secure suture material to the anchor. For example, it may be possible to use separate tools for inserting the anchor and securing the suture material. In addition, in alternative embodiments, the anchor base **100** may be connected to the anchor top **200** throughout the procedure, or the anchor base may be separately inserted into the bone, and the anchor top can be attached thereafter by axially sliding the distal end of the anchor top **200** into the hole **108** in the anchor base **100**.

It will be appreciated by those of skill in the art that the anchor **300** and inserter **400** provide a system for easy attachment of a suture to bone. The anchor **300** may be inserted into bone with minimal disruption of surrounding tissue. Only an access route having the diameter of the outer tube **404** and the anchor base **100** is required. Furthermore, the suture can be securely attached to the anchor **300** and tensioned as desired without having to insert additional instrumentation into the site or without performing any cumbersome attachment maneuvers such as knot tying. It should also be appreciated that the general principle illustrated by this system of inserting an anchor into bone without having suture material preattached and then attaching suture to the anchor without tying any knots may be implemented using any appropriate system other than the specific embodiments depicted in FIGS. **4**-**9**.

Tissue and Bone Piercing Anchor

One embodiment is a bone anchor adapted for piercing through the soft tissue and into underlying bone. In one embodiment, the suture material may be pre-attached to the piercing bone anchor so that after implantation, a suture passes from the bone anchor through to the top of the soft tissue for easy passing over the end of the suture. In one embodiment, the piercing bone anchor has two configurations, a first configuration having a small diameter for easy piercing

through soft tissue and bone and a second deployed configuration where structures such as protrusions are deployed to prevent the bone anchor from being easily removed from the bone.

In one embodiment, the anchor includes a substantially hollow cylinder having a portion of its walls cut in such a manner so as to allow the cylinder to deform under axial stress and form lateral protrusions. The lateral protrusions may thus prevent the anchor from being easily removed from the bone after deployment. In one embodiment, the anchor comprises a pointed tip coupled to the hollow cylinder for piercing the soft tissue and bone. In one embodiment, suture is pre-attached to the pointed tip inside of the hollow cylinder. In other embodiments, suture is pre-attached at other locations on the piercing anchor, such as at the proximal end of the hollow cylinder.

One embodiment of a deployable piercing anchor is depicted in FIGS. **10**A and **10**B. In FIG. **10**A, the anchor is depicted in a pre-deployed state. The anchor includes a substantially hollow cylinder **650** with a plurality of cuts **652** in the side of the cylinder **650**. The cylinder **650** is open on one end **654**. On the other end, a pointed tip **656** is disposed, allowing the anchor to pierce through soft tissue and bone. In FIG. **10**B, the anchor is depicted in a deployed state. Stress is applied in an axial direction such that the cylinder **650** collapses along cuts **652** so as to form two lateral wings **660**. The lateral wings **660** prevent the anchor from being removed from the bone. Hinges **662** connect one end of each wing to either the top or the bottom parts of anchor body. These hinges deform and fold, in the plane tangent to the anchor body at that point when the anchor is deployed. A strip of material **664** connects the top and bottom wing on each side of the anchor body, and serves as a hinge between the two as well as aiding in alignment of the wings during deformation. The tips of the wings adjacent to the connecting strip **664** utilize rolling edges **666**, which ensure uniform alignment and smooth transition during deformation. Those of skill in the art will appreciate that any number of geometries of cuts in the cylinder **650** may be utilized to create a deformable structure that will produce lateral protrusions upon exposure to stress.

In some embodiments, structures may be positioned within the cylinder **650** for attaching sutures and engaging with an anchor inserter. In one embodiment, such structures are coupled to the anchor tip **656** within the cylinder **650**. FIG. **11** depicts one such embodiment. Attached to the tip **656** is a structure **670** through which there is an aperture **672**. The structure **670** may be adapted to engage the inner surface of cylinder **650** for attaching the tip **656** to the cylinder **650**. The attachment mechanism may be by forced fit, frictional fit, threads, welding, adhesive, or any other suitable means. Suture material may be threaded through the aperture **672** in order to attach the suture to the anchor. The suture material may be secured to the tip **656** by tying the suture around structure **670**, tying a knot in the end of the suture that prevents it from being pulled through the aperture **672**, clamping the suture between the structure **670** and the inside of the cylinder **650**, adhering the suture to structure **670** by welding or adhesive, or any other suitable means. In one embodiment, the suture material is attached to the anchor at tip **656** prior to use of the anchor.

An anchor inserter attachment structure **674** may also be coupled to the tip **656**. This structure **674** may couple to an anchor inserter through a wire or any other suitable means. The attachment between the anchor inserter and the anchor at this point may be used to apply axial stress to the anchor for

US 7,585,311 B2

11                                                                    12

deploying the anchor as described above. The attachment at this point may also serve to keep the anchor attached to the inserter prior to deployment.

One embodiment of an anchor inserter suitable for use with the above-described anchor is depicted in FIG. 12. The anchor inserter comprises a grasping handle 700 to which is attached an outer sleeve 702 which is fixed relative to the handle 700. The piercing anchor 704 is disposed at the end of the sleeve 702. A deployment lever 706 may be pressed by a user to deploy and detach the anchor 704 as described below. A safety switch 708 may be provided to prevent the anchor 704 from being deployed prematurely. A spool 710 may be provided at the proximal end of the handle 700 for holding excess suture. A lid 712 may be provided for gaining access to the inner components of the inserter.

FIG. 13 depicts the anchor 704 coupled to the inserter. As described above, the anchor 704 comprises a hollow cylinder 650 with cuts in the sides and a pointed tip 656. Furthermore, as depicted in FIG. 11, a suture receiving aperture 672 and an inserter attachment structure 674 are attached to the pointed tip 656 within the cylinder 650. The outer sleeve 702 of the inserter may fit over the open end 654 of the cylinder 650 or be flush with the open end 654. The outer sleeve 702 may thus hold the top part of the anchor 704 steady during insertion. In an alternative embodiment, the outer sleeve 702 may fit over the length of the cylinder 650 to prevent the cylinder 650 from deforming while it is being inserted into bone. In this alternative embodiment, the outer sleeve 702 may be retracted prior to deployment of the anchor. An inner tube 720 may be positioned within the outer sleeve 702 and the hollow cylinder 650 and contact the top surface of the anchor tip 656 (see FIG. 11). The inner tube 720 provides structural reinforcement of the anchor 704 and pushes against the tip of the anchor 704 while it is being driven into bone or tissue. The inner tube 720 may be fixed relative to the handle 712 and outer sleeve 702 during insertion, however, during deployment of the anchor 704, the inner tube 720 may be released by switching safety switch 708 so that the inner tube 720 can move axially relative to the outer sleeve 702 while the anchor cylinder 650 collapses. A wire may be positioned inside of the inner tube 720 running from within the handle 712 through the inner tube 720 to the anchor 704 and attached to the anchor inserter attachment structure 674. During deployment, the lever 706 may be pressed to pull the wire axially towards the handle 700. The axially movement of the wire forces the anchor 704 to press against outer sleeve 702 and stresses the cylinder 650, causing it to deform and deploy. During collapse of the cylinder 650, the inner tube 720 will also move in an axial direction toward the handle 700. Upon further stress on the wire, the wire may break free from the anchor inserter attachment structure 674, releasing the inserter from the anchor 704. Suture material may run from the inside of handle 700 through the inner tube 720 to attach to the anchor 704 through aperture 672 (see FIG. 11). Upon detachment of the anchor inserter from the anchor 704, the inserter may be withdrawn, leaving the inserted and deployed anchor with suture coming out of the open end 654 of the cylinder 650. The suture will still be coupled to the inserter through the inner tube 720, handle 700, and around spool 710. Those of skill in the art will appreciate other inserters and mechanisms that may be used to insert and deploy the piercing anchors described herein. For example, rather then axially stressing the anchor 704 by pulling the tip 656 in an proximal direction, the cylinder 650 may be pushed in a distal direction to deform the cylinder 650.

FIG. 14 is a cut-away view of the handle 700, showing the inner workings of the anchor inserter. The suture material attached to a piercing anchor at the tip of the inserter may pass through the central bore of the inner tube 720 and through a bore 750 in the handle 700. The suture material may then pass through a hole 752 in the end of the handle 700 and be wrapped around the spool 710, which may be integral with the handle 700. The wire attached to the anchor inserter attachment structure 674 in the anchor may also pass through the central bore of the inner tube 720 and may then proceed around a pulley 754 and attach securely to the handle 700 at point 756. The pulley 754 may be attached to the lever 706. When the lever 706 is pressed down, the pulley 754 will move toward the back end of the handle 700, causing the wire attached to the anchor to retract. Because of the use of pulley 754, the wire will retract twice the distance as the pulley 754 moves.

The safety switch 708 may be used to prevent the lever 706 from being pressed and prevent the inner tube 720 from moving unless the safety switch 708 is in the correct position. The safety mechanism operates via a drum 760 disposed within the handle 700 to which the safety switch 708 is attached. Moving the safety switch 708 rotates the drum 760 within the handle 700. FIG. 15 shows the drum 760 and safety switch 708 mechanism in more detail. The inner tube 720 passes through a central bore in the drum 760. On the other side of the drum 760, the inner tube 720 is attached to a stopper 762. The stopper 762 has a through-hole 764 to permit passage of the deployment wire and suture. The stopper 762 may be positioned within a cavity 766 in the end of the drum 760. A second similarly shaped cavity may be disposed within the handle 700. The stopper 762 and attached inner tube 720 may only be allowed to move axially relative to the handle 700 when the safety switch 708 and drum 760 is rotated so that the cavity 766 in the drum 760 is aligned with the matching cavity in the handle 700. When the cavities are aligned, the stopper 762 is allowed to move from the cavity 766 to the cavity in the handle 700, thus allowing the inner tube 720 to move axially and the anchor to be deployed.

Additionally, the drum 760 comprises a groove 768. A spring-loaded sliding pin 770 (see FIG. 14) may be coupled to the lever 706. The lever 706 can only be moved when the drum 760 and switch 708 are rotated so that groove 768 is aligned with the pin 770. Thus, both the stopper 764 and the pin 770 prevent the anchor from being deployed unless the switch 708 is in the correct position.

Those of skill in the art will appreciate other mechanisms that could be used for deploying a deployable anchor and providing safety mechanisms to prevent premature deployment.

Example Using a Piercing Anchor and a Suture Capturing Anchor

The above-described anchors may be used in a surgical procedure for attaching soft tissue to bone. One example of such a procedure is depicted in FIGS. 16A through 16F. In FIG. 16A, the piercing anchor 800 attached to an anchor inserter 802 as described above is pierced through soft tissue 804 that has become detached from underlying bone 806. In FIG. 16B, the anchor inserter 802 is moved laterally relative to the bone 806 so as to stretch the soft tissue 804 laterally relative to the bone 806. Once the soft tissue 804 has been stretched to the desired position, the anchor 800 is inserted into the bone 806 and the anchor 800 is deployed as described above and the inserter 802 is detached from the anchor 800, leaving a suture 808 attached to the anchor 800 and extending through the soft tissue 804. The anchor 800 may be inserted into bone 806 by tapping on the inserter 802 with a hammer or by any other suitable means of applying axial force. FIG. 16C

13

depicts the deployed anchor **800** with attached suture **808**. The suture **808** will extend into the inserter **802**.

Next, as depicted in FIG. **16**D, a suture capturing anchor **810** is inserted into the bone **806** using the inserter **812** as described above. In FIG. **16**E, the inserter **812** is then retracted to expose the suture capturing mechanism. The suture **808** is then passed over the soft tissue **804** and laterally moved into the suture capturing mechanism and tensioned. Finally, as depicted in FIG. **16**F, the suture capturing mechanism is deployed to capture the suture **808**, the anchor inserter **812** is detached from the anchor **810**, and the suture **808** is cut to detach it from the suture inserter **802**. The result is a length of suture **808** between the bone anchors **808** and **810** that presses the soft tissue **804** against the bone **806**. Multiple anchors and sutures may be used to produce geometries such as depicted in FIGS. **2** and **3** and variations thereof.

It will be appreciated that there are numerous stitches, suture threading patterns, and anchor patterns that may be used to secure soft tissue to bone by the methods and devices described herein. These variations as well as variations in the design of the above described anchor devices and inserter devices are within the scope of the present disclosure.

Methods of Attaching Soft Tissue to Bone

Various embodiments include methods for attaching soft tissue to bone. In some embodiments, the methods include using the bone anchors described above. In one embodiment, a bone anchor is inserted into the bone and then a length of suture is passed over the soft tissue and secured to the anchor after inserting the anchor without tying any knots or without passing the suture through an aperture in the anchor. In some embodiments, the suture is secured to the anchor by laterally moving it into a securing mechanism. In one embodiment, securing the suture to the anchor includes clamping the suture between at least two surfaces on the anchor. In one embodiment, the anchor is not inserted further into the bone after securing the suture to it.

In another embodiment, a first anchor with a suture pre-attached is inserted through the soft tissue and into the bone. The suture may then be passed over the soft tissue and fixedly secured to a second bone anchor. In one embodiment, the first anchor is inserted by directly piercing the soft tissue and the bone. In one embodiment, lateral protrusion may be deployed on the first anchor to prevent the first anchor from being removed. In one embodiment, the suture may be coupled to the second bone anchor prior to insertion and then fixedly secured after insertion. In this context, "coupled" means that the suture is attached to the bone anchor but not fixedly secured, such that the suture can move to some extent relative to the bone anchor. In an alternative embodiment, the suture is not coupled to the second bone anchor during its insertion.

In another embodiment, a first portion of suture is inserted into the proximal surface of the soft tissue. A second portion of the suture (e.g., the portion proximal to the inserted portion) is then passed over the proximal surface of the soft tissue and fixedly secured to a bone anchor. In one embodiment, the procedure may be performed without passing the first portion of the suture back out of the proximal surface of the soft tissue. In one embodiment, this result is accomplished by the first portion of the suture being attached to an anchor that is inserted through the soft tissue and into bone.

One embodiment includes inserting a first anchor with a pre-coupled suture through soft tissue and into bone. The suture may then be passed over the soft tissue and fixedly secured to a second anchor. In one embodiment, the pre-coupled suture is fixedly secured to the first anchor prior to insertion. In an alternative embodiment, the pre-coupled

14

suture can move relative to the first anchor prior to insertion and is fixedly secured after insertion.

In another embodiment, multiple lengths of suture are attached to multiple anchors. In one embodiment at least three anchors are inserted into bone. A first length of suture may be secured between a first and second anchor and a second length of suture may be secured between the first and a third anchor. In one embodiment, the first anchor is positioned beneath the soft tissue and the second and third anchors are positioned laterally to the soft tissue. In an alternative embodiment, the first anchor is positioned laterally to the soft tissue and the second and third anchors are positioned beneath the soft tissue. In some embodiments, the lengths of suture are fixedly secured to the anchor(s) positioned beneath the soft tissue prior to insertion of those anchor(s). In one embodiment, the different lengths of suture may be tensioned separately.

In various embodiments, prior to fixedly securing suture to a bone anchor, it can be tensioned. In one embodiment, tensioning is accomplished by manually pulling on the suture such as by a surgeon grasping the suture using an appropriate instrument and then pulling. In one embodiment, the suture may be pressed against the bone anchor to provide leverage for pulling. For example, the suture may be wrapped partly around a proximal portion of the anchor prior to pulling.

Although the invention has been described with reference to embodiments and examples, it should be understood that numerous and various modifications can be made without departing from the spirit of the invention. Accordingly, the invention is limited only by the following claims.

What is claimed is:

**1**. A method of attaching soft tissue to bone, comprising:

inserting a first anchor into bone, wherein the first anchor is positioned underneath the soft tissue such that no part of the anchor extends beyond an edge of the soft tissue;

passing a first length of suture from said first anchor over the soft tissue;

inserting a second anchor into bone, wherein the second anchor is positioned beyond the edge of the soft tissue such that it is not underneath the soft tissue;

after inserting the second anchor, tensioning the first length of suture to compress an area of tissue to bone between the edge of the soft tissue and the first anchor; and

fixedly securing the first length of suture to the second anchor without tying any knots.

**2**. The method of claim **1**, wherein the first length of suture is fixedly secured to the first anchor prior to insertion of the first anchor.

**3**. The method of claim **1**, wherein the first anchor is inserted through the soft tissue.

**4**. The method of claim **1**, wherein the first length of suture is fixedly secured to the second anchor without passing the first length of suture through any aperture in the second anchor.

**5**. The method of claim **1**, comprising inserting a third anchor into bone, wherein the third anchor is positioned beyond an edge of the soft tissue such that it is not underneath the soft tissue.

**6**. The method of claim **5**, comprising passing a second length of suture from said first anchor over the soft tissue.

**7**. The method of claim **6**, comprising fixedly securing the second length of suture to the third anchor without tying any knots.

**8**. The method of claim **1**, wherein the first length of suture is coupled to the first anchor prior to insertion of the first anchor.

US 7,585,311 B2

15      16

**9**. The method of claim **8**, wherein the first length of suture is fixedly secured to the first anchor after insertion of the first anchor.

**10**. The method of claim **1**, wherein the first length of suture is coupled to the second anchor prior to insertion of the first anchor.

**11**. The method of claim **1**, comprising inserting a third anchor into bone, wherein the third anchor is positioned underneath the soft tissue at a location distinct from the first anchor.

**12**. The method of claim **11**, comprising passing a second length of suture from said third anchor over the soft tissue.

**13**. The method of claim **12**, wherein the second length of suture is crossed over the first length of suture.

**14**. The method of claim **12**, comprising fixedly securing the second length of suture to the second anchor without tying any knots.

**15**. The method of claim **14**, comprising inserting a fourth anchor into bone, wherein the fourth anchor is positioned beyond an edge of the soft tissue such that it is not underneath the soft tissue at a location distinct from the second anchor.

**16**. The method of claim **15**, comprising passing a third length of suture from said third anchor over the soft tissue and the first length of suture.

**17**. The method of claim **16**, comprising fixedly securing the third length of suture to the fourth anchor.

**18**. The method of claim **17**, comprising passing a fourth length of suture from said first anchor over the soft issue.

**19**. The method of claim **18**, comprising fixedly securing the fourth length of suture to the fourth anchor.

**20**. The method of claim **1**, comprising:

inserting a third anchor into bone, wherein the third anchor is positioned underneath the soft tissue at a location distinct from the first anchor;

inserting a fourth anchor into bone, wherein the fourth anchor is positioned beyond an edge of the soft tissue such that it is not underneath the soft tissue at a location distinct from the second anchor;

passing a second length of suture from said third anchor over the soft tissue and the first length of suture; and

fixedly securing the second length of suture to said fourth anchor.

**21**. The method of claim **1**, wherein inserting the first anchor into the bone comprises directly piercing the bone with the first anchor without drilling any holes.

**22**. The method of claim **1**, wherein inserting the first anchor into the bone comprises deploying lateral protrusions on the first anchor, wherein the lateral protrusions are adapted to prevent the first anchor from being removed.

**23**. The method of claim **1**, wherein the passing step comprises passing the length of suture over the soft tissue without the suture being coupled to the second anchor.

**24**. The method of claim **1**, wherein suture is coupled to the second anchor prior to insertion and wherein, after inserting the second anchor, the length of suture is tensioned and then fixedly secured to the second anchor.

**25**. The method of claim **1**, wherein the step of inserting the second anchor comprises inserting the anchor directly into the bone without the anchor passing through the soft tissue.

**26**. The method of claim **1**, wherein no suture is coupled to the second anchor during its insertion and wherein, after inserting the second anchor, the length of suture is tensioned and then fixedly secured to the second anchor.

**27**. The method of claim **1**, wherein the step of fixedly securing is performed without passing the suture through any apertures in the second anchor.

**28**. The method of claim **1**, wherein the inserting steps, passing step, and fixedly securing step are conducted arthroscopically.

**29**. The method of claim **1**, wherein passing the first length of suture over the soft tissue comprises passing the first length of suture over the edge of its soft tissue.

**30**. The method of claim **1**, wherein the first length of suture passes though the soft tissue only once.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.      : 7,585,311 B2                                        Page 1 of 1
APPLICATION NO. : 11/143007
DATED           : September 8, 2009
INVENTOR(S)     : Green et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page:

The first or sole Notice should read --

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1126 days.

Signed and Sealed this

Fourteenth Day of September, 2010

David J. Kappos
*Director of the United States Patent and Trademark Office*

(12) **EX PARTE REEXAMINATION CERTIFICATE** (8542nd)

# United States Patent

Green et al.

(10) **Number:** US 7,585,311 C1

(45) **Certificate Issued:** Sep. 13, 2011

(54) **SYSTEM AND METHOD FOR ATTACHING SOFT TISSUE TO BONE**

(75) Inventors: **Michael L. Green**, Pleasanton, CA (US); **Joseph C. Tauro**, Toms River, NJ (US); **Bart Bojanowski**, Fremont, CA (US)

(73) Assignee: **KFX Medical Corporation**, San Diego, CA (US)

**Reexamination Request:**
No. 90/011,430, Jan. 11, 2011

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **7,585,311** |
| Issued: | **Sep. 8, 2009** |
| Appl. No.: | **11/143,007** |
| Filed: | **Jun. 1, 2005** |

Certificate of Correction issued Sep. 14, 2010.

**Related U.S. Application Data**

(60) Provisional application No. 60/576,477, filed on Jun. 2, 2004, provisional application No. 60/610,924, filed on Sep. 17, 2004, and provisional application No. 60/634,174, filed on Dec. 7, 2004.

(51) **Int. Cl.**
*A61B 17/04* (2006.01)

(52) **U.S. Cl.** .................................................... **606/232**

(58) **Field of Classification Search** ................... 606/232
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 4,872,840 | A | * | 10/1989 | Bori | ........................... 433/173 |
| 5,443,482 | A | * | 8/1995 | Stone et al. | .................. 606/232 |
| 5,569,306 | A | * | 10/1996 | Thal | ........................... 606/232 |
| 5,891,168 | A | * | 4/1999 | Thal | ........................... 606/232 |
| 6,585,730 | B1 | * | 7/2003 | Foerster | ....................... 606/32 |
| 2003/0120309 | A1 | * | 6/2003 | Colleran et al. | ............. 606/232 |

OTHER PUBLICATIONS

Moore et al, "Suturing techniques for periodontal plastic surgery," Periodontology 2000, vol. 11, 1996.*

* cited by examiner

*Primary Examiner*—Jeanne M Clark

(57) **ABSTRACT**

Disclosed herein are methods and devices for securing soft tissue to a rigid material such as bone. A bone anchor is described that comprises a base and a top such that suture material may be compressed between surfaces on the base and top to secure the suture to the anchor. Also described is an inserter that can be used to insert the bone anchor into bone and move the anchor top relative to the anchor base to clamp suture material there between. Also described is a soft-tissue and bone piercing anchor and associated inserter. Methods are described that allow use of the bone anchors to provide multiple lengths of suture material to compress a large area of soft tissue against bone.



US 7,585,311 C1

**1**

## EX PARTE
## REEXAMINATION CERTIFICATE
## ISSUED UNDER 35 U.S.C. 307

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

**2**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **1-3**, **5-25** and **28-30** is con-
firmed.

Claims **4**, **26** and **27** were not reexamined.

\*   \*   \*   \*   \*

CASE PARTICIPANTS ONLY

# ADDENDUM   G

US008100942B1

(12) **United States Patent**
Green et al.

(10) **Patent No.:**     **US 8,100,942 B1**

(45) **Date of Patent:**     \*Jan. 24, 2012

(54) **SYSTEM AND METHOD FOR ATTACHING SOFT TISSUE TO BONE**

(75) Inventors: **Michael L. Green**, Pleasanton, CA (US); **Joseph C. Tauro**, Brick, NJ (US); **Bart Bojanowski**, San Jose, CA (US)

(73) Assignee: **KFx Medical Corporation**, San Diego, CA (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/245,620**

(22) Filed: **Sep. 26, 2011**

**Related U.S. Application Data**

(60) Continuation of application No. 12/549,105, filed on Aug. 27, 2009, which is a division of application No. 11/143,007, filed on Jun. 1, 2005, now Pat. No. 7,585,311.

(60) Provisional application No. 60/576,477, filed on Jun. 2, 2004, provisional application No. 60/610,924, filed on Sep. 17, 2004, provisional application No. 60/634,174, filed on Dec. 7, 2004.

(51) **Int. Cl.**
*A61B 17/04*     (2006.01)

(52) **U.S. Cl.** ...................................... **606/232**; 606/300

(58) **Field of Classification Search** .................. 606/72, 606/75, 78, 219, 224, 232, 300–313
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,623,192 A | 11/1971 | Button | |
| 4,210,148 A | 7/1980 | Stivala | |
| 4,532,926 A | 8/1985 | O'Holla | |

| | | | |
|---|---|---|---|
| 4,796,612 A | 1/1989 | Reese | |
| 4,898,156 A | 2/1990 | Gatturna et al. | |
| 5,013,316 A | 5/1991 | Goble et al. | |
| 5,192,303 A | 3/1993 | Gatturna et al. | |
| 5,219,359 A | 6/1993 | McQuilkin et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

SU     1600713     10/1990

(Continued)

OTHER PUBLICATIONS

Arthrex, Inc.'s Answer to Plaintiff KFX Medical Corp.'s complaint for Patent Infringement and Counterclaims, United States District Court , Southern District of California, Sep. 23, 2011, Los Angeles, USA.

(Continued)

*Primary Examiner* — Darwin Erezo
*Assistant Examiner* — Gregory Anderson
(74) *Attorney, Agent, or Firm* — Knobbe, Martens, Olson & Bear LLP

(57)     **ABSTRACT**

Disclosed herein are methods and devices for securing soft tissue to a rigid material such as bone. A bone anchor is described that comprises a base and a top such that suture material may be compressed between surfaces on the base and top to secure the suture to the anchor. Also described is an inserter that can be used to insert the bone anchor into bone and move the anchor top relative to the anchor base to clamp suture material there between. Also described is a soft-tissue and bone piercing anchor and associated inserter. Methods are described that allow use of the bone anchors to provide multiple lengths of suture material to compress a large area of soft tissue against bone.

**19 Claims, 24 Drawing Sheets**



## US 8,100,942 B1

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,224,946 | A | 7/1993 | Hayhurst et al. |
| 5,269,784 | A | 12/1993 | Mast |
| 5,336,240 | A | 8/1994 | Metzler et al. |
| 5,372,604 | A | 12/1994 | Trott |
| 5,417,712 | A | 5/1995 | Whittaker et al. |
| 5,423,858 | A | 6/1995 | Bolanos et al. |
| 5,423,860 | A | 6/1995 | Lizardi et al. |
| 5,472,452 | A | 12/1995 | Trott |
| 5,478,353 | A | 12/1995 | Yoon |
| 5,500,001 | A | 3/1996 | Trott |
| 5,527,341 | A | 6/1996 | Gogolewski et al. |
| 5,527,343 | A | 6/1996 | Bonutti |
| 5,543,012 | A | 8/1996 | Watson et al. |
| 5,545,180 | A | 8/1996 | Le et al. |
| 5,569,306 | A | 10/1996 | Thal |
| 5,575,801 | A | 11/1996 | Habermeyer et al. |
| 5,578,057 | A | 11/1996 | Wenstrom, Jr. |
| 5,584,835 | A | 12/1996 | Greenfield |
| 5,591,207 | A | 1/1997 | Coleman |
| 5,634,926 | A | 6/1997 | Jobe |
| 5,683,419 | A | 11/1997 | Thal |
| 5,690,676 | A | 11/1997 | DiPoto et al. |
| 5,697,950 | A | 12/1997 | Fucci et al. |
| 5,720,765 | A | 2/1998 | Thal |
| 5,725,557 | A | 3/1998 | Gatturna |
| 5,769,894 | A | 6/1998 | Ferragamo |
| 5,800,436 | A | 9/1998 | Lerch |
| 5,814,072 | A | 9/1998 | Bonutti |
| 5,891,168 | A | 4/1999 | Thal |
| RE36,289 | E | 8/1999 | Le et al. |
| 5,948,001 | A | 9/1999 | Larsen |
| 5,948,002 | A | 9/1999 | Bonutti |
| 5,951,590 | A | 9/1999 | Goldfarb |
| 5,964,769 | A | 10/1999 | Wagner et al. |
| 6,010,525 | A | 1/2000 | Bonutti et al. |
| 6,013,077 | A | 1/2000 | Harwin |
| 6,013,083 | A | 1/2000 | Bennett |
| 6,027,523 | A | 2/2000 | Schmieding |
| 6,045,573 | A | 4/2000 | Wenstrom, Jr. et al. |
| 6,056,751 | A | 5/2000 | Fenton, Jr. |
| 6,063,106 | A | 5/2000 | Gibson |
| 6,093,201 | A | 7/2000 | Cooper et al. |
| 6,093,301 | A | 7/2000 | Van Atta |
| 6,099,547 | A | 8/2000 | Gellman et al. |
| 6,110,207 | A | 8/2000 | Eichhorn et al. |
| 6,117,160 | A | 9/2000 | Bonutti |
| 6,117,161 | A | 9/2000 | Li et al. |
| 6,126,677 | A | 10/2000 | Ganaja et al. |
| 6,149,669 | A | 11/2000 | Li |
| 6,200,330 | B1 | 3/2001 | Benderev et al. |
| 6,241,749 | B1 | 6/2001 | Rayhanabad |
| 6,245,082 | B1 | 6/2001 | Gellman et al. |
| 6,280,474 | B1 | 8/2001 | Cassidy et al. |
| 6,293,961 | B2 | 9/2001 | Schwartz et al. |
| 6,296,659 | B1 | 10/2001 | Foerster |
| 6,306,159 | B1 | 10/2001 | Schwartz et al. |
| 6,319,271 | B1 | 11/2001 | Schwartz et al. |
| 6,328,758 | B1 | 12/2001 | Tornier et al. |
| 6,391,030 | B1 | 5/2002 | Wagner et al. |
| 6,423,065 | B2 | 7/2002 | Ferree |
| 6,432,123 | B2 | 8/2002 | Schwartz et al. |
| 6,464,713 | B2 | 10/2002 | Bonutti |
| 6,491,714 | B1 | 12/2002 | Bennett |
| 6,514,274 | B1 | 2/2003 | Boucher et al. |
| 6,518,200 | B2 | 2/2003 | Lin |
| 6,520,980 | B1 | 2/2003 | Foerster |
| 6,524,317 | B1 | 2/2003 | Ritchart et al. |
| 6,527,794 | B1 | 3/2003 | McDevitt et al. |
| 6,533,795 | B1 | 3/2003 | Tran et al. |
| 6,540,770 | B1 | 4/2003 | Tornier et al. |
| 6,547,800 | B2 | 4/2003 | Foerster et al. |
| 6,551,330 | B1 | 4/2003 | Bain et al. |
| 6,554,852 | B1 | 4/2003 | Oberlander |
| 6,569,187 | B1 | 5/2003 | Bonutti et al. |
| 6,575,987 | B2 | 6/2003 | Gellman et al. |
| 6,582,453 | B1 | 6/2003 | Tran et al. |
| 6,585,730 | B1 | 7/2003 | Foerster |
| 6,605,096 | B1 | 8/2003 | Ritchart |

| | | | |
|---|---|---|---|
| 6,635,073 | B2 | 10/2003 | Bonutti |
| 6,638,279 | B2 | 10/2003 | Bonutti |
| 6,641,597 | B2 | 11/2003 | Dreyfuss et al. |
| 6,652,561 | B1 | 11/2003 | Tran |
| 6,660,008 | B1 | 12/2003 | Foerster et al. |
| 6,660,023 | B2 | 12/2003 | McDevitt et al. |
| 6,673,094 | B1 | 1/2004 | McDevitt et al. |
| 6,712,830 | B2 | 3/2004 | Esplin |
| 6,770,076 | B2 | 8/2004 | Foerster |
| 6,780,198 | B1 | 8/2004 | Gregoire et al. |
| 6,855,157 | B2 | 2/2005 | Foerster et al. |
| 6,984,241 | B2 | 1/2006 | Lubbers et al. |
| 6,986,781 | B2 | 1/2006 | Smith |
| 7,001,411 | B1 | 2/2006 | Dean |
| 7,041,120 | B2 | 5/2006 | Li et al. |
| 7,056,333 | B2 | 6/2006 | Walshe |
| 7,081,126 | B2 | 7/2006 | McDevitt et al. |
| 7,083,638 | B2 | 8/2006 | Foerster |
| 7,090,690 | B2 | 8/2006 | Foerster et al. |
| 7,144,415 | B2 | 12/2006 | Del Rio et al. |
| 7,153,312 | B1 | 12/2006 | Torrie et al. |
| 7,156,864 | B2 | 1/2007 | Lintner |
| 7,232,455 | B2 | 6/2007 | Pedlick et al. |
| 7,235,100 | B2 | 6/2007 | Martinek |
| 7,247,164 | B1 | 7/2007 | Ritchart et al. |
| 7,517,357 | B2 | 4/2009 | Abrams et al. |
| 7,837,710 | B2 | 11/2010 | Lombardo et al. |
| 8,029,537 | B2 | 10/2011 | West, Jr. et al. |
| 2001/0008971 | A1 | 7/2001 | Schwartz et al. |
| 2001/0018597 | A1 | 8/2001 | Gellman et al. |
| 2001/0051815 | A1 | 12/2001 | Esplin |
| 2001/0051816 | A1 | 12/2001 | Enzerink et al. |
| 2002/0019649 | A1 | 2/2002 | Sikora et al. |
| 2002/0029066 | A1 | 3/2002 | Foerster |
| 2002/0077613 | A1 | 6/2002 | Lubbers et al. |
| 2002/0111653 | A1 | 8/2002 | Foerster |
| 2002/0128684 | A1 | 9/2002 | Foerster |
| 2002/0169478 | A1 | 11/2002 | Schwartz et al. |
| 2002/0188305 | A1 | 12/2002 | Foerster et al. |
| 2003/0018358 | A1 | 1/2003 | Saadat |
| 2003/0088270 | A1 | 5/2003 | Lubbers et al. |
| 2003/0105591 | A1 | 6/2003 | Hagiwara |
| 2003/0149448 | A1 | 8/2003 | Foerster et al. |
| 2003/0167072 | A1 | 9/2003 | Oberlander |
| 2003/0181925 | A1 | 9/2003 | Bain et al. |
| 2003/0191498 | A1 | 10/2003 | Foerster et al. |
| 2003/0195528 | A1 | 10/2003 | Ritchart |
| 2003/0195562 | A1 | 10/2003 | Foerster |
| 2003/0195564 | A1 | 10/2003 | Tran et al. |
| 2003/0204204 | A1 | 10/2003 | Bonutti |
| 2003/0236555 | A1 | 12/2003 | Thornes |
| 2004/0002735 | A1 | 1/2004 | Lizardi et al. |
| 2004/0024420 | A1 | 2/2004 | Lubbers et al. |
| 2004/0044366 | A1 | 3/2004 | Bonutti et al. |
| 2004/0093031 | A1 | 5/2004 | Burkhart et al. |
| 2004/0098050 | A1 | 5/2004 | Foerster et al. |
| 2004/0102779 | A1 | 5/2004 | Nesper et al. |
| 2004/0116961 | A1 | 6/2004 | Nesper et al. |
| 2004/0133238 | A1 | 7/2004 | Cerier |
| 2004/0193217 | A1 | 9/2004 | Lubbers et al. |
| 2004/0225325 | A1 | 11/2004 | Bonutti |
| 2004/0243178 | A1 | 12/2004 | Haut et al. |
| 2004/0254609 | A1 | 12/2004 | Esplin |
| 2004/0267317 | A1 | 12/2004 | Higgins et al. |
| 2005/0027307 | A1 | 2/2005 | Schwartz et al. |
| 2005/0055052 | A1 | 3/2005 | Lombardo et al. |
| 2005/0240199 | A1 | 10/2005 | Martinek et al. |
| 2005/0240226 | A1 | 10/2005 | Foerster et al. |
| 2005/0245932 | A1 | 11/2005 | Fanton et al. |
| 2005/0283158 | A1 | 12/2005 | West |
| 2005/0288682 | A1 | 12/2005 | Howe |
| 2006/0067967 | A1 | 3/2006 | Bowman et al. |
| 2006/0106423 | A1 | 5/2006 | Weisel et al. |
| 2006/0116719 | A1 | 6/2006 | Martinek |
| 2006/0161159 | A1 | 7/2006 | Dreyfuss et al. |
| 2006/0178702 | A1 | 8/2006 | Pierce et al. |
| 2006/0235413 | A1 | 10/2006 | Denham et al. |
| 2006/0271060 | A1 | 11/2006 | Gordon |
| 2006/0271105 | A1 | 11/2006 | Foerster et al. |

| 2006/0293710 | A1 | 12/2006 | Foerster et al. |
| 2007/0142835 | A1 | 6/2007 | Green et al. |
| 2007/0142861 | A1 | 6/2007 | Burkhart |

## FOREIGN PATENT DOCUMENTS

| WO | WO 99/52478 | A1 | 10/1999 |
| WO | WO 01/54586 | A1 | 8/2001 |
| WO | WO 01/67962 | A2 | 9/2001 |
| WO | WO 02/11630 | A1 | 2/2002 |
| WO | WO 02/21998 | A1 | 3/2002 |
| WO | WO 03/065904 | A1 | 8/2003 |
| WO | WO 2004/062506 | A1 | 7/2004 |
| WO | WO 2005/112786 | A2 | 12/2005 |
| WO | WO 2005/112788 | A2 | 12/2005 |
| WO | WO 2006/060035 | A2 | 6/2006 |
| WO | WO 2006/067548 | A1 | 6/2006 |
| WO | WO 2006/128092 | A2 | 11/2006 |
| WO | WO 2007/084714 | A2 | 7/2007 |

## OTHER PUBLICATIONS

Complaint for Patent Infringement, dated Aug. 1, 2011, *KFX Medical Corporation v. Arthrex, Inc.*, (S.D.C.A.).

International Preliminary Report on Patentability dated Jan. 25, 2007 for International Application No. PCT/US2005/019454.

International Search Report and Written Opinion of the International Searching Authority, dated Sep. 6, 2006, for International Application No. PCT/US2005/019454.

Lo et al., Double-Row Arthroscopic Rotator Cuff Repair: Re-Establishing the Footprint of the Rotator Cuff, Arthroscopy: The Journal of Arthroscopic and Related Surgery, Nov. 2003, pp. 1035-1042, vol. 19, No. 9.

Mazzocca et al., Arthroscopic Single-Row Versus Double-Row Suture Anchor Rotator Cuff Repair, The American Journal of Sports Medicine, 2005, 33:1861.

Mazzocca et al., Arthroscopic Single versus Double Row Suture Anchor Rotator Cuff Repair, abstract of presentation made on Jun. 25, 2004 at 2004 Annual Meeting of the American Orthopaedic Society for Sports Medicine in Quebec, Canada, publication date unknown.

Millett et al., Mattress double anchor footprint repair: a novel, arthroscopic rotator cuff repair technique, Arthroscopy: The Journal of Arthroscopic and Related Surgery, 20(8):875-879 (2004).

Paulos, M.D., Graftjacket Regenerative Tissue Matrix Rotator Cuff, date unknown, Wright Medical Techology, Inc.; Wright Cremascoli Ortho SA.

PCT International Preliminary Report on Patentability, dated May 22, 2009, for International Application No. PCT/US2007/083662.

PCT International Search Report and Written Opinion, dated Aug. 8, 2008, for International Application No. PCT/US2007/083662.

PCT Invitation to Pay Additional Fees, dated May 13, 2008, for International Application No. PCT/US2007/083662.

Robbe, M.D. et al., Knotless Suture-based Anchors, Operative Techniques in Sports Medicine, 2004, pp. 221-224, Elsevier Inc.

Seldes, M.D., et al., Tissue Mend Arthroscopic Insertion of a Biologic Rotator Cuff Tissue Augment After Rotator Cuff Repair, Stryker, date unknown, pp. 1-7.

Statement of Tate Scott, dated Apr. 12, 2011, submitted in Re-Examination No. 90/011,430.

TissueMend Advanced Soft Tissue Repair Matrix, Stryker, date unknown.

TissueMend Soft Tissue Repair Matrix, Stryker, 2004, USA.

Waltrip, "Rotator Cuff Repair a Biomechanical Comparison of Three Techniques", The American Journal of Sports Medicine, 2003, pp. 493-497, No. 4.

Yian, M.D., et al., Arthroscopic Repair of SLAP Lesions With a Bioknotless Suture Anchor, Arthroscopy: The Journal of Arthroscopic and Related Surgery, May-Jun. 2004, pp. 547-551, vol. 20, No. 5. Arthroscopy Association of North America.



**FIG. 1**



**FIG. 2**



**FIG. 3A**



**FIG. 3B**

A000119



# FIG. 3C



## FIG. 4A



FIG. 4B

Case: 14-1372 Case: 14-1372 Document: 20 Page: 161 Filed: 06/23/2014 Filed: 06/23/2014



FIG. 4D



FIG. 4C

Case: 14-1372 CASE PARTICIPANTS ONLY Document: 20 Page: 162 Filed: 06/23/2014



**FIG. 5B**



**FIG. 5A**



FIG. 6A



FIG. 5C

Case: 14-1372    Case: 14-1372    Document: 16-2    Page: 164    Filed: 06/23/2014



# FIG. 6B



FIG. 7B

FIG. 7A



FIG. 8



# FIG. 9A



**FIG. 9B**

A000130

Case: 14-1372 Case: 14-1372 Document: 16 Page: 169 Filed: 06/23/2014 Page: 169 Filed: 06/23/2014



**FIG. 9C**

A000131



*420*

*200*

*600*

*100*

# FIG. 9D

Case: 14-1372 Case: 14-1372 Document: 20 Page: 171 Filed: 06/23/2014 Page: 171 Filed: 06/23/2014



# FIG. 9E

A000133

Case: 14-1372 Case: 14-1372 Document: 20 Page: 172 Filed: 06/23/2014 Document: 20 Page: 172 Filed: 06/23/2014



# FIG. 10A



# FIG. 10B

Case: 14-1372 CASE PARTICIPANTS ONLY Document: 173-20 Page: 173 Filed: 06/23/2014



FIG. 12



FIG. 11



702

654

650

720

656

# FIG. 13



**FIG. 14**



FIG. 15

Case: 14-1372 CASE PARTICIPANTS ONLY Document: 17 Page: 177 Filed: 06/23/2014



## FIG. 16A



## FIG. 16B



## FIG. 16C



## FIG. 16D



# FIG. 16E



# FIG. 16F

US 8,100,942 B1

**1**

## SYSTEM AND METHOD FOR ATTACHING SOFT TISSUE TO BONE

### RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 12/549,105, filed Aug. 27, 2009, which is a divisional of U.S. application Ser. No. 11/143,007, now U.S. Pat. No. 7,585,311, filed Jun. 1, 2005, which claims priority to U.S. Provisional Application Nos. 60/576,477, filed on Jun. 2, 2004; 60/610,924, filed on Sep. 17, 2004; and 60/634,174, filed on Dec. 7, 2004; all of which are incorporated herein by reference in their entirety.

### BACKGROUND OF THE INVENTION

#### 1. Field of the Invention

The present invention relates to medical devices and procedures. More particularly, the present invention relates to devices and methods for securing soft tissue to a rigid material such as bone.

#### 2. Description of the Related Art

There are several medical procedures where a surgeon needs to attach soft tissue such as tendons or other soft connective tissue to bone. One common example is a torn rotator cuff, where the supraspinatus tendon has separated from the humerus causing pain and loss of ability to elevate and externally rotate the arm. To repair a torn rotator cuff, typically a surgical procedure is used to suture the torn tendon to the bone using a variety of methods. Some procedures utilize large incisions and involve complete detachment of the deltoid muscle from the acromion. Small diameter holes are made in the bone for passing suture material through the bone to secure the tendon. Such large incision procedures are traumatic, causing prolonged pain and recovery time. Other procedures make small incisions and use arthroscopic techniques to attach sutures using either small diameter holes or a bone anchor. However, it is difficult to manipulate sutures within the surgical site using arthroscopic techniques. In addition, when knot tying is used to secure the suture to a bone anchor, it is difficult to properly adjust the tension of the suture while tightening the knot. Similarly, when the suture is attached to a bone anchor prior to insertion of the anchor into the bone, it is difficult to judge the appropriate point of attachment so that the suture will be properly tensioned upon insertion of the bone anchor into the bone. Thus, there is a need for methods and devices that allow easy arthroscopic attachment of a suture to a bone anchor after the anchor is inserted into the bone without the use of knot tying.

### SUMMARY OF THE INVENTION

The present invention is particularly suited for use in arthroscopic procedures, including but not limited to rotator cuff surgery. More broadly, it can be used in any procedure in which it is desired to fix a suture to a solid object without tying of knots, including not only arthroscopic procedures, but also open surgery, and can be used for such diverse purposes as bladder neck suspension, tendon and ligament affixation or repair, prosthetic attachment, and rotator cuff repair.

In one embodiment, the invention includes an anchor for securing a suture to bone, including an anchor base adapted to be securely fixed into the bone and a suture securing mechanism coupled to the anchor base and positioned proximally relative to the anchor base, the mechanism adapted to receive and secure a suture moved laterally into the

**2**

In another embodiment, the invention includes an anchor for securing a suture to bone, including an anchor base adapted to be securely fixed into the bone, a first surface coupled to the anchor base and positioned proximally relative to the anchor base, and a second surface coupled to the anchor base and positioned proximally relative to the anchor base, wherein the first and second surfaces are adapted to be relatively positioned in at least two configurations, one of the configurations such that a gap is present between the first and second surfaces so that the suture can be positioned between the first and second surfaces by moving the suture laterally into the gap, and the other of the configurations such that the first and second surfaces are in close proximity so that the suture can be securely clamped between the first and second surfaces.

In another embodiment, the invention includes a method of attaching soft tissue to bone, including passing a length of suture over the soft tissue, inserting an anchor into the bone, and securing the length of suture to the anchor after the inserting without passing an end of the length of suture through any aperture in the anchor and without tying any knots.

In another embodiment, the invention includes a method of attaching soft tissue to bone, including inserting a first anchor through the soft tissue, wherein the first anchor comprises a length of suture fixedly secured to the first anchor prior to insertion, inserting the first anchor into the bone, passing the length of suture over the soft tissue, and fixedly securing, after the passing, the length of suture to a second anchor.

In another embodiment, the invention includes a method of attaching soft tissue to bone, the soft tissue comprising a first surface adjacent to the bone's surface and a second surface opposite the first surface, the method including inserting a first portion of a length of suture into the second surface of the soft tissue, passing a second portion of the length of suture over the second surface of the soft tissue, inserting a first anchor with no suture coupled thereto into the bone, and fixedly securing the length of suture to the inserted first anchor, with the proviso that no part of the first portion of the length of suture is passed out of the second surface of the soft tissue.

In another embodiment, the invention includes a method of attaching soft tissue to bone, including inserting a first anchor with a length of suture pre-coupled thereto through the soft tissue, inserting the first anchor into the bone, inserting a second anchor with no suture coupled thereto into bone, passing the length of suture over the soft tissue, and fixedly securing the length of suture to the inserted second anchor.

In another embodiment, the invention includes a method of attaching soft tissue to bone, the method including inserting a first, second, and third anchor into the bone, fixedly securing a first length of suture over the soft tissue to the first and second anchors, and fixedly securing a second length of suture over the soft tissue to the first and third anchors.

In another embodiment, the invention includes an anchor for securing a suture to bone, the anchor including an anchor base adapted to be securely fixed into the bone, the anchor base comprising a first proximal surface and an anchor top, the anchor top comprising a distal member coupled to the anchor base and a first proximal member comprising a first distal surface, wherein the anchor top is adapted to couple to the anchor base in at least two configurations, one of the configurations such that the first distal surface is above the bone's surface when the anchor base is securely fixed into the bone, such that a suture can be freely passed between the first proximal and first distal surfaces above the bone's surface, and the other of the configurations such that the first distal

US 8,100,942 B1

3

surface is in close proximity to the first proximal surface, such that a suture may be securely clamped between the first proximal and first distal surfaces.

In another embodiment, the invention includes an anchor for securing a suture to the bone, the anchor including a substantially hollow cylinder comprising an open end and comprising a portion of its walls cut in such a manner so as to allow the cylinder to deform under stress and form lateral protrusions, a substantially pointed tip coupled to the cylinder opposite the open end, wherein the pointed tip is adapted to pierce the bone, and a suture receiver coupled to the pointed tip and positioned within the substantially hollow cylinder so that a suture may be attached to the suture receiver and extend through the cylinder and out of the open end.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** depicts attaching soft tissue to bone using a single bone anchor and a stitch.

FIG. **2** depicts attaching soft tissue to bone using a two bone anchors with a suture stretched there between.

FIGS. **3**A-**3**C depict various geometries of bone anchors and suture patterns for attaching soft tissue to bone.

FIGS. **4**A-**4**D depicts the base of a two-part suture anchor that can be inserted into bone.

FIGS. **5**A-**5**C depicts the top of a two-part suture anchor.

FIGS. **6**A and **6**B depict the suture anchor top of FIGS. **5**A-**5**C inserted into the suture anchor bottom of FIGS. **4**A-**4**D.

FIGS. **7**A and **7**B depict a suture anchor inserter.

FIG. **8** depicts components on a suture anchor inserter for attaching to bone and manipulating a suture anchor.

FIGS. **9**A-**9**E depicts manipulation of a suture anchor using a suture anchor inserter to insert the suture anchor into bone and attach suture material to the suture anchor.

FIGS. **10**A and **10**B depict a piercing bone anchor in an un-deployed (FIG. **10**A) and deployed (FIG. **10**B) state.

FIG. **11** depicts a piercing bone anchor tip.

FIG. **12** depicts an anchor inserter for inserting a piercing bone anchor.

FIG. **13** depicts the interface between a piercing bone anchor and an anchor inserter.

FIG. **14** is a cut-away view of a bone anchor inserter.

FIG. **15** depicts a safety switch mechanism for a bone anchor inserter.

FIGS. **16**A-**16**F depict a method for attaching soft-tissue to bone using a piercing bone anchor and a suture capturing anchor.

DETAILED DESCRIPTION OF THE CERTAIN EMBODIMENTS

In various embodiments, soft tissue may be attached to bone utilizing one or more bone anchors with suture attached thereto. As used herein, "suture" refers to any flexible structure that can be stretched between two or more anchors and includes, without limitation, traditional suture material, single or multiple stranded threads, or a mesh structure. In some embodiments, suture is passed over the top of the soft tissue so that the suture can press the soft tissue against the bone. In one embodiment, a length of suture is attached to a single bone anchor. One non-limiting example, depicted in FIG. **1**, includes stitching the suture **10** to the soft tissue **12**, such as by an incline mattress stitch, and then securing the suture **10** to the single bone anchor **14** that is inserted into the bone **16**. However, in other embodiments, a length of suture is attached to multiple bone anchors. The use of multiple bone

4

anchors increases the footprint over which the suture material presses the soft tissue against bone. One non-limiting example, depicted in FIG. **2**, includes two bone anchors. One anchor **20** is positioned in a medial location underneath the soft tissue **12** and a second anchor **22** is positioned lateral to the soft tissue **12**. The suture **10** is attached to both anchors.

In one embodiment, the suture **10** is attached to the lateral bone anchor **22** only after the medial bone anchor **20** is inserted and the suture **10** is passed over the soft tissue **12**. In one embodiment, the suture **10** is attached to the medial bone anchor **20** prior to insertion of the medial bone anchor **20**. Thus, in this embodiment, the surgeon does not need to pass the suture through the soft tissue **12** from beneath the soft tissue **12**. In one embodiment, the procedure involves inserting the medial bone anchor **20** with suture **10** pre-attached through the soft tissue **12**. The medial bone anchor **20** may then be moved laterally relative to the bone **16** in order to pull the soft tissue **12** laterally relative to the bone **16**. After appropriate positioning of the soft tissue **12**, the medial bone anchor **20** may then be inserted into the bone **16**. The lateral bone anchor **22** may then be inserted into the bone **16**. The suture **12** may then be passed over the soft tissue **12** and attached to the lateral bone anchor **22**. In some embodiments, a lateral bone anchor **22** is provided to which suture **12** can be attached without tying any knots or without passing the suture **12** through any aperture in the lateral bone anchor **22**.

In some embodiments, multiple anchors and multiple suture lengths may used to provide a wider area of pressure of the soft tissue against bone. For example, as depicted in FIG. **3**A, three anchors are used with two lengths of suture **26** and **28**. Alternatively, a mesh structure **29** may be stretched between the three anchors. In another example, as depicted in FIG. **3**B, four anchors are used with two lengths of suture. In still another example, as depicted in FIG. **3**C, four anchors are used with four lengths of suture. In some embodiments, the individual suture lengths may be part of a larger continuous suture. For example, in FIG. **3**A, the suture lengths **26** and **28** may be part of a larger length of suture such that the lengths **26** and **28** are joined at medial bone anchor **20**. Those of skill in the art will appreciate that there are any number of anchor and suture geometries that can be used.

In some embodiments, the medial bone anchors **20** are designed so that they can be easily pierced through the soft tissue **12** and bone **16**. In some embodiments, the lateral bone anchors **22** are designed so that they can easily capture suture material after insertion of the bone anchors **22**. Together, these design features provide a suturing system and method that provides an increased footprint of suture pressure against the soft tissue **12** and ease of implementation for a surgeon. For example, in some embodiments, the entire procedure may be done arthroscopically, with the surgeon needing only to insert the medial bone anchor **20** with suture optionally pre-attached through a first port, insert the lateral anchor **22** through a second port, pass the suture over the soft tissue **12** by capturing it from within the second port, and securing the suture to the lateral anchor **22**. Accordingly, described below are certain embodiments of anchors adapted to capture suture material and anchors adapted to easily pierce through soft tissue and bone.

Suture Capturing Anchor

One embodiment is a bone anchor that allows easy capturing and securing of a suture after the bone anchor is inserted into the bone. In one embodiment, the bone anchor includes a suture securing mechanism positioned on the proximal end of the bone anchor (i.e., the end nearest the surface of the bone and the surgeon). In one embodiment, the suture securing mechanism allows a suture to be moved laterally into the

5

mechanism. By "laterally," it is meant that the suture can be moved into the mechanism by moving the suture in a direction that is generally perpendicular to the axis of the suture. In other words, the suture can be moved into the mechanism without threading an end of the suture into the mechanism. In one embodiment, the suture can be fixedly secured within the mechanism without tying any knots. By "fixedly secured," it is meant that the suture within the securing mechanism cannot be easily moved relative to the bone anchor.

One embodiment is a bone anchor that allows easy attachment of suture material by clamping the suture material between two surfaces on the bone anchor. The bone anchor may be configured such that the bone anchor is inserted into the bone without the suture material attached. The two surfaces of the suture securing mechanism may be spaced apart so as to form a gap between the surfaces. The suture material may be passed between the two surfaces and tensioned as desired followed by clamping of the two surfaces together, thereby clamping the suture material there between.

In one embodiment, the bone anchor consists of two parts: an anchor base and an anchor top. The anchor base may be designed to be inserted into a hole in the bone with a proximal surface facing up. The anchor top may be coupled to the anchor base via a distal member. A proximal member on the anchor top may have a distal surface facing down toward the proximal surface on the anchor base. The coupling of the anchor top to the anchor base may be such that the anchor top can move relative to the anchor base such that it can be positioned in one configuration where there is space between the proximal surface on the anchor base and the distal surface on the proximal member of the anchor top. In another configuration, the proximal member of the anchor top may be position such that there is very little space, if any, between the proximal surface on the anchor base and the distal surface on the proximal member of the anchor top. Thus, in the first configuration, suture material may be easily passed between the two surfaces and tensioned as desired. In the second configuration, the suture material may be clamped between the two surfaces such that the suture is secured to the bone anchor.

One embodiment of an anchor base 100 is depicted in FIGS. 4A through 4D. FIG. 4A is a perspective view showing the side 101 and bottom 102 of the anchor base 100. The bottom 102 of the anchor base 100 may advantageously be tapered to facilitate insertion of the anchor base 100 into bone. In some embodiments, a hole is predrilled into the bone to facilitate insertion of the anchor base 100. In other embodiments, the anchor base 100 is forced directly into the bone, thereby creating the hole. The sides 101 of the anchor base 100 comprise threads 104 so that the anchor base 100 may be inserted into bone using a screwing action. In some embodiments, the anchor base 100 may be tapped to start the threads 104 into the bone followed by screwing the anchor base 100 into the bone. When the hole in the bone is pre-drilled, the hole is advantageously drilled with a diameter smaller than the diameter of threads 104 so that the threads engage the bone through the sides of the hole. It will be appreciated that means other than threads may be used to secure the anchor base 100 to bone. For example, angled protrusions may be used that provide greater resistance to removal of the anchor base 100 than to insertion. The protrusions may be static or deployable once the anchor is inserted.

The top of anchor base 100 preferably includes a structure 106 for facilitating the driving or screwing of the bone 100 into the bone. In the illustrated embodiment, this comprises a hex nut structure 106 that facilitates engagement with a hex nut driver for screwing the anchor base 100 into the bone. It

6

will be appreciated that other structures known in the art for engaging tools used for screwing anchor may be used instead of hex nut structure 106, and that this structure can be indented into or extending out from the top of the anchor base 100, or can alternatively be formed on the sides of the anchor base 100.

With reference to FIG. 4B, which is a perspective view of the top and side of anchor base 100, the top (proximal end) comprises a hole 108 in the center for receiving the anchor top, which is described below. The top of anchor base 100 also contains a suture gripping structure such as a circular groove 110 that may be concentric with hole 108. Because of groove 110, the proximal surface of anchor base 100 is not flat and comprises top surfaces 112 and 114, bottom surface 116, and side surfaces 118 and 120. In some embodiments, some or all of these surfaces may be textured such as with a scallop shape or grooves so as to inhibit movement of suture material pressed against the surfaces. Although a grooved surface is illustrated, it will be appreciated that other shapes for the proximal surface of anchor base 100 are also contemplated, including multiple concentric grooves, a series of protruding ridges, a "vee" shaped channel, or any other suitable structure that permits a suture to be securely locked against the top or proximal end of the anchor base 100.

Hole 108 in anchor base 100 is an opening into a central ("axial") bore into the anchor base 100. The sides of the central bore preferably include structures for gripping something inserted into the central bore, such as ratchet structures 122. FIG. 4C show a central ratchet bushing 126 that fits within the central bore and contains the ratchet structures 122. In the embodiment of FIG. 4C, the ratchet structures 122 are constructed by cutting U shaped cuts into bushing 126. The U shaped cuts then define tabs that make up the ratchet structures 122. It will be appreciated that other shapes and methods for making ratchet structures may be used. The purpose of ratchet bushing 126 is to receive the anchor top and secure it to the anchor base 100. It will be appreciated that other methods of securing the anchor top to the anchor base 100 may be used, such as a frictional fit or threading. Furthermore, the anchor top may be coupled to the anchor base 100 using means other than hole 108 and bushing 126. For example, the anchor top may be coupled via structures at the perimeter rather than the center or by a hinge.

FIG. 4D depicts a cross section through the center of anchor base 100. This view illustrates central bore 130 and groove 110. The proximal surfaces 112, 114, 116, 118, and 120 are also apparent. Central bore 130 preferably does not extend all the way through the anchor base 100. Instead, a smaller bore 132 is present at the distal end 102 of the anchor base 100. Smaller bore 132 is used to receive a wire connected to an anchor inserter. It will be appreciated that other structures than bore 132 may be used for attaching the wire and that other means than a wire may be used to secure the anchor to the anchor inserter.

FIGS. 5A through 5C illustrate one embodiment of an anchor top 200. FIG. 5A provides a perspective view of the side and top of the anchor top 200 and FIG. 5B provides a perspective view of the side and bottom of the anchor top 200. Anchor top 200 has two members, a distal member 202 and a proximal member 204. The distal member 202 comprises an elongated shaft, the longitudinal direction of which shall be considered to run along the axis of the distal member 202. A series of grooves or other mating or locking surfaces or structures 206 exist along a portion of the outside surface of the shaft. The distal member 202 is designed to be inserted into the central bore 130 of the anchor base 100. The ratchet structures 122 in the anchor base 100 engage grooves 206 to

US 8,100,942 B1

7

couple the anchor top **200** to the anchor base **100**. The ratchet structures **122** are oriented such that the distal member **202** can be easily moved in the distal direction in central bore **130** with the ratchet structures **122** snapping into the grooves **206** as the distal member **202** is moved downward. However, when the ratchet structures **122** are snapped into grooves **206**, proximal movement of distal member **202** is inhibited. Thus, the anchor top **200** may be ratcheted down into anchor base **100**. Because the ratchet structures **122** exist along substantially the entire surface of the central bore **130** (see FIG. 4C), the anchor top **200** may be coupled to the anchor base **100** in several positions. In other words, in one embodiment the anchor top **200** need not be ratcheted into the anchor base **100** as far as it will go for it to be secured to the anchor base **100**.

The proximal member **204** of anchor top **200** is generally cylindrical in shape with a diameter larger than distal member **202**. A hole **208** may advantageously be provided in the center of proximal member **204**. With reference to FIG. 5B, the bottom of distal member **202** also contains a hole **210**. Holes **208** and **210** open into a central bore through the anchor top **200**. This central bore allows the wire referred to above to extend through the anchor top **200** to be secured to bore **132** in the anchor bottom **100**, thus allowing the anchor bottom **100** to be attached to an anchor inserter while still allowing anchor top **200** to be ratchet into anchor bottom **100**. FIG. 5B also illustrates that proximal member **204** contains a groove **212** in its distal surface. Thus, the distal surface of proximal member **204** is not flat and comprises distally facing surfaces **214** and **216** and side facing surfaces **218** and **220**. In some embodiments, some or all of these surfaces may be textured such as with a scallop shape or grooves so as to inhibit movement of suture material pressed against the surfaces. In some embodiments, texturing in the distal surfaces of proximal member **204** match texturing in the proximal surfaces of anchor base **100**. It will be appreciated that the illustrated embodiments represent only one possibility; thus, other shapes for the distal surface of proximal member **204** may also be used. FIG. 5C depicts a cross section through the center of anchor top **200**. In this figure, the central bore **226** is depicted as are surfaces **214**, **216**, **218**, and **220** and grooves **206**.

FIGS. 6A and 6B depict cross sections showing how the anchor top **200** may be coupled to anchor base **100** to form the complete anchor **300**. In FIG. 6A, the anchor top **200** is coupled to anchor base **100** with the proximal member **204** separated from the anchor base **100**. The anchor top **200** is secured to anchor base **100** by distal member **202** extending into central bore **130** of the anchor base **100**. The distal member **202** is secured by ratchet structures (not shown) engaging grooves **206** in distal member **202**. Central bore **226** in anchor top **200** and central bore **130** in anchor base **100** allow a wire to extend into the top of the anchor **300** and be secured to bore **132**. Alternatively, the wire may be secured at other locations within central bore **130**. Thus the wire, which can be coupled to an anchor inserter, can hold the entire anchor assembly **300** and still allow anchor top **200** to move relative to anchor base **100** and the wire.

FIG. 6B depicts the anchor assembly **300** with the distal member **202** of anchor top **200** ratcheted all the way into central bore **130** in anchor base **100**. In this configuration, it can be seen that proximal surfaces **112**, **114**, **116**, **118**, and **120** of the anchor base **100** and distal surfaces **214**, **216**, **218**, and **220** of the proximal member **204** of anchor top from passageways **302** and **304**. The size of passageways **302** and **304** are advantageously such that when a suture passes through them, it will be compressed so that it is securely attached to the anchor **300**.

8

Another embodiment of the present invention is an inserter designed to insert and manipulate an anchor such as described in FIGS. **1**-**3**. One such inserter **400** is depicted in FIGS. 7A and 7B. Inserter **400** comprises a handle **402** and an outer tube **404**. As depicted in FIG. 7A, the handle **402** comprises a cover **403**. FIG. 7B depicts the inserter **400** with cover **403** removed. Not depicted in FIGS. 7A and 7B are an inner tube disposed inside outer tube **404** and a wire disposed within the inner tube. As will be described in more detail below, the inner and outer tubes may be used to manipulate an anchor **300** such as that described in FIGS. 4-6. The wire may be used to couple the inserter **400** to the anchor **300** as described above. Inserter **400** also comprises an outer tube manipulator **406** and a wire manipulator **408**. Outer tube manipulator **406** comprises release button **410**. Outer tube manipulator **406** is securely attached to outer tube **404**. Outer tube manipulator **406** may move longitudinally relative to handle **402** and the inner tube when release button **410** is pressed. Thus, when outer tube manipulator **406** is moved, outer tube **404** also moves.

Wire manipulator **408** comprises wire grabber **410** to which the wire is attached. The wire extends from wire grabber **410**, through handle **402**, and then through the inner tube. In one embodiment, wire manipulator **408** also comprises a release button **412**. When release button **412** is pressed, the wire manipulator **408** may be pressed into the handle **402** to contact and thus provide additional tension on the wire. When in use, the additional tension causes the anchor base **100** to mover relative to inserter **400**. When enough tension is provided to the wire by wire manipulator **408**, the wire may break free from the anchor **300** at its attachment point in bore **132** or at some other predetermined location along the wire. It will be appreciated that any suitable breakable attachment means may be used for securing the wire to the anchor **300**. For example, the wire may be frictionally secured into bore **132** or it may welded to the anchor base **100** using a weld that is weaker than the wire itself or a portion of the wire where breaking is desired may be weakened. In one embodiment, the wire is notched so as to create a weaker region in the wire that will break upon application of suitable force.

The tip **414** of outer tube **404** is depicted in more detail along with inner tube **420**, wire **422**, and anchor **300** in FIG. 8. The end of outer tube **404** may comprise a hex nut driver structure **424** for receiving the hex nut structure **106** of anchor base **100**. Of course, any other suitable engagement structure can be provided on the inserter **400** and the anchor base **100** in order to facilitate placement of the anchor base **100**. Wire **422** extends out of inner tube **420** and into the central bore in the anchor top **200** to attach to anchor base **100** as described above. In some advantageous embodiments, the wire length and tension is adjusted such that the proximal member **204** of anchor top **200** buts against the end **426** of inner tube **420**.

FIGS. 9A through 9E depict how inserter **400** and anchor **300** may be used to insert the anchor **300** into bone and attach a suture to it. FIG. 9A depicts the configuration for inserting the anchor **300** into bone. Outer tube **404** and outer tube manipulator **406** (see FIGS. 7A and 7B) are positioned relative to inner tube **420** and handle **402** (see FIGS. 7 and 8) so that the outer tube **404** engages hex nut structure **106** in the anchor base **100**. It is advantageous in this configuration for the anchor top **200** to be in a position relative to the anchor base **100** such as depicted in FIG. 6A. In the configuration of FIG. 9A, a surgeon may then screw the anchor base **100** into bone by twisting handle **402** of inserter **400** (see FIGS. 7A and 7B).

After the anchor base **100** is inserted into the bone, the outer tube **404** may be slid backward relative to the inner tube **420** and handle **402** to expose the anchor top **200** such as in

US 8,100,942 B1

9

FIG. 9B. One or more lengths of suture **600** may then be placed in the space between the distal surface **602** of the proximal member **204** of anchor top **200** and the proximal surface **604** of the anchor base **100** by moving the suture laterally into the space as depicted in FIG. **9**C. The suture **600** may be manually tensioned as desired. In some embodiments, tensioning of the suture **600** is aided by pulling the suture **600** against the distal member **202** of the anchor top **200**.

After appropriate tensioning of suture **600**, wire manipulator **408** may be pressed to tension the wire, causing the handle **402** of the inserter **400** and the inner tube **420** to be pulled down towards the anchor base **100** so that inner tube **420** ratchets the anchor top **200** down into the anchor bottom **100** as depicted in FIG. **9**D. As the anchor top **200** is pushed axially down, suture **600** will be clamped between the distal surface **602** of the proximal member **204** of anchor top **200** and the proximal surface **604** of the anchor base **100** (see also FIG. **9**C). The clamping will force the suture to be compressed within the passageways **302** and **304** depicted in FIG. **6**B and thus be secured to anchor **300**. The fit between the anchor top **200** and the anchor base **100** in the clamping region is such that the suture **600** is firmly gripped, but is not cut, when it is clamped in place. Appropriate edges that may contact the suture are preferably beveled or rounded to avoid damage to the suture. After anchor top **200** is ratcheted sufficiently into anchor base **100**, wire manipulator **408** (see FIGS. **7**A and **7**B) in inserter **400** may be compressed further to further tension wire **422** (see FIG. **8**) such that wire **422** breaks free from its attachment to anchor base **100**, thus leaving the anchor **300** free from inserter **400** with suture **600** securely attached as depicted in FIG. **9**E.

Although a particular inserter device for inserting and manipulating anchor **300** has been described, it should be understood that other inserter designs may be used for manipulating the parts of anchor **300** described above to insert the anchor into bone and secure suture material to the anchor. For example, it may be possible to use separate tools for inserting the anchor and securing the suture material. In addition, in alternative embodiments, the anchor base **100** may be connected to the anchor top **200** throughout the procedure, or the anchor base may be separately inserted into the bone, and the anchor top can be attached thereafter by axially sliding the distal end of the anchor top **200** into the hole **108** in the anchor base **100**.

It will be appreciated by those of skill in the art that the anchor **300** and inserter **400** provide a system for easy attachment of a suture to bone. The anchor **300** may be inserted into bone with minimal disruption of surrounding tissue. Only an access route having the diameter of the outer tube **404** and the anchor base **100** is required. Furthermore, the suture can be securely attached to the anchor **300** and tensioned as desired without having to insert additional instrumentation into the site or without performing any cumbersome attachment maneuvers such as knot tying. It should also be appreciated that the general principle illustrated by this system of inserting an anchor into bone without having suture material pre-attached and then attaching suture to the anchor without tying any knots may be implemented using any appropriate system other than the specific embodiments depicted in FIGS. 4-9.

Tissue and Bone Piercing Anchor

One embodiment is a bone anchor adapted for piercing through the soft tissue and into underlying bone. In one embodiment, the suture material may be pre-attached to the piercing bone anchor so that after implantation, a suture passes from the bone anchor through to the top of the soft tissue for easy passing over the soft tissue. In one embodiment, the piercing bone anchor has two configurations, a first

10

configuration having a small diameter for easy piercing through soft tissue and bone and a second deployed configuration where structures such as protrusions are deployed to prevent the bone anchor from being easily removed from the bone.

In one embodiment, the anchor includes a substantially hollow cylinder having a portion of its walls cut in such a manner so as to allow the cylinder to deform under axial stress and form lateral protrusions. The lateral protrusions may thus prevent the anchor from being easily removed from the bone after deployment. In one embodiment, the anchor comprises a pointed tip coupled to the hollow cylinder for piercing the soft tissue and bone. In one embodiment, suture is pre-attached to the pointed tip inside of the hollow cylinder. In other embodiments, suture is pre-attached at other locations on the piercing anchor, such as at the proximal end of the hollow cylinder.

One embodiment of a deployable piercing anchor is depicted in FIGS. **10**A and **10**B. In FIG. **10**A, the anchor is depicted in a pre-deployed state. The anchor includes a substantially hollow cylinder **650** with a plurality of cuts **652** in the side of the cylinder **650**. The cylinder **650** is open on one end **654**. On the other end, a pointed tip **656** is disposed, allowing the anchor to pierce through soft tissue and bone. In FIG. **10**B, the anchor is depicted in a deployed state. Stress is applied in an axial direction such that the cylinder **650** collapses along cuts **652** so as to form two lateral wings **660**. The lateral wings **660** prevent the anchor from being removed from the bone. Hinges **662** connect one end of each wing to either the top or the bottom parts of anchor body. These hinges deform and fold, in the plane tangent to the anchor body at that point when the anchor is deployed. A strip of material **664** connects the top and bottom wing on each side of the anchor body, and serves as a hinge between the two as well as aiding in alignment of the wings during deformation. The tips of the wings adjacent to the connecting strip **664** utilize rolling edges **666**, which ensure uniform alignment and smooth transition during deformation. Those of skill in the art will appreciate that any number of geometries of cuts in the cylinder **650** may be utilized to create a deformable structure that will produce lateral protrusions upon exposure to stress.

In some embodiments, structures may be positioned within the cylinder **650** for attaching sutures and engaging with an anchor inserter. In one embodiment, such structures are coupled to the anchor tip **656** within the cylinder **650**. FIG. **11** depicts one such embodiment. Attached to the tip **656** is a structure **670** through which there is an aperture **672**. The structure **670** may be adapted to engage the inner surface of cylinder **650** for attaching the tip **656** to the cylinder **650**. The attachment mechanism may be by forced fit, frictional fit, threads, welding, adhesive, or any other suitable means. Suture material may be threaded through the aperture **672** in order to attach the suture to the anchor. The suture material may be secured to the tip **656** by tying the suture around structure **670**, tying a knot in the end of the suture that prevents it from being pulled through the aperture **672**, clamping the suture between the structure **670** and the inside of the cylinder **650**, adhering the suture to structure **670** by welding or adhesive, or any other suitable means. In one embodiment, the suture material is attached to the anchor at tip **656** prior to use of the anchor.

An anchor inserter attachment structure **674** may also be coupled to the tip **656**. This structure **674** may couple to an anchor inserter through a wire or any other suitable means. The attachment between the anchor inserter and the anchor at this point may be used to apply axial stress to the anchor for

US 8,100,942 B1

11

deploying the anchor as described above. The attachment at this point may also serve to keep the anchor attached to the inserter prior to deployment.

One embodiment of an anchor inserter suitable for use with the above-described anchor is depicted in FIG. 12. The anchor inserter comprises a grasping handle 700 to which is attached an outer sleeve 702 which is fixed relative to the handle 700. The piercing anchor 704 is disposed at the end of the sleeve 702. A deployment lever 706 may be pressed by a user to deploy and detach the anchor 704 as described below. A safety switch 708 may be provided to prevent the anchor 704 from being deployed prematurely. A spool 710 may be provided at the proximal end of the handle 700 for holding excess suture. A lid 712 may be provided for gaining access to the inner components of the inserter.

FIG. 13 depicts the anchor 704 coupled to the inserter. As described above, the anchor 704 comprises a hollow cylinder 650 with cuts in the sides and a pointed tip 656. Furthermore, as depicted in FIG. 11, a suture receiving aperture 672 and an inserter attachment structure 674 are attached to the pointed tip 656 within the cylinder 650. The outer sleeve 702 of the inserter may fit over the open end 654 of the cylinder 650 or be flush with the open end 654. The outer sleeve 702 may thus hold the top part of the anchor 704 steady during insertion. In an alternative embodiment, the outer sleeve 702 may fit over the length of the cylinder 650 to prevent the cylinder 650 from deforming while it is being inserted into bone. In this alternative embodiment, the outer sleeve 702 may be retracted prior to deployment of the anchor. An inner tube 720 may be positioned within the outer sleeve 702 and the hollow cylinder 650 and contact the top surface of the anchor tip 656 (see FIG. 11). The inner tube 720 provides structural reinforcement of the anchor 704 and pushes against the tip of the anchor 704 while it is being driven into bone or tissue. The inner tube 720 may be fixed relative to the handle 712 and outer sleeve 702 during insertion. The inner tube 720 may be fixed relative to the handle 712 and outer sleeve 702 during insertion, however, during deployment of the anchor 704, the inner tube 720 may be released by switching safety switch 708 so that the inner tube 720 can move axially relative to the outer sleeve 702 while the anchor cylinder 650 collapses. A wire may be positioned inside of the inner tube 720 running from within the handle 712 through the inner tube 720 to the anchor 704 and attached to the anchor inserter attachment structure 674. During deployment, the lever 706 may be pressed to pull the wire axially towards the handle 700. The axially movement of the wire forces the anchor 704 to press against outer sleeve 702 and stresses the cylinder 650, causing it to deform and deploy. Upon collapse of the cylinder 650, the inner tube 720 will also move in an axial direction toward the handle 700. Upon further stress on the wire, the wire may break free from the anchor inserter attachment structure 674, releasing the inserter from the anchor 704. Suture material may run from the inside of handle 700 through the inner tube 720 to attach to the anchor 704 through aperture 672 (see FIG. 11). Upon detachment of the anchor inserter from the anchor 704, the inserter may be withdrawn, leaving the inserted and deployed anchor with suture coming out of the open end 654 of the cylinder 650. The suture will still be coupled to the inserter through the inner tube 720, handle 700, and around spool 710. Those of skill in the art will appreciate other inserters and mechanisms that may be used to insert and deploy the piercing anchors described herein. For example, rather then axially stressing the anchor 704 by pulling the tip 656 in an proximal direction, the cylinder 650 may be pushed in a distal direction to deform the cylinder 650.

FIG. 14 is a cut-away view of the handle 700, showing the inner workings of the anchor inserter. The suture material attached to a piercing anchor at the tip of the inserter may pass

12

through the central bore of the inner tube 720 and through a bore 750 in the handle 700. The suture material may then pass through a hole 752 in the end of the handle 700 and be wrapped around the spool 710, which may be integral with the handle 700. The wire attached to the anchor inserter attachment structure 674 in the anchor may also pass through the central bore of the inner tube 720 and may then proceed around a pulley 754 and attach securely to the handle 700 at point 756. The pulley 754 may be attached to the lever 706. When the lever 706 is pressed down, the pulley 754 will move toward the back end of the handle 700, causing the wire attached to the anchor to retract. Because of the use of pulley 754, the wire will retract twice the distance as the pulley 754 moves.

The safety switch 708 may be used to prevent the lever 706 from being pressed and prevent the inner tube 720 from moving unless the safety switch 708 is in the correct position. The safety mechanism operates via a drum 760 disposed within the handle 700 to which the safety switch 708 is attached. Moving the safety switch 708 rotates the drum 760 within the handle 700. FIG. 15 shows the drum 760 and safety switch 708 mechanism in more detail. The inner tube 720 passes through a central bore in the drum 760. On the other side of the drum 760, the inner tube 720 is attached to a stopper 762. The stopper 762 has a through-hole 764 to permit passage of the deployment wire and suture. The stopper 762 may be positioned within a cavity 766 in the end of the drum 760. A second similarly shaped cavity may be disposed within the handle 700. The stopper 762 and attached inner tube 720 may only be allowed to move axially relative to the handle 700 when the safety switch 708 and drum 760 is rotated so that the cavity 766 in the drum 760 is aligned with the matching cavity in the handle 700. When the cavities are aligned, the stopper 762 is allowed to move from the cavity 766 to the cavity in the handle 700, thus allowing the inner tube 720 to move axially and the anchor to be deployed.

Additionally, the drum 760 comprises a groove 768. A spring-loaded sliding pin 770 (see FIG. 14) may be coupled to the lever 706. The lever 706 can only be moved when the drum 760 and switch 708 are rotated so that groove 768 is aligned with the pin 770. Thus, both the stopper 764 and the pin 770 prevent the anchor from being deployed unless the switch 708 is in the correct position.

Those of skill in the art will appreciate other mechanisms that could be used for deploying a deployable anchor and providing safety mechanisms to prevent premature deployment.

Example Using a Piercing Anchor and a Suture Capturing Anchor

The above-described anchors may be used in a surgical procedure for attaching soft tissue to bone. One example of such a procedure is depicted in FIGS. 16A through 16F. In FIG. 16A, the piercing anchor 800 attached to an anchor inserter 802 as described above is pierced through soft tissue 804 that has become detached from underlying bone 806. In FIG. 16B, the anchor inserter 802 is moved laterally relative to the bone 806 so as to stretch the soft tissue 804 laterally relative to the bone 806. Once the soft tissue 804 has been stretched to the desired position, the anchor 800 is inserted into the bone 806 and the anchor 800 is deployed as described above and the inserter 802 is detached from the anchor 800, leaving a suture 808 attached to the anchor 800 and extending through the soft tissue 804. The anchor 800 may be inserted into bone 806 by tapping on the inserter 802 with a hammer or by any other suitable means of applying axial force. FIG. 16C depicts the deployed anchor 800 with attached suture 808. The suture 808 will extend into the inserter 802.

US 8,100,942 B1

13

Next, as depicted in FIG. 16D, a suture capturing anchor **810** is inserted into the bone **806** using the inserter **812** as described above. In FIG. 16E, the inserter **812** is then retracted to expose the suture capturing mechanism. The suture **808** is then passed over the soft tissue **804** and laterally moved into the suture capturing mechanism and tensioned. Finally, as depicted in FIG. 16F, the suture capturing mechanism is deployed to capture the suture **808**, the anchor inserter **812** is detached from the anchor **810**, and the suture **808** is cut to detach it from the suture inserter **802**. The result is a length of suture **808** between the bone anchors **808** and **810** that presses the soft tissue **804** against the bone **806**. Multiple anchors and sutures may be used to produce geometries such as depicted in FIGS. 2 and 3 and variations thereof.

It will be appreciated that there are numerous stitches, suture threading patterns, and anchor patterns that may be used to secure soft tissue to bone by the methods and devices described herein. These variations as well as variations in the design of the above described anchor devices and inserter devices are within the scope of the present disclosure.

Methods of Attaching Soft Tissue to Bone

Various embodiments include methods for attaching soft tissue to bone. In some embodiments, the methods include using the bone anchors described above. In one embodiment, a bone anchor is inserted into the bone and then a length of suture is passed over the soft tissue and secured to the anchor after inserting the anchor without tying any knots or without passing the suture through an aperture in the anchor. In some embodiments, the suture is secured to the anchor by laterally moving it into a securing mechanism. In one embodiment, securing the suture to the anchor includes clamping the suture between at least two surfaces on the anchor. In one embodiment, the anchor is not inserted further into the bone after securing the suture to it.

In another embodiment, a first anchor with a suture pre-attached is inserted through the soft tissue and into the bone. The suture may then be passed over the soft tissue and fixedly secured to a second bone anchor. In one embodiment, the first anchor is inserted by directly piercing the soft tissue and the bone. In one embodiment, lateral protrusion may be deployed on the first anchor to prevent the first anchor from being removed. In one embodiment, the suture may be coupled to the second bone anchor prior to insertion and then fixedly secured after insertion. In this context, "coupled" means that the suture is attached to the bone anchor but not fixedly secured, such that the suture can move to some extent relative to the bone anchor. In an alternative embodiment, the suture is not coupled to the second bone anchor during its insertion.

In another embodiment, a first portion of suture is inserted into the proximal surface of the soft tissue. A second portion of the suture (e.g., the portion proximal to the inserted portion) is then passed over the proximal surface of the soft tissue and fixedly secured to a bone anchor. In one embodiment, the procedure may be performed without passing the first portion of the suture back out of the proximal surface of the soft tissue. In one embodiment, this result is accomplished by the first portion of the suture being attached to an anchor that is inserted through the soft tissue and into bone.

One embodiment includes inserting a first anchor with a pre-coupled suture through soft tissue and into bone. The suture may then be passed over the soft tissue and fixedly secured to a second anchor. In one embodiment, the pre-coupled suture is fixedly secured to the first anchor prior to insertion. In an alternative embodiment, the pre-coupled suture can move relative to the first anchor prior to insertion and is fixedly secured after insertion.

14

In another embodiment, multiple lengths of suture are attached to multiple anchors. In one embodiment at least three anchors are inserted into bone. A first length of suture may be secured between a first and second anchor and a second length of suture may be secured between the first and a third anchor. In one embodiment, the first anchor is positioned beneath the soft tissue and the second and third anchors are positioned laterally to the soft tissue. In an alternative embodiment, the first anchor is positioned laterally to the soft tissue and the second and third anchors are positioned beneath the soft tissue. In some embodiments, the lengths of suture are fixedly secured to the anchor(s) positioned beneath the soft tissue prior to insertion of those anchor(s). In one embodiment, the different lengths of suture may be tensioned separately.

In various embodiments, prior to fixedly securing suture to a bone anchor, it can be tensioned. In one embodiment, tensioning is accomplished by manually pulling on the suture such as by a surgeon grasping the suture using an appropriate instrument and then pulling. In one embodiment, the suture may be pressed against the bone anchor to provide leverage for pulling. For example, the suture may be wrapped partly around a proximal portion of the anchor prior to pulling.

Although the invention has been described with reference to embodiments and examples, it should be understood that numerous and various modifications can be made without departing from the spirit of the invention. Accordingly, the invention is limited only by the following claims.

What is claimed is:

**1**. A method of attaching soft tissue to bone, comprising:
inserting a first anchor into bone, wherein after insertion, the first anchor is positioned underneath the soft tissue;
passing a first length of suture from said first anchor over the soft tissue;
inserting a distal member of a second anchor into bone at a position beyond an edge of the soft tissue, wherein the second anchor comprises said distal member and a proximal member;
after inserting the distal member of the second anchor, tensioning the first length of suture to compress an area of tissue to bone between the edge of the soft tissue and the first anchor; and
after tensioning the first length of suture, moving the proximal member of the second anchor distally towards the distal member of the second anchor, thereby fixedly securing the first length of suture at the second anchor position without tying any knots.

**2**. The method of claim **1**, wherein the first length of suture is attached to the first anchor prior to insertion of the first anchor into bone.

**3**. The method of claim **1**, comprising forming a hole in the bone into which the distal member of the second anchor is inserted.

**4**. The method of claim **1**, wherein the distal member of the second anchor comprises a first proximally facing surface.

**5**. The method of claim **4**, wherein the proximal member of the second anchor has a second distally facing surface facing toward said first surface.

**6**. The method of claim **5**, wherein said proximal member is configured to move relative to said distal member such that it can be positioned in a first configuration wherein said first and second surfaces are spaced apart and be positioned in a second configuration wherein said first and second surfaces are in close proximity.

**7**. The method of claim **1**, wherein the distal member of the second anchor is tapered.

A000148

**15**

**8**. The method of claim **1**, wherein a proximal portion of the distal member of the second anchor comprises a suture gripping structure.

**9**. The method of claim **1**, wherein a proximal end of the distal member of the second anchor comprises a hole opening into a central bore.

**10**. The method of claim **9**, wherein sides of the central bore comprise threads.

**11**. The method of claim **1**, wherein the proximal member of the second anchor is cylindrically shaped.

**12**. The method of claim **1**, wherein a central bore extends through the proximal member of the second anchor.

**13**. The method of claim **12**, wherein inserting the distal member of the second anchor and moving the proximal member of the second anchor distally toward the distal member comprises using an anchor inserter comprising a handle, a tube, and an inner member, wherein the inner member extends through the tube and the central bore in the proximal member of the second anchor and is removably coupled to the distal member of the second anchor.

**14**. The method of claim **13**, wherein the inserter comprises an inner tube and an outer tube, wherein the inner tube extends through the outer tube, and wherein the inner member extends through the inner tube.

**15**. The method of claim **13**, wherein the tube is movable longitudinally relative to the inner member.

**16**. The method of claim **1**, comprising coupling the first length of suture to the second anchor prior to inserting the distal member of the second anchor into bone.

**17**. The method of claim **1**, wherein the tensioning comprises manually pulling on the first length of suture.

**18**. The method of claim **1**, comprising:

inserting a third anchor into bone, wherein after insertion, the third anchor is positioned underneath the soft tissue;

passing a second length of suture from said third anchor over the soft issue;

tensioning the second length of suture independently from the first length of suture; and

**16**

after tensioning the first and second lengths of suture, moving the proximal member of the second anchor distally towards the distal member of the second anchor, thereby fixedly securing both the first and second lengths of suture at the second anchor position without tying any knots.

**19**. A method of attaching soft tissue to bone, comprising:

inserting a first anchor into bone, wherein after insertion, the first anchor is positioned underneath the soft tissue;

passing a first length of suture from said first anchor over the soft tissue;

coupling the first length of suture to a second anchor, wherein the second anchor comprises a distal member and a proximal member, wherein said proximal member is cylindrically shaped and comprises a central bore extending therethrough;

after coupling the first length of suture to the second anchor, inserting the distal member of the second anchor into bone at a position beyond an edge of the soft tissue;

after inserting the distal member of the second anchor, tensioning the first length of suture to compress an area of tissue to bone between the edge of the soft tissue and the first anchor; and

after tensioning the first length of suture, moving the proximal member of the second anchor distally towards the distal member of the second anchor, thereby fixedly securing the first length of suture at the second anchor position without tying any knots, wherein inserting the distal member of the second anchor and moving the proximal member of the second anchor distally toward the distal member comprises using an anchor inserter comprising a handle, a tube, and an inner member, wherein the inner member extends through the tube and the central bore in the proximal member of the second anchor and is removably coupled to the distal member of the second anchor.

* * * * *

CASE PARTICIPANTS ONLY Document: 20 Page: 188 Filed: 06/23/2014

# ADDENDUM   H

US008109969B1

(12) **United States Patent**   (10) **Patent No.:** **US 8,109,969 B1**

Green et al.   (45) **Date of Patent:** *Feb. 7, 2012

(54) **SYSTEM AND METHOD FOR ATTACHING SOFT TISSUE TO BONE**

(75) Inventors: **Michael L. Green**, Pleasanton, CA (US); **Joseph C. Tauro**, Brick, NJ (US); **Bart Bojanowski**, San Jose, CA (US)

(73) Assignee: **KFx Medical Corporation**, Carlsbad, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/245,622**

(22) Filed: **Sep. 26, 2011**

**Related U.S. Application Data**

(60) Continuation of application No. 12/549,105, filed on Aug. 27, 2009, which is a division of application No. 11/143,007, filed on Jun. 1, 2005, now Pat. No. 7,585,311.

(60) Provisional application No. 60/576,477, filed on Jun. 2, 2004, provisional application No. 60/610,924, filed on Sep. 17, 2004, provisional application No. 60/634,174, filed on Dec. 7, 2004.

(51) **Int. Cl.**
*A61B 17/04* (2006.01)

(52) **U.S. Cl.** ........................................ **606/232**; 606/300

(58) **Field of Classification Search** .................... 606/72, 606/75, 78, 219, 224, 232, 300–313
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,623,192 A | 11/1971 | Button |
| 4,210,148 A | 7/1980 | Stivala |
| 4,532,926 A | 8/1985 | O'Holla |
| 4,796,612 A | 1/1989 | Reese |
| 4,898,156 A | 2/1990 | Gatturna et al. |
| 5,013,316 A | 5/1991 | Goble et al. |
| 5,192,303 A | 3/1993 | Gatturna et al. |
| 5,219,359 A | 6/1993 | McQuilkin et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

SU 1600713 10/1990

(Continued)

OTHER PUBLICATIONS

Arthrex, Inc.'s Answer to Plaintiff KFX Medical Corp.'s complaint for Patent Infringement and Counterclaims, United States District Court , Southern District of California, Sep. 23, 2011, Los Angeles, USA.

(Continued)

*Primary Examiner* — Darwin Erezo
*Assistant Examiner* — Gregory Anderson
(74) *Attorney, Agent, or Firm* — Knobbe Martens Olson & Bear LLP

(57) **ABSTRACT**

Disclosed herein are methods and devices for securing soft tissue to a rigid material such as bone. A bone anchor is described that comprises a base and a top such that suture material may be compressed between surfaces on the base and top to secure the suture to the anchor. Also described is an inserter that can be used to insert the bone anchor into bone and move the anchor top relative to the anchor base to clamp suture material there between. Also described is a soft-tissue and bone piercing anchor and associated inserter. Methods are described that allow use of the bone anchors to provide multiple lengths of suture material to compress a large area of soft tissue against bone.

**17 Claims, 24 Drawing Sheets**



**US 8,109,969 B1**

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,224,946 A | 7/1993 | Hayhurst et al. |
| 5,269,784 A | 12/1993 | Mast |
| 5,336,240 A | 8/1994 | Metzler et al. |
| 5,372,604 A | 12/1994 | Trott |
| 5,417,712 A | 5/1995 | Whittaker et al. |
| 5,423,858 A | 6/1995 | Bolanos et al. |
| 5,423,860 A | 6/1995 | Lizardi et al. |
| 5,472,452 A | 12/1995 | Trott |
| 5,478,353 A | 12/1995 | Yoon |
| 5,500,001 A | 3/1996 | Trott |
| 5,527,341 A | 6/1996 | Gogolewski et al. |
| 5,527,343 A | 6/1996 | Bonutti |
| 5,543,012 A | 8/1996 | Watson et al. |
| 5,545,180 A | 8/1996 | Le et al. |
| 5,569,306 A | 10/1996 | Thal |
| 5,575,801 A | 11/1996 | Habermeyer et al. |
| 5,578,057 A | 11/1996 | Wenstrom, Jr. |
| 5,584,835 A | 12/1996 | Greenfield |
| 5,591,207 A | 1/1997 | Coleman |
| 5,634,926 A | 6/1997 | Jobe |
| 5,683,419 A | 11/1997 | Thal |
| 5,690,676 A | 11/1997 | DiPoto et al. |
| 5,697,950 A | 12/1997 | Fucci et al. |
| 5,720,765 A | 2/1998 | Thal |
| 5,725,557 A | 3/1998 | Gatturna |
| 5,769,894 A | 6/1998 | Ferragamo |
| 5,800,436 A | 9/1998 | Lerch |
| 5,814,072 A | 9/1998 | Bonutti |
| 5,891,168 A | 4/1999 | Thal |
| RE36,289 E | 8/1999 | Le et al. |
| 5,948,001 A | 9/1999 | Larsen |
| 5,948,002 A | 9/1999 | Bonutti |
| 5,951,590 A | 9/1999 | Goldfarb |
| 5,964,769 A | 10/1999 | Wagner et al. |
| 6,010,525 A | 1/2000 | Bonutti et al. |
| 6,013,077 A | 1/2000 | Harwin |
| 6,013,083 A | 1/2000 | Bennett |
| 6,027,523 A | 2/2000 | Schmieding |
| 6,045,573 A | 4/2000 | Wenstrom, Jr. et al. |
| 6,056,751 A | 5/2000 | Fenton, Jr. |
| 6,063,106 A | 5/2000 | Gibson |
| 6,093,201 A | 7/2000 | Cooper et al. |
| 6,093,301 A | 7/2000 | Van Atta |
| 6,099,547 A | 8/2000 | Gellman et al. |
| 6,110,207 A | 8/2000 | Eichhorn et al. |
| 6,117,160 A | 9/2000 | Bonutti |
| 6,117,161 A | 9/2000 | Li et al. |
| 6,126,677 A | 10/2000 | Ganaja et al. |
| 6,149,669 A | 11/2000 | Li |
| 6,200,330 B1 | 3/2001 | Benderev et al. |
| 6,241,749 B1 | 6/2001 | Rayhanabad |
| 6,245,082 B1 | 6/2001 | Gellman et al. |
| 6,280,474 B1 | 8/2001 | Cassidy et al. |
| 6,293,961 B2 | 9/2001 | Schwartz et al. |
| 6,296,659 B1 | 10/2001 | Foerster |
| 6,306,159 B1 | 10/2001 | Schwartz et al. |
| 6,319,271 B1 | 11/2001 | Schwartz et al. |
| 6,328,758 B1 | 12/2001 | Tornier et al. |
| 6,391,030 B1 | 5/2002 | Wagner et al. |
| 6,423,065 B2 | 7/2002 | Ferree |
| 6,432,123 B2 | 8/2002 | Schwartz et al. |
| 6,464,713 B2 | 10/2002 | Bonutti |
| 6,491,714 B1 | 12/2002 | Bennett |
| 6,514,274 B1 | 2/2003 | Boucher et al. |
| 6,518,200 B2 | 2/2003 | Lin |
| 6,520,980 B1 | 2/2003 | Foerster |
| 6,524,317 B1 | 2/2003 | Ritchart et al. |
| 6,527,794 B1 | 3/2003 | McDevitt et al. |
| 6,533,795 B1 | 3/2003 | Tran et al. |
| 6,540,770 B1 | 4/2003 | Tornier et al. |
| 6,547,800 B2 | 4/2003 | Foerster et al. |
| 6,551,330 B1 | 4/2003 | Bain et al. |
| 6,554,852 B1 | 4/2003 | Oberlander |
| 6,569,187 B1 | 5/2003 | Bonutti et al. |
| 6,575,987 B2 | 6/2003 | Gellman et al. |
| 6,582,453 B1 | 6/2003 | Tran et al. |
| 6,585,730 B1 | 7/2003 | Foerster |
| 6,605,096 B1 | 8/2003 | Ritchart |
| 6,635,073 B2 | 10/2003 | Bonutti |
| 6,638,279 B2 | 10/2003 | Bonutti |
| 6,641,597 B2 | 11/2003 | Burkhart et al. |
| 6,652,561 B1 | 11/2003 | Tran |
| 6,660,008 B1 | 12/2003 | Foerster et al. |
| 6,660,023 B2 | 12/2003 | McDevitt et al. |
| 6,673,094 B1 | 1/2004 | McDevitt et al. |
| 6,712,830 B2 | 3/2004 | Esplin |
| 6,770,076 B2 | 8/2004 | Foerster |
| 6,780,198 B1 | 8/2004 | Gregoire et al. |
| 6,855,157 B2 | 2/2005 | Foerster et al. |
| 6,984,241 B2 | 1/2006 | Lubbers et al. |
| 6,986,781 B2 | 1/2006 | Smith |
| 7,001,411 B1 | 2/2006 | Dean |
| 7,041,120 B2 | 5/2006 | Li et al. |
| 7,056,333 B2 | 6/2006 | Walshe |
| 7,081,126 B2 | 7/2006 | McDevitt et al. |
| 7,083,638 B2 | 8/2006 | Foerster |
| 7,090,690 B2 | 8/2006 | Foerster et al. |
| 7,144,415 B2 | 12/2006 | Del Rio et al. |
| 7,153,312 B1 | 12/2006 | Torrie et al. |
| 7,156,864 B2 | 1/2007 | Lintner |
| 7,232,455 B2 | 6/2007 | Pedlick et al. |
| 7,235,100 B2 | 6/2007 | Martinek |
| 7,247,164 B1 | 7/2007 | Ritchart et al. |
| 7,517,357 B2 | 4/2009 | Abrams et al. |
| 7,837,710 B2 | 11/2010 | Lombardo et al. |
| 8,029,537 B2 | 10/2011 | West, Jr. et al. |
| 2001/0008971 A1 | 7/2001 | Schwartz et al. |
| 2001/0018597 A1 | 8/2001 | Gellman et al. |
| 2001/0051815 A1 | 12/2001 | Esplin |
| 2001/0051816 A1 | 12/2001 | Enzerink et al. |
| 2002/0019649 A1 | 2/2002 | Sikora et al. |
| 2002/0029066 A1 | 3/2002 | Foerster |
| 2002/0077631 A1 | 6/2002 | Lubbers et al. |
| 2002/0111653 A1 | 8/2002 | Foerster |
| 2002/0128684 A1 | 9/2002 | Foerster |
| 2002/0169478 A1 | 11/2002 | Schwartz et al. |
| 2002/0188305 A1 | 12/2002 | Foerster et al. |
| 2003/0018358 A1 | 1/2003 | Saadat |
| 2003/0088270 A1 | 5/2003 | Lubbers et al. |
| 2003/0105591 A1 | 6/2003 | Hagiwara |
| 2003/0149448 A1 | 8/2003 | Foerster et al. |
| 2003/0167072 A1 | 9/2003 | Oberlander |
| 2003/0181925 A1 | 9/2003 | Bain et al. |
| 2003/0191498 A1 | 10/2003 | Foerster et al. |
| 2003/0195528 A1 | 10/2003 | Ritchart |
| 2003/0195563 A1 | 10/2003 | Foerster |
| 2003/0195564 A1 | 10/2003 | Tran et al. |
| 2003/0204204 A1 | 10/2003 | Bonutti |
| 2003/0236555 A1 | 12/2003 | Thornes |
| 2004/0002735 A1 | 1/2004 | Lizardi et al. |
| 2004/0024420 A1 | 2/2004 | Lubbers et al. |
| 2004/0044366 A1 | 3/2004 | Bonutti et al. |
| 2004/0093031 A1 | 5/2004 | Burkhart et al. |
| 2004/0098050 A1 | 5/2004 | Foerster et al. |
| 2004/0102779 A1 | 5/2004 | Nesper et al. |
| 2004/0116961 A1 | 6/2004 | Nesper et al. |
| 2004/0133238 A1 | 7/2004 | Cerier |
| 2004/0193217 A1 | 9/2004 | Lubbers et al. |
| 2004/0225325 A1 | 11/2004 | Bonutti |
| 2004/0243178 A1 | 12/2004 | Haut et al. |
| 2004/0254609 A1 | 12/2004 | Esplin |
| 2004/0267317 A1 | 12/2004 | Higgins et al. |
| 2005/0027307 A1 | 2/2005 | Schwartz et al. |
| 2005/0055052 A1 | 3/2005 | Lombardo et al. |
| 2005/0240199 A1 | 10/2005 | Martinek et al. |
| 2005/0240226 A1 | 10/2005 | Foerster et al. |
| 2005/0245932 A1 | 11/2005 | Fanton et al. |
| 2005/0283158 A1 | 12/2005 | West |
| 2005/0288682 A1 | 12/2005 | Howe |
| 2006/0067967 A1 | 3/2006 | Bowman et al. |
| 2006/0106423 A1 | 5/2006 | Weisel et al. |
| 2006/0116719 A1 | 6/2006 | Martinek |
| 2006/0161159 A1 | 7/2006 | Dreyfuss et al. |
| 2006/0178702 A1 | 8/2006 | Pierce et al. |
| 2006/0235413 A1 | 10/2006 | Denham et al. |
| 2006/0271060 A1 | 11/2006 | Gordon |
| 2006/0271105 A1 | 11/2006 | Foerster et al. |

# US 8,109,969 B1

| 2006/0293710 | A1 | 12/2006 | Foerster et al. |
| 2007/0142835 | A1 | 6/2007 | Green et al. |
| 2007/0142861 | A1 | 6/2007 | Burkhart |

### FOREIGN PATENT DOCUMENTS

| WO | WO 99/52478 A1 | 10/1999 |
| WO | WO 01/54586 A1 | 8/2001 |
| WO | WO 01/67962 A2 | 9/2001 |
| WO | WO 02/11630 A1 | 2/2002 |
| WO | WO 02/21998 A1 | 3/2002 |
| WO | WO 03/065904 A1 | 8/2003 |
| WO | WO 2004/062506 A1 | 7/2004 |
| WO | WO 2005/112786 A2 | 12/2005 |
| WO | WO 2005/112788 A2 | 12/2005 |
| WO | WO 2006/060035 A2 | 6/2006 |
| WO | WO 2006/067548 A1 | 6/2006 |
| WO | WO 2006/128092 A2 | 11/2006 |
| WO | WO 2007/084714 A2 | 7/2007 |

### OTHER PUBLICATIONS

Complaint for Patent Infringement, dated Aug. 1, 2011, *KFX Medical Corporation* v. *Arthrex, Inc.*, (S.D.C.A.).

International Preliminary Report on Patentability dated Jan. 25, 2007 for International Application No. PCT/US2005/019454.

International Search Report and Written Opinion of the International Searching Authority, dated Sep. 6, 2006, for International Application No. PCT/US2005/019454.

Lo et al., Double-Row Arthroscopic Rotator Cuff Repair: Re-Establishing the Footprint of the Rotator Cuff, Arthroscopy: The Journal of Arthroscopic and Related Surgery, Nov. 2003, pp. 1035-1042, vol. 19, No. 9.

Mazzocca et al., Arthroscopic Single-Row Versus Double-Row Suture Anchor Rotator Cuff Repair, The American Journal of Sports Medicine, 2005, 33:1861.

Mazzocca et al., Arthroscopic Single versus Double Row Suture Anchor Rotator Cuff Repair, abstract of presentation made on Jun. 25, 2004 at 2004 Annual Meeting of the American Orthopaedic Society for Sports Medicine in Quebec, Canada, publication date unknown.

Millett et al., Mattress double anchor footprint repair: a novel, arthroscopic rotator cuff repair technique, Arthroscopy: The Journal of Arthroscopic and Related Surgery, 20(8):875-879 (2004).

Paulos, M.D., Graftjacket Regenerative Tissue Matrix Rotator Cuff, date unknown, Wright Medical Techology, Inc.; Wright Cremascoli Ortho SA, 2011.

PCT International Preliminary Report on Patentability, dated May 22, 2009, for International Application No. PCT/US2007/083662.

PCT International Search Report and Written Opinion, dated Aug. 8, 2008, for International Application No. PCT/US2007/083662.

PCT Invitation to Pay Additional Fees, dated May 13, 2008, for International Application No. PCT/US2007/083662.

Robbe, M.D. et al., Knotless Suture-based Anchors, Operative Techniques in Sports Medicine, 2004, pp. 221-224, Elsevier Inc.

Seldes, M.D., et al., Tissue Mend Arthroscopic Insertion of a Biologic Rotator Cuff Tissue Augment After Rotator Cuff Repair, Stryker, date unknown, pp. 1-7, 2006.

Statement of Tate Scott, dated Apr. 12, 2011, submitted in Re-Examination No. 90/011,430.

TissueMend Advanced Soft Tissue Repair Matrix, Stryker, date unknown, 2003.

TissueMend Soft Tissue Repair Matrix, Stryker, 2004, USA.

Waltrip, "Rotator Cuff Repair A Biomechanical Comparison of Three Techniques", The American Journal of Sports Medicine, 2003, pp. 493-497, No. 4.

Yian, M.D., et al., Arthroscopic Repair of SLAP Lesions With a Bioknotless Suture Anchor, Arthroscopy: The Journal of Arthroscopic and Related Surgery, May-Jun. 2004, pp. 547-551, vol. 20, No. 5. Arthroscopy Association of North America.



**FIG. 1**



**FIG. 2**

Case: 14-1372 CASE PARTICIPANTS ONLY Document: 19-2 Page: 193 Filed: 06/23/2014



## FIG. 3A



## FIG. 3B



# FIG. 3C

Case: 14-1372    CASE PARTICIPANTS ONLY    Document: 19-20    Page: 195    Filed: 06/23/2014



FIG. 4A



FIG. 4B



FIG. 4D



FIG. 4C

Case: 14-1372CaSe 14-1372ICIPANUTMenONLY DoRamen 19820 Filteage0628/20Filed: 06/23/2014



FIG. 5B

FIG. 5A

Case: 14-1372 Case: 14-1372 Document: 19-2 Document: 19 Page: 199 Page: 199 Filed: 06/29/2014 Filed: 06/23/2014



**FIG. 6A**



**FIG. 5C**



## FIG. 6B



FIG. 7A

FIG. 7B

Case: 14-1372    Case: 14-1372    Document: 20    Page: 202    Filed: 06/23/2014



FIG. 8



FIG. 9A



**FIG. 9B**

Case: 14-1372 Case: 14-1372 Document: 20 Document: 20 Page: 205 Page: 205 Filed: 06/23/2014 Filed: 06/23/2014



## FIG. 9C



FIG. 9D



# FIG. 9E

Case: 14-1372 CASE PARTICIPANTS ONLY Document: 20 Page: 208 Filed: 06/23/2014



FIG. 10A



FIG. 10B



FIG. 12



FIG. 11

Case: 14-1372 Case: 14-1372 Document: 21 Page: 210 Filed: 06/23/2014



# FIG. 13

A000171



FIG. 14

A000172

Case: 14-1372 CASE PARTICIPANTS ONLY Document: 21 Page: 212 Filed: 06/23/2014



FIG. 15

Case: 14-1372 CASE PARTICIPANTS ONLY Document: 21 Page: 213 Filed: 06/23/2014



# FIG. 16A



# FIG. 16B



## FIG. 16C



## FIG. 16D



## FIG. 16E



## FIG. 16F

US 8,109,969 B1

1

# SYSTEM AND METHOD FOR ATTACHING SOFT TISSUE TO BONE

## RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 12/549,105, filed Aug. 27, 2009, which is a divisional of U.S. application Ser. No. 11/143,007, now U.S. Pat. No. 7,585,311, filed Jun. 1, 2005, which claims priority to U.S. Provisional Application Nos. 60/576,477, filed on Jun. 2, 2004; 60/610,924, filed on Sep. 17, 2004; and 60/634,174, filed on Dec. 7, 2004; all of which are incorporated herein by reference in their entirety.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to medical devices and procedures. More particularly, the present invention relates to devices and methods for securing soft tissue to a rigid material such as bone.

### 2. Description of the Related Art

There are several medical procedures where a surgeon needs to attach soft tissue such as tendons or other soft connective tissue to bone. One common example is a torn rotator cuff, where the supraspinatus tendon has separated from the humerus causing pain and loss of ability to elevate and externally rotate the arm. To repair a torn rotator cuff, typically a surgical procedure is used to suture the torn tendon to the bone using a variety of methods. Some procedures utilize large incisions and involve complete detachment of the deltoid muscle from the acromion. Small diameter holes are made in the bone for passing suture material through the bone to secure the tendon. Such large incision procedures are traumatic, causing prolonged pain and recovery time. Other procedures make small incisions and use arthroscopic techniques to attach sutures using either small diameter holes or a bone anchor. However, it is difficult to manipulate sutures within the surgical site using arthroscopic techniques. In addition, when knot tying is used to secure the suture to a bone anchor, it is difficult to properly adjust the tension of the suture while tightening the knot. Similarly, when the suture is attached to a bone anchor prior to insertion of the anchor into the bone, it is difficult to judge the appropriate point of attachment so that the suture will be properly tensioned upon insertion of the bone anchor into the bone. Thus, there is a need for methods and devices that allow easy arthroscopic attachment of a suture to a bone anchor after the anchor is inserted into the bone without the use of knot tying.

## SUMMARY OF THE INVENTION

The present invention is particularly suited for use in arthroscopic procedures, including but not limited to rotator cuff surgery. More broadly, it can be used in any procedure in which it is desired to fix a suture to a solid object without tying of knots, including not only arthroscopic procedures, but also open surgery, and can be used for such diverse purposes as bladder neck suspension, tendon and ligament affixation or repair, prosthetic attachment, and rotator cuff repair.

In one embodiment, the invention includes an anchor for securing a suture to bone, including an anchor base adapted to be securely fixed into the bone and a suture securing mechanism coupled to the anchor base and positioned proximally relative to the anchor base, the mechanism adapted to receive and secure a suture moved laterally into the

2

In another embodiment, the invention includes an anchor for securing a suture to bone, including an anchor base adapted to be securely fixed into the bone, a first surface coupled to the anchor base and positioned proximally relative to the anchor base, and a second surface coupled to the anchor base and positioned proximally relative to the anchor base, wherein the first and second surfaces are adapted to be relatively positioned in at least two configurations, one of the configurations such that a gap is present between the first and second surfaces so that the suture can be positioned between the first and second surfaces by moving the suture laterally into the gap, and the other of the configurations such that the first and second surfaces are in close proximity so that the suture can be securely clamped between the first and second surfaces.

In another embodiment, the invention includes a method of attaching soft tissue to bone, including passing a length of suture over the soft tissue, inserting an anchor into the bone, and securing the length of suture to the anchor after the inserting without passing an end of the length of suture through any aperture in the anchor and without tying any knots.

In another embodiment, the invention includes a method of attaching soft tissue to bone, including inserting a first anchor through the soft tissue, wherein the first anchor comprises a length of suture fixedly secured to the first anchor prior to insertion, inserting the first anchor into the bone, passing the length of suture over the soft tissue, and fixedly securing, after the passing, the length of suture to a second anchor.

In another embodiment, the invention includes a method of attaching soft tissue to bone, the soft tissue comprising a first surface adjacent to the bone's surface and a second surface opposite the first surface, the method including inserting a first portion of a length of suture into the second surface of the soft tissue, passing a second portion of the length of suture over the second surface of the soft tissue, inserting a first anchor with no suture coupled thereto into the bone, and fixedly securing the length of suture to the inserted first anchor, with the proviso that no part of the first portion of the length of suture is passed out of the second surface of the soft tissue.

In another embodiment, the invention includes a method of attaching soft tissue to bone, including inserting a first anchor with a length of suture pre-coupled thereto through the soft tissue, inserting the first anchor into the bone, inserting a second anchor with no suture coupled thereto into bone, passing the length of suture over the soft tissue, and fixedly securing the length of suture to the inserted second anchor.

In another embodiment, the invention includes a method of attaching soft tissue to bone, the method including inserting a first, second, and third anchor into the bone, fixedly securing a first length of suture over the soft tissue to the first and second anchors, and fixedly securing a second length of suture over the soft tissue to the first and third anchors.

In another embodiment, the invention includes an anchor for securing a suture to bone, the anchor including an anchor base adapted to be securely fixed into the bone, the anchor base comprising a first proximal surface and an anchor top, the anchor top comprising a distal member coupled to the anchor base and a first proximal member comprising a first distal surface, wherein the anchor top is adapted to couple to the anchor base in at least two configurations, one of the configurations such that the first distal surface is above the bone's surface when the anchor base is securely fixed into the bone, such that a suture can be freely passed between the first proximal and first distal surfaces above the bone's surface, and the other of the configurations such that the first distal

US 8,109,969 B1

3

surface is in close proximity to the first proximal surface, such that a suture may be securely clamped between the first proximal and first distal surfaces.

In another embodiment, the invention includes an anchor for securing a suture to bone, the anchor including a substantially hollow cylinder comprising an open end and comprising a portion of its walls cut in such a manner so as to allow the cylinder to deform under stress and form lateral protrusions, a substantially pointed tip coupled to the cylinder opposite the open end, wherein the pointed tip is adapted to pierce the bone, and a suture receiver coupled to the pointed tip and positioned within the substantially hollow cylinder so that a suture may be attached to the suture receiver and extend through the cylinder and out of the open end.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 depicts attaching soft tissue to bone using a single bone anchor and a stitch.

FIG. 2 depicts attaching soft tissue to bone using a two bone anchors with a suture stretched there between.

FIGS. 3A-3C depict various geometries of bone anchors and suture patterns for attaching soft tissue to bone.

FIGS. 4A-4D depicts the base of a two-part suture anchor that can be inserted into bone.

FIGS. 5A-5C depicts the top of a two-part suture anchor.

FIGS. 6A and 6B depict the suture anchor top of FIGS. 5A-5C inserted into the suture anchor bottom of FIGS. 4A-4D.

FIGS. 7A and 7B depict a suture anchor inserter.

FIG. 8 depicts components on a suture anchor inserter for attaching to bone and manipulating a suture anchor.

FIGS. 9A-9E depicts manipulation of a suture anchor using a suture anchor inserter to insert the suture anchor into bone and attach suture material to the suture anchor.

FIGS. 10A and 10B depict a piercing bone anchor in an un-deployed (FIG. 10A) and deployed (FIG. 10B) state.

FIG. 11 depicts a piercing bone anchor tip.

FIG. 12 depicts an anchor inserter for inserting a piercing bone anchor.

FIG. 13 depicts the interface between a piercing bone anchor and an anchor inserter.

FIG. 14 is a cut-away view of a bone anchor inserter.

FIG. 15 depicts a safety switch mechanism for a bone anchor inserter.

FIGS. 16A-16F depict a method for attaching soft-tissue to bone using a piercing bone anchor and a suture capturing anchor.

DETAILED DESCRIPTION OF THE CERTAIN EMBODIMENTS

In various embodiments, soft tissue may be attached to bone utilizing one or more bone anchors with suture attached thereto. As used herein, "suture" refers to any flexible structure that can be stretched between two or more anchors and includes, without limitation, traditional suture material, single or multiple stranded threads, or a mesh structure. In some embodiments, suture is passed over the top of the soft tissue so that the suture can press the soft tissue against the bone. In one embodiment, a length of suture is attached to a single bone anchor. One non-limiting example, depicted in FIG. 1, includes stitching the suture 10 to the soft tissue 12, such as by an incline mattress stitch, and then securing the suture 10 to the single bone anchor 14 that is inserted into the bone 16. However, in other embodiments, a length of suture is attached to multiple bone anchors. The use of multiple bone

4

anchors increases the footprint over which the suture material presses the soft tissue against bone. One non-limiting example, depicted in FIG. 2, includes two bone anchors. One anchor 20 is positioned in a medial location underneath the soft tissue 12 and a second anchor 22 is positioned lateral to the soft tissue 12. The suture 10 is attached to both anchors.

In one embodiment, the suture 10 is attached to the lateral bone anchor 22 only after the medial bone anchor 20 is inserted and the suture 10 is passed over the soft tissue 12. In one embodiment, the suture 10 is attached to the medial bone anchor 20 prior to insertion of the medial bone anchor 20. Thus, in this embodiment, the surgeon does not need to pass the suture through the soft tissue 12 from beneath the soft tissue 12. In one embodiment, the procedure involves inserting the medial bone anchor 20 with suture 10 pre-attached through the soft tissue 12. The medial bone anchor 20 may then be moved laterally relative to the bone 16 in order to pull the soft tissue 12 laterally relative to the bone 16. After appropriate positioning of the soft tissue 12, the medial bone anchor 20 may then be inserted into the bone 16. The lateral bone anchor 22 may then be inserted into the bone 16. The suture 12 may then be passed over the soft tissue 12 and attached to the lateral bone anchor 22. In some embodiments, a lateral bone anchor 22 is provided to which suture 12 can be attached without tying any knots or without passing the suture 12 through any aperture in the lateral bone anchor 22.

In some embodiments, multiple anchors and multiple suture lengths may used to provide a wider area of pressure of the soft tissue against bone. For example, as depicted in FIG. 3A, three anchors are used with two lengths of suture 26 and 28. Alternatively, a mesh structure 29 may be stretched between the three anchors. In another example, as depicted in FIG. 3B, four anchors are used with two lengths of suture. In still another example, as depicted in FIG. 3C, four anchors are used with four lengths of suture. In some embodiments, the individual suture lengths may be part of a larger continuous suture. For example, in FIG. 3A, the suture lengths 26 and 28 may be part of a larger length of suture such that the lengths 26 and 28 are joined at medial bone anchor 20. Those of skill in the art will appreciate that there are any number of anchor and suture geometries that can be used.

In some embodiments, the medial bone anchors 20 are designed so that they can be easily pierced through the soft tissue 12 and bone 16. In some embodiments, the lateral bone anchors 22 are designed so that they can easily capture suture material after insertion of the bone anchors 22. Together, these design features provide a suturing system and method that provides an increased footprint of suture pressure against the soft tissue 12 and ease of implementation for a surgeon. For example, in some embodiments, the entire procedure may be done arthroscopically, with the surgeon needing only to insert the medial bone anchor 20 with suture optionally preattached through a first port, insert the lateral anchor 22 through a second port, pass the suture over the soft tissue 12 by capturing it from within the second port, and securing the suture to the lateral anchor 22. Accordingly, described below are certain embodiments of anchors adapted to capture suture material and anchors adapted to easily pierce through soft tissue and bone.

Suture Capturing Anchor

One embodiment is a bone anchor that allows easy capturing and securing of a suture after the bone anchor is inserted into the bone. In one embodiment, the bone anchor includes a suture securing mechanism positioned on the proximal end of the bone anchor (i.e., the end nearest the surface of the bone and the surgeon). In one embodiment, the suture securing mechanism allows a suture to be moved laterally into the

US 8,109,969 B1

5

mechanism. By "laterally," it is meant that the suture can be moved into the mechanism by moving the suture in a direction that is generally perpendicular to the axis of the suture. In other words, the suture can be moved into the mechanism without threading an end of the suture into the mechanism. In one embodiment, the suture can be fixedly secured within the mechanism without tying any knots. By "fixedly secured," it is meant that the suture within the securing mechanism cannot be easily moved relative to the bone anchor.

One embodiment is a bone anchor that allows easy attachment of suture material by clamping the suture material between two surfaces on the bone anchor. The bone anchor may be configured such that the bone anchor is inserted into the bone without the suture material attached. The two surfaces of the suture securing mechanism may be spaced apart so as to form a gap between the surfaces. The suture material may be passed between the two surfaces and tensioned as desired followed by clamping of the two surfaces together, thereby clamping the suture material there between.

In one embodiment, the bone anchor consists of two parts: an anchor base and an anchor top. The anchor base may be designed to be inserted into a hole in the bone with a proximal surface facing up. The anchor top may be coupled to the anchor base via a distal member. A proximal member on the anchor top may have a distal surface facing down toward the proximal surface on the anchor base. The coupling of the anchor top to the anchor base may be such that the anchor top can move relative to the anchor base such that it can be positioned in one configuration where there is space between the proximal surface on the anchor base and the distal surface on the proximal member of the anchor top. In another configuration, the proximal member of the anchor top may be position such that there is very little space, if any, between the proximal surface on the anchor base and the distal surface on the proximal member of the anchor top. Thus, in the first configuration, suture material may be easily passed between the two surfaces and tensioned as desired. In the second configuration, the suture material may be clamped between the two surfaces such that the suture is secured to the bone anchor.

One embodiment of an anchor base 100 is depicted in FIGS. 4A through 4D. FIG. 4A is a perspective view showing the side 101 and bottom 102 of the anchor base 100. The bottom 102 of the anchor base 100 may advantageously be tapered to facilitate insertion of the anchor base 100 into bone. In some embodiments, a hole is predrilled into the bone to facilitate insertion of the anchor base 100. In other embodiments, the anchor base 100 is forced directly into the bone, thereby creating the hole. The sides 101 of the anchor base 100 comprise threads 104 so that the anchor base 100 may be inserted into bone using a screwing action. In some embodiments, the anchor base 100 may be tapped to start the threads 104 into the bone followed by screwing the anchor base 100 into the bone. When the hole in the bone is pre-drilled, the hole is advantageously drilled with a diameter smaller than the diameter of threads 104 so that the threads engage the bone through the sides of the hole. It will be appreciated that means other than threads may be used to secure the anchor base 100 to bone. For example, angled protrusions may be used that provide greater resistance to removal of the anchor base 100 than to insertion. The protrusions may be static or deployable once the anchor is inserted.

The top of anchor base 100 preferably includes a structure 106 for facilitating the driving or screwing of the bone 100 into the bone. In the illustrated embodiment, this comprises a hex nut structure 106 that facilitates engagement with a hex nut driver for screwing the anchor base 100 into the bone. It

6

will be appreciated that other structures known in the art for engaging tools used for screwing action may be used instead of hex nut structure 106, and that this structure can be indented into or extending out from the top of the anchor base 100, or can alternatively be formed on the sides of the anchor base 100.

With reference to FIG. 4B, which is a perspective view of the top and side of anchor base 100, the top (proximal end) comprises a hole 108 in the center for receiving the anchor top, which is described below. The top of anchor base 100 also contains a suture gripping structure such as a circular groove 110 that may be concentric with hole 108. Because of groove 110, the proximal surface of anchor base 100 is not flat and comprises top surfaces 112 and 114, bottom surface 116, and side surfaces 118 and 120. In some embodiments, some or all of these surfaces may be textured such as with a scallop shape or grooves so as to inhibit movement of suture material pressed against the surfaces. Although a grooved surface is illustrated, it will be appreciated that other shapes for the proximal surface of anchor base 100 are also contemplated, including multiple concentric grooves, a series of protruding ridges, a "vee" shaped channel, or any other suitable structure that permits a suture to be securely locked against the top or proximal end of the anchor base 100.

Hole 108 in anchor base 100 is an opening into a central ("axial") bore into the anchor base 100. The sides of the central bore preferably include structures for gripping something inserted into the central bore, such as ratchet structures 122. FIG. 4C show a central ratchet bushing 126 that fits within the central bore and contains the ratchet structures 122. In the embodiment of FIG. 4C, the ratchet structures 122 are constructed by cutting U shaped cuts into bushing 126. The U shaped cuts then define tabs that make up the ratchet structures 122. It will be appreciated that other shapes and methods for making ratchet structures may be used. The purpose of ratchet bushing 126 is to receive the anchor top and secure it to the anchor base 100. It will be appreciated that other methods of securing the anchor top to the anchor base 100 may be used, such as a frictional fit or threading. Furthermore, the anchor top may be coupled to the anchor base 100 using means other than hole 108 and bushing 126. For example, the anchor top may be coupled via structures at the perimeter rather than the center or by a hinge.

FIG. 4D depicts a cross section through the center of anchor base 100. This view illustrates central bore 130 and groove 110. The proximal surfaces 112, 114, 116, 118, and 120 are also apparent. Central bore 130 preferably does not extend all the way through the anchor base 100. Instead, a smaller bore 132 is present at the distal end 102 of the anchor base 100. Smaller bore 132 is used to receive a wire connected to an anchor inserter. It will be appreciated that other structures than bore 132 may be used for attaching the wire and that other means than a wire may be used to secure the anchor to the anchor inserter.

FIGS. 5A through 5C illustrate one embodiment of an anchor top 200. FIG. 5A provides a perspective view of the side and top of the anchor top 200 and FIG. 5B provides a perspective view of the side and bottom of the anchor top 200. Anchor top 200 has two members, a distal member 202 and a proximal member 204. The distal member 202 comprises an elongated shaft, the longitudinal direction of which shall be considered to run along the axis of the distal member 202. A series of grooves or other mating surfaces or structures 206 exist along a portion of the outside surface of the shaft. The distal member 202 is designed to be inserted into the central bore 130 of the anchor base 100. The ratchet structures 122 in the anchor base 100 engage grooves 206 to

US 8,109,969 B1

7

couple the anchor top **200** to the anchor base **100**. The ratchet structures **122** are oriented such that the distal member **202** can be easily moved in the distal direction in central bore **130** with the ratchet structures **122** snapping into the grooves **206** as the distal member **202** is moved downward. However, when the ratchet structures **122** are snapped into grooves **206**, proximal movement of distal member **202** is inhibited. Thus, the anchor top **200** may be ratcheted down into anchor base **100**. Because the ratchet structures **122** exist along substantially the entire surface of the central bore **130** (see FIG. **4C**), the anchor top **200** may be coupled to the anchor base **100** in several positions. In other words, in one embodiment the anchor top **200** need not be ratcheted into the anchor base **100** as far as it will go for it to be secured to the anchor base **100**.

The proximal member **204** of anchor top **200** is generally cylindrical in shape with a diameter larger than distal member **202**. A hole **208** may advantageously be provided in the center of proximal member **204**. With reference to FIG. **5B**, the bottom of distal member **202** also contains a hole **210**. Holes **208** and **210** open into a central bore through the anchor top **200**. This central bore allows the wire referred to above to extend through the anchor top **200** to be secured to bore **132** in the anchor bottom **100**, thus allowing the anchor bottom **100** to be attached to an anchor inserter while still allowing anchor top **200** to be ratchet into anchor bottom **100**. FIG. **5B** also illustrates that proximal member **204** contains a groove **212** in its distal surface. Thus, the distal surface of proximal member **204** is not flat and comprises distally facing surfaces **214** and **216** and side facing surfaces **218** and **220**. In some embodiments, some or all of these surfaces may be textured such as with a scallop shape or grooves so as to inhibit movement of suture material pressed against the surfaces. In some embodiments, texturing in the distal surfaces of proximal member **204** match texturing in the proximal surfaces of anchor base **100**. It will be appreciated that the illustrated embodiments represent only one possibility; thus, other shapes for the distal surface of proximal member **204** may also be used. FIG. **5C** depicts a cross section through the center of anchor top **200**. In this figure, the central bore **226** is depicted as are surfaces **214**, **216**, **218**, and **220** and grooves **206**.

FIGS. **6A** and **6B** depict cross sections showing how the anchor top **200** may be coupled to the anchor base **100** to form the complete anchor **300**. In FIG. **6A**, the anchor top **200** is coupled to the anchor base **100** with the proximal member **204** separated from the anchor base **100**. The anchor top **200** is secured to anchor base **100** by distal member **202** extending into central bore **130** of the anchor base **100**. The distal member **202** is secured by ratchet structures (not shown) engaging grooves **206** in distal member **202**. Central bore **226** in anchor top **200** and central bore **130** in anchor base **100** allow a wire to extend into the top of the anchor **300** and be secured to bore **132**. Alternatively, the wire may be secured at other locations within central bore **130**. Thus the wire, which can be coupled to an anchor inserter, can hold the entire anchor assembly **300** and still allow anchor top **200** to move relative to anchor base **100** and the wire.

FIG. **6B** depicts the anchor assembly **300** with the distal member **202** of anchor top **200** ratcheted all the way into central bore **130** in anchor base **100**. In this configuration, it can be seen that proximal surfaces **112**, **114**, **116**, **118**, and **120** of the anchor base **100** and distal surfaces **214**, **216**, **218**, and **220** of the proximal member **204** of anchor top **200** form passageways **302** and **304**. The size of passageways **302** and **304** are advantageously such that when a suture passes through them, it will be compressed so that it is securely attached to the anchor **300**.

8

Another embodiment of the present invention is an inserter designed to insert and manipulate an anchor such as described in FIGS. **1-3**. One such inserter **400** is depicted in FIGS. **7A** and **7B**. Inserter **400** comprises a handle **402** and an outer tube **404**. As depicted in FIG. **7A**, the handle **402** comprises a cover **403**. FIG. **7B** depicts the inserter **400** with cover **403** removed. Not depicted in FIGS. **7A** and **7B** are an inner tube disposed inside outer tube **404** and a wire disposed within the inner tube. As will be described in more detail below, the inner and outer tubes may be used to manipulate an anchor **300** such as that described in FIGS. **4-6**. The wire may be used to couple the inserter **400** to the anchor **300** as described above. Inserter **400** also comprises an outer tube manipulator **406** and a wire manipulator **408**. Outer tube manipulator **406** comprises release button **410**. Outer tube manipulator **406** is securely attached to outer tube **404**. Outer tube manipulator **406** may move longitudinally relative to handle **402** and the inner tube when release button **410** is pressed. Thus, when outer tube manipulator **406** is moved, outer tube **404** also moves.

Wire manipulator **408** comprises wire grabber **410** to which the wire is attached. The wire extends from wire grabber **410**, through handle **402**, and then through the inner tube. In one embodiment, wire manipulator **408** also comprises a release button **412**. When release button **412** is pressed, the wire manipulator **408** may be pressed into the handle **402** to contact and thus provide additional tension on the wire. When in use, the additional tension causes the anchor base **100** to mover relative to inserter **400**. When enough tension is provided to the wire by wire manipulator **408**, the wire may break free from the anchor **300** at its attachment point in bore **132** or at some other predetermined location along the wire. It will be appreciated that any suitable breakable attachment means may be used for securing the wire to the anchor **300**. For example, the wire may be frictionally secured into bore **132** or it may welded to the anchor base **100** using a weld that is weaker than the wire itself or a portion of the wire where breaking is desired may be weakened. In one embodiment, the wire is notched so as to create a weaker region in the wire that will break upon application of suitable force.

The tip **414** of outer tube **404** is depicted in more detail along with inner tube **420**, wire **422**, and anchor **300** in FIG. **8**. The end of outer tube **404** may comprise a hex nut driver structure **424** for receiving the hex nut structure **106** of anchor base **100**. Of course, any other suitable engagement structure can be provided on the inserter **400** and the anchor base **100** in order to facilitate placement of the anchor base **100**. Wire **422** extends out of inner tube **420** and into the central bore in the anchor top **200** to attach to anchor base **100** as described above. In some advantageous embodiments, the wire length and tension is adjusted such that the proximal member **204** of anchor top **200** buts against the end **426** of inner tube **420**.

FIGS. **9A** through **9E** depict how inserter **400** and anchor **300** may be used to insert the anchor **300** into bone and attach a suture to it. FIG. **9A** depicts the configuration for inserting the anchor **300** into bone. Outer tube **404** and outer tube manipulator **406** (see FIGS. **7A** and **7B**) are positioned relative to inner tube **420** and handle **402** (see FIGS. **7** and **8**) so that the outer tube **404** engages hex nut structure **106** in the anchor base **100**. It is advantageous in this configuration for the anchor top **200** to be in a position relative to the anchor base **100** such as depicted in FIG. **6A**. In the configuration of FIG. **9A**, a surgeon may then screw the anchor base **100** into bone by twisting handle **402** of inserter **400** (see FIGS. **7A** and **7B**).

After the anchor base **100** is inserted into the bone, the outer tube **404** may be slid backward relative to the inner tube **420** and handle **402** to expose the anchor top **200** such as in

US 8,109,969 B1

9

FIG. 9B. One or more lengths of suture 600 may then be placed in the space between the distal surface 602 of the proximal member 204 of anchor top 200 and the proximal surface 604 of the anchor base 100 by moving the suture laterally into the space as depicted in FIG. 9C. The suture 600 may be manually tensioned as desired. In some embodiments, tensioning of the suture 600 is aided by pulling the suture 600 against the distal member 202 of the anchor top 200.

After appropriate tensioning of suture 600, wire manipulator 408 may be pressed to tension the wire, causing the handle 402 of the inserter 400 and the inner tube 420 to be pulled down towards the anchor base 100 so that inner tube 420 ratchets the anchor top 200 down into the anchor bottom 100 as depicted in FIG. 9D. As the anchor top 200 is pushed axially down, suture 600 will be clamped between the distal surface 602 of the proximal member 204 of anchor top 200 and the proximal surface 604 of the anchor base 100 (see also FIG. 9C). The clamping will force the suture to be compressed within the passageways 302 and 304 depicted in FIG. 6B and thus be secured to anchor 300. The fit between the anchor top 200 and the anchor base 100 in the clamping region is such that the suture 600 is firmly gripped, but is not cut, when it is clamped in place. Appropriate edges that may contact the suture are preferably beveled or rounded to avoid damage to the suture. After anchor top 200 is ratcheted sufficiently into anchor base 100, wire manipulator 408 (see FIGS. 7A and 7B) in inserter 400 may be compressed further to further tension wire 422 (see FIG. 8) such that wire 422 breaks free from its attachment to anchor base 100, thus leaving the anchor 300 free from inserter 400 with suture 600 securely attached as depicted in FIG. 9E.

Although a particular inserter device for inserting and manipulating anchor 300 has been described, it should be understood that other inserter designs may be used for manipulating the parts of anchor 300 described above to insert the anchor into bone and secure suture material to the anchor. For example, it may be possible to use separate tools for inserting the anchor and securing the suture material. In addition, in alternative embodiments, the anchor base 100 may be connected to the anchor top 200 throughout the procedure, or the anchor base may be separately inserted into the bone, and the anchor top can be attached thereafter by axially sliding the distal end of the anchor top 200 into the hole 108 in the anchor base 100.

It will be appreciated by those of skill in the art that the anchor 300 and inserter 400 provide a system for easy attachment of a suture to bone. The anchor 300 may be inserted into bone with minimal disruption of surrounding tissue. Only an access route having the diameter of the outer tube 404 and the anchor base 100 is required. Furthermore, the suture can be securely attached to the anchor 300 and tensioned as desired without having to insert additional instrumentation into the site or without performing any cumbersome attachment maneuvers such as knot tying. It should also be appreciated that the general principle illustrated by this system of inserting an anchor into bone without having suture material pre-attached and then attaching suture to the anchor without tying any knots may be implemented using any appropriate system other than the specific embodiments depicted in FIGS. 4-9.

Tissue and Bone Piercing Anchor

One embodiment is a bone anchor adapted for passage through the soft tissue and into underlying bone. In one embodiment, the suture material may be pre-attached to the piercing bone anchor so that after implantation, a suture passes from the bone anchor through to the top of the soft tissue for easy passing over the soft tissue. In one embodiment, the piercing bone anchor has two configurations, a first

10

configuration having a small diameter for easy piercing through soft tissue and bone and a second deployed configuration where structures such as protrusions are deployed to prevent the bone anchor from being easily removed from the bone.

In one embodiment, the anchor includes a substantially hollow cylinder having a portion of its walls cut in such a manner so as to allow the cylinder to deform under axial stress and form lateral protrusions. The lateral protrusions may thus prevent the anchor from being easily removed from the bone after deployment. In one embodiment, the anchor comprises a pointed tip coupled to the hollow cylinder for piercing the soft tissue and bone. In one embodiment, suture is pre-attached to the pointed tip inside of the hollow cylinder. In other embodiments, suture is pre-attached at other locations on the piercing anchor, such as at the proximal end of the hollow cylinder.

One embodiment of a deployable piercing anchor is depicted in FIGS. 10A and 10B. In FIG. 10A, the anchor is depicted in a pre-deployed state. The anchor includes a substantially hollow cylinder 650 with a plurality of cuts 652 in the side of the cylinder 650. The cylinder 650 is open on one end 654. On the other end, a pointed tip 656 is disposed, allowing the anchor to pierce through soft tissue and bone. In FIG. 10B, the anchor is depicted in a deployed state. Stress is applied in an axial direction such that the cylinder 650 collapses along cuts 652 so as to form two lateral wings 660. The lateral wings 660 prevent the anchor from being removed from the bone. Hinges 662 connect one end of each wing to either the top or the bottom parts of anchor body. These hinges deform and fold, in the plane tangent to the anchor body at that point when the anchor is deployed. A strip of material 664 connects the top and bottom wing on each side of the anchor body, and serves as a hinge between the two as well as aiding in alignment of the wings during deformation. The tips of the wings adjacent to the connecting strip 664 utilize rolling edges 666, which ensure uniform alignment and smooth transition during deformation. Those of skill in the art will appreciate that any number of geometries of cuts in the cylinder 650 may be utilized to create a deformable structure that will produce lateral protrusions upon exposure to stress.

In some embodiments, structures may be positioned within the cylinder 650 for attaching sutures and engaging with an anchor inserter. In one embodiment, such structures are coupled to the anchor tip 656 within the cylinder 650. FIG. 11 depicts one such embodiment. Attached to the tip 656 is a structure 670 through which there is an aperture 672. The structure 670 may be adapted to engage the inner surface of cylinder 650 for attaching the tip 656 to the cylinder 650. The attachment mechanism may be by forced fit, frictional fit, threads, welding, adhesive, or any other suitable means. Suture material may be threaded through the aperture 672 in order to attach the suture to the anchor. The suture material may be secured to the tip 656 by tying the suture around structure 670, tying a knot in the end of the suture that prevents it from being pulled through the aperture 672, clamping the suture between the structure 670 and the inside of the cylinder 650, adhering the suture to structure 670 by welding or adhesive, or any other suitable means. In one embodiment, the suture material is attached to the anchor at tip 656 prior to use of the anchor.

An anchor inserter attachment structure 674 may also be coupled to the tip 656. This structure 674 may couple to an anchor inserter through a wire or any other suitable means. The attachment between the anchor inserter and the anchor at this point may be used to apply axial stress to the anchor for

US 8,109,969 B1

11

deploying the anchor as described above. The attachment at this point may also serve to keep the anchor attached to the inserter prior to deployment.

One embodiment of an anchor inserter suitable for use with the above-described anchor is depicted in FIG. 12. The anchor inserter comprises a grasping handle 700 to which is attached an outer sleeve 702 which is fixed relative to the handle 700. The piercing anchor 704 is disposed at the end of the sleeve 702. A deployment lever 706 may be pressed by a user to deploy and detach the anchor 704 as described below. A safety switch 708 may be provided to prevent the anchor 704 from being deployed prematurely. A spool 710 may be provided at the proximal end of the handle 700 for holding excess suture. A lid 712 may be provided for gaining access to the inner components of the inserter.

FIG. 13 depicts the anchor 704 coupled to the inserter. As described above, the anchor 704 comprises a hollow cylinder 650 with cuts in the sides and a pointed tip 656. Furthermore, as depicted in FIG. 11, a suture receiving aperture 672 and an inserter attachment structure 674 are attached to the pointed tip 656 within the cylinder 650. The outer sleeve 702 of the inserter may fit over the open end 654 of the cylinder 650 or be flush with the open end 654. The outer sleeve 702 may thus hold the top part of the anchor 704 steady during insertion. In an alternative embodiment, the outer sleeve 702 may fit over the length of the cylinder 650 to prevent the cylinder 650 from deforming while it is being inserted into bone. In this alternative embodiment, the outer sleeve 702 may be retracted prior to deployment of the anchor. An inner tube 720 may be positioned within the outer sleeve 702 and the hollow cylinder 650 and contact the top surface of the anchor tip 656 (see FIG. 11). The inner tube 720 provides structural reinforcement of the anchor 704 and pushes against the tip of the anchor 704 while it is being driven into bone or tissue. The inner tube 720 may be fixed relative to the handle 712 and outer sleeve 702 during insertion, however, during deployment of the anchor 704, the inner tube 720 may be released by switching safety switch 708 so that the inner tube 720 can move axially relative to the outer sleeve 702 while the anchor cylinder 650 collapses. A wire may be positioned inside of the inner tube 720 running from within the handle 712 through the inner tube 720 to the anchor 704 and attached to the anchor inserter attachment structure 674. During deployment, the lever 704 may be pressed to pull the wire axially towards the handle 700. The axially movement of the wire forces the anchor 704 to press against outer sleeve 702 and stresses the cylinder 650, causing it to deform and deploy. Upon collapse of the cylinder 650, the inner tube 720 will also move in an axial direction toward the handle 700. Upon further stress on the wire, the wire may break free from the anchor inserter attachment structure 674, releasing the inserter from the anchor 704. Suture material may run from the inside of handle 700 through the inner tube 720 to attach to the anchor 704 through aperture 672 (see FIG. 11). Upon detachment of the anchor inserter from the anchor 704, the inserter may be withdrawn, leaving the inserted and deployed anchor with suture coming out of the open end 654 of the cylinder 650. The suture will still be coupled to the inserter through the inner tube 720, handle 700, and around spool 710. Those of skill in the art will appreciate other inserters and mechanisms that may be used to insert and deploy the piercing anchors described herein. For example, rather then axially stressing the anchor 704 by pulling the tip 656 in an proximal direction, the cylinder 650 may be pushed in a distal direction to deform the cylinder 650.

FIG. 14 is a cut-away view of the handle 700, showing the inner workings of the anchor inserter. The suture material attached to a piercing anchor at the tip of the inserter may pass

12

through the central bore of the inner tube 720 and through a bore 750 in the handle 700. The suture material may then pass through a hole 752 in the end of the handle 700 and be wrapped around the spool 710, which may be integral with the handle 700. The wire attached to the anchor inserter attachment structure 674 in the anchor may also pass through the central bore of the inner tube 720 and may then proceed around a pulley 754 and attach securely to the handle 700 at point 756. The pulley 754 may be attached to the lever 706. When the lever 706 is pressed down, the pulley 754 will move toward the back end of the handle 700, causing the wire attached to the anchor to retract. Because of the use of pulley 754, the wire will retract twice the distance as the pulley 754 moves.

The safety switch 708 may be used to prevent the lever 706 from being pressed and prevent the inner tube 720 from moving unless the safety switch 708 is in the correct position. The safety mechanism operates via a drum 760 disposed within the handle 700 to which the safety switch 708 is attached. Moving the safety switch 708 rotates the drum 760 within the handle 700. FIG. 15 shows the drum 760 and safety switch 708 mechanism in more detail. The inner tube 720 passes through a central bore in the drum 760. On the other side of the drum 760, the inner tube 720 is attached to a stopper 762. The stopper 762 has a through-hole 764 to permit passage of the deployment wire and suture. The stopper 762 may be positioned within a cavity 766 in the end of the drum 760. A second similarly shaped cavity may be disposed within the handle 700. The stopper 762 and attached inner tube 720 may only be allowed to move axially relative to the handle 700 when the safety switch 708 and drum 760 is rotated so that the cavity 766 in the drum 760 is aligned with the matching cavity in the handle 700. When the cavities are aligned, the stopper 762 is allowed to move from the cavity 766 to the cavity in the handle 700, thus allowing the inner tube 720 to move axially and the anchor to be deployed.

Additionally, the drum 760 comprises a groove 768. A spring-loaded sliding pin 770 (see FIG. 14) may be coupled to the lever 706. The lever 706 can only be moved when the drum 760 and switch 708 are rotated so that groove 768 is aligned with the pin 770. Thus, both the stopper 764 and the pin 770 prevent the anchor from being deployed unless the switch 708 is in the correct position.

Those of skill in the art will appreciate other mechanisms that could be used for deploying a deployable anchor and providing safety mechanisms to prevent premature deployment.

Example Using a Piercing Anchor and a Suture Capturing Anchor

The above-described anchors may be used in a surgical procedure for attaching soft tissue to bone. One example of such a procedure is depicted in FIGS. 16A through 16F. In FIG. 16A, the piercing anchor 800 attached to an anchor inserter 802 as described above is pierced through soft tissue 804 that has become detached from underlying bone 806. In FIG. 16B, the anchor inserter 802 is moved laterally relative to the bone 806 so as to stretch the soft tissue 804 laterally relative to the bone 806. Once the soft tissue 804 has been stretched to the desired position, the anchor 800 is inserted into the bone 806 and the anchor 800 is deployed as described above and the inserter 802 is detached from the anchor 800, leaving a suture 808 attached to the anchor 800 and extending through the soft tissue 804. The anchor 800 may be inserted into bone 806 by tapping on the inserter 802 with a hammer or by any other suitable means of applying axial force. FIG. 16C depicts the deployed anchor 800 with attached suture 808. The suture 808 will extend into the inserter 802.

13

Next, as depicted in FIG. 16D, a suture capturing anchor **810** is inserted into the bone **806** using the inserter **812** as described above. In FIG. 16E, the inserter **812** is then retracted to expose the suture capturing mechanism. The suture **808** is then passed over the soft tissue **804** and laterally moved into the suture capturing mechanism and tensioned. Finally, as depicted in FIG. 16F, the suture capturing mechanism is deployed to capture the suture **808**, the anchor inserter **812** is detached from the anchor **810**, and the suture **808** is cut to detach it from the suture inserter **802**. The result is a length of suture **808** between the bone anchors **808** and **810** that presses the soft tissue **804** against the bone **806**. Multiple anchors and sutures may be used to produce geometries such as depicted in FIGS. **2** and **3** and variations thereof.

It will be appreciated that there are numerous stitches, suture threading patterns, and anchor patterns that may be used to secure soft tissue to bone by the methods and devices described herein. These variations as well as variations in the design of the above described anchor devices and inserter devices are within the scope of the present disclosure.

Methods of Attaching Soft Tissue to Bone

Various embodiments include methods for attaching soft tissue to bone. In some embodiments, the methods include using the bone anchors described above. In one embodiment, a bone anchor is inserted into the bone and then a length of suture is passed over the soft tissue and secured to the anchor after inserting the anchor without tying any knots or without passing the suture through an aperture in the anchor. In some embodiments, the suture is secured to the anchor by laterally moving it into a securing mechanism. In one embodiment, securing the suture to the anchor includes clamping the suture between at least two surfaces on the anchor. In one embodiment, the anchor is not inserted further into the bone after securing the suture to it.

In another embodiment, a first anchor with a suture pre-attached is inserted through the soft tissue and into the bone. The suture may then be passed over the soft tissue and fixedly secured to a second bone anchor. In one embodiment, the first anchor is inserted by directly piercing the soft tissue and the bone. In one embodiment, lateral protrusion may be deployed on the first anchor to prevent the first anchor from being removed. In one embodiment, the suture may be coupled to the second bone anchor prior to insertion and then fixedly secured after insertion. In this context, "coupled" means that the suture is attached to the bone anchor but not fixedly secured, such that the suture can move to some extent relative to the bone anchor. In an alternative embodiment, the suture is not coupled to the second bone anchor during its insertion.

In another embodiment, a first portion of suture is inserted into the proximal surface of the soft tissue. A second portion of the suture (e.g., the portion proximal to the inserted portion) is then passed over the proximal surface of the soft tissue and fixedly secured to a bone anchor. In one embodiment, the procedure may be performed without passing the first portion of the suture back out of the proximal surface of the soft tissue. In one embodiment, this result is accomplished by the first portion of the suture being attached to an anchor that is inserted through the soft tissue and into bone.

One embodiment includes inserting a first anchor with a pre-coupled suture through soft tissue and into bone. The suture may then be passed over the soft tissue and fixedly secured to a second anchor. In one embodiment, the pre-coupled suture is fixedly secured to the first anchor prior to insertion. In an alternative embodiment, the pre-coupled suture can move relative to the first anchor prior to insertion and is fixedly secured after insertion.

14

In another embodiment, multiple lengths of suture are attached to multiple anchors. In one embodiment at least three anchors are inserted into bone. A first length of suture may be secured between a first and second anchor and a second length of suture may be secured between the first and a third anchor. In one embodiment, the first anchor is positioned beneath the soft tissue and the second and third anchors are positioned laterally to the soft tissue. In an alternative embodiment, the first anchor is positioned laterally to the soft tissue and the second and third anchors are positioned beneath the soft tissue. In some embodiments, the lengths of suture are fixedly secured to the anchor(s) positioned beneath the soft tissue prior to insertion of those anchor(s). In one embodiment, the different lengths of suture may be tensioned separately.

In various embodiments, prior to fixedly securing suture to a bone anchor, it can be tensioned. In one embodiment, tensioning is accomplished by manually pulling on the suture such as by a surgeon grasping the suture using an appropriate instrument and then pulling. In one embodiment, the suture may be pressed against the bone anchor to provide leverage for pulling. For example, the suture may be wrapped partly around a proximal portion of the anchor prior to pulling.

Although the invention has been described with reference to embodiments and examples, it should be understood that numerous and various modifications can be made without departing from the spirit of the invention. Accordingly, the invention is limited only by the following claims.

What is claimed is:

**1**. A method of attaching soft tissue to bone, comprising:
 inserting a first anchor into bone, wherein after insertion, the first anchor is positioned underneath the soft tissue;
 passing a first length of suture from said first anchor over the soft tissue;
 inserting at least a portion of a second anchor into bone at a position beyond an edge of the soft tissue;
 after inserting said at least a portion of the second anchor, tensioning the first length of suture to compress an area of tissue to bone between the edge of the soft tissue and the first anchor; and
 after tensioning the first length of suture, fixedly securing the first length of suture at the second anchor position without tying any knots;
 wherein at least one of said anchors comprises an anchor tip and a hollow cylinder, wherein the anchor tip comprises an aperture through which suture material is threaded prior to insertion of the at least one anchor.

**2**. The method of claim **1**, wherein said anchor tip comprises an engaging member adapted to engage an inner surface of said cylinder.

**3**. The method of claim **1**, wherein said anchor tip comprises an anchor inserter attachment member.

**4**. The method of claim **3**, wherein insertion of the at least one anchor comprising an anchor tip and a hollow cylinder comprises using an inserter that comprises a handle, an outer sleeve, and an inner member, wherein the inner member extends through the outer sleeve and the hollow cylinder and is attached to the anchor inserter attachment member.

**5**. The method of claim **4**, wherein the inserter comprises an inner tube extending through the outer sleeve and through the hollow cylinder and contacts the anchor tip, wherein the inner member extends through the inner tube.

**6**. The method of claim **5**, wherein the inner tube is fixed relative to the handle.

**7**. The method of claim **5**, wherein the inner tube is movable axially relative to the outer sleeve.

A000183

US 8,109,969 B1

## 15

**8**. The method of claim **5**, wherein suture material runs from inside the handle of the inserter, through the inner tube, and through the aperture in the anchor tip.

**9**. The method of claim **8**, wherein the suture material runs through a bore in the handle and passes through a hole in an end of the handle.

**10**. The method of claim **9**, wherein the handle comprises a spool at a proximal end of the handle adapted to hold excess suture.

**11**. The method of claim **10**, wherein the suture material is wrapped around the spool.

**12**. The method of claim **11**, wherein the spool is integral with the handle.

**13**. The method of claim **4**, wherein insertion of the at least one anchor comprising an anchor tip and a hollow cylinder comprises tapping on the inserter with a hammer.

**14**. The method of claim **1**, comprising coupling the first length of suture to the at least one anchor comprising an anchor tip and a hollow cylinder prior to inserting the at least one anchor comprising an anchor tip and a hollow cylinder.

**15**. The method of claim **1**, wherein the tensioning comprises manually pulling on the first length of suture.

**16**. The method of claim **1**, comprising:

inserting a third anchor into bone, wherein after insertion, the third anchor is positioned underneath the soft tissue;

passing a second length of suture from said third anchor over the soft issue;

tensioning the second length of suture independently from the first length of suture; and

after tensioning the first and second lengths of suture, fixedly securing both the first and second lengths of suture at the second anchor position without tying any knots.

## 16

**17**. A method of attaching soft tissue to bone, comprising:

inserting a first anchor into bone, wherein after insertion, the first anchor is positioned underneath the soft tissue;

passing a first length of suture from said first anchor over the soft tissue at a position beyond an edge of the soft tissue;

inserting at least a portion of a second anchor into bone at a position beyond an edge of the soft tissue;

after inserting said at least a portion of the second anchor, tensioning the first length of suture to compress an area of tissue to bone between the edge of the soft tissue and the first anchor; and

after tensioning the first length of suture, fixedly securing the first length of suture at the second anchor position without tying any knots;

wherein at least one of said anchors comprises an anchor tip and a hollow cylinder, wherein the anchor tip comprises:

an aperture through which suture material is threaded prior to insertion of the at least one anchor,

an engaging member adapted to engage an inner surface of said cylinder, and

an anchor inserter attachment member, wherein insertion of the at least one anchor comprising an anchor tip and a hollow cylinder comprises using an inserter that comprises a handle, an outer sleeve, and an inner member, wherein the inner member extends through the outer sleeve and the hollow cylinder and is attached to the anchor inserter attachment member.

\* \* \* \* \*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on    Jun 23, 2014
by:

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
   (by email or CM/ECF)

Robert W. Dickerson
_____
Name of Counsel

/s/ Robert W. Dickerson
_____
Signature of Counsel

Law Firm   DICKSTEIN SHAPIRO LLP

Address   2049 Century Park East, Suite 700

City, State, ZIP   Los Angeles, CA 90067-3109

Telephone Number   (310) 772-8317

FAX Number   (310) 772-8301

E-mail Address   DickersonR@dicksteinshapiro.com

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

## <u>CERTIFICATE OF COMPLIANCE</u>

Defendant-Appellants' Brief is submitted in accordance with Rule

32(a)(7)(B)(i) of the Federal Rules of Appellate Procedure.  The Brief contains

13,853 words, as determined by Microsoft Word.


Dated:  June 23, 2014                    By:  /s/ Robert W. Dickerson

                                              Robert W. Dickerson
                                              DICKSTEIN SHAPIRO LLP
                                              2049 Century Park East, Suite 700
                                              Los Angeles, CA 90067-3109
                                              Tel.: (310) 772-8317
                                              DickersonR@dicksteinshapiro.com

                                              Counsel for Defendant-Appellee